1

**PORTER | SCOTT**

2
A PROFESSIONAL CORPORATION
Carl L. Fessenden, SBN 161494

3
Matthew W. Gross, SBN 324007
350 University Ave., Suite 200

4
Sacramento, California 95825
TEL: 916.929.1481

5
FAX: 916.927.3706

6
Attorneys for Defendants SACRAMENTO COUNTY, BENJAMIN GONZALES, JARROD

7
HOPECK, ROBERT RANUM and JEFFREY WILSON

8
UNITED STATES DISTRICT COURT

9
EASTERN DISTRICT OF CALIFORNIA

10

11
ALEXSEY PREDYBAYLO, an individual,          CASE NO.   2:19-CV-01243- MCE-CKD

12
                    Plaintiff          **INDEX OF EXHIBITS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

13
v.

14
SACRAMENTO COUNTY, CALIFORNIA,          Date: November 18, 2021

15
a county government and the operator of the          Time: 2:00
Sacramento County Sheriff's Department          Location: Courtroom 7, 14th floor

16
and its Correctional Health Services
Division; and Does 1 through 20,

17

18
                    Defendants.          FAC Filed: 8/29/19

19
_____/          Complaint Filed:  07/02/2019

20

21
          Defendants submit the following index of exhibits:

22
Exhibit A:     Plaintiff Alexsey Predybaylo's Deposition

23
Exhibit B:     Jarrod Hopeck Deposition

24
Exhibit C:     Robert Ranum Deposition

25
Exhibit D:     Benjamin Gonzales Deposition

26
Exhibit E:     Jeffrey Wilson Deposition

27
Exhibit F:     Andy Hall Deposition

28
Exhibit G:     Orrlando Mayes Deposition

PORTER | SCOTT
350 University Ave., Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

{02464747.DOCX}                    1

1   Exhibit H:      Inmate Booking Information Receipt

2   Exhibit I:      Main Jail Video – Entrance to Booking Area - DEF 368

3   Exhibit J:      Main Jail Video – Booking Area - DEF 370

4   Exhibit K:      Main Jail Video – Booking Area Paper Processing - DEF 371

5   Exhibit L:      Main Jail Video – Medical Screening - DEF 372

6   Exhibit M:      Main Jail Video – Booking Photo Area - DEF 373

7   Exhibit N:      Main Jail Video – Hallway Outside Safety Cell #2 - DEF 375

8   Exhibit O:      Main Jail Video – Inside Safety Cell #2 - DEF 376

9   Exhibit P:      Medical Intake Screening

10  Exhibit Q:      Operations Order – Prisoner Strip Searches

11  Exhibit R:      PF-10 Report

12  Exhibit S:      Operations Order – Use of Force

13  Exhibit T:      General Order – Use of Force

14

15  Dated:  October 19, 2021                    PORTER SCOTT
                                                A PROFESSIONAL CORPORATION
16

17                                              By  _/s/ Matthew W. Gross_____
                                                        Carl L. Fessenden
18                                                      Matthew W. Gross
                                                        Attorneys for Defendants
19

20

21

22

23

24

25

26

27

28

PORTER | SCOTT
350 University Ave., Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

INDEX OF EXHIBITS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# EXHIBIT A

1                     UNITED STATES DISTRICT COURT

2                     EASTERN DISTRICT OF CALIFORNIA

3                            ---oOo---

4

5      ALEXSEY PREDYBAYLO,

6                     Plaintiff(s),

7          v.                        No. 1:19-CV-01243-MCE-CKD

8      SACRAMENTO COUNTY, CALIFORNIA,

       A COUNTY GOVERNMENT AND THE

9      OPERATOR OF THE SACRAMENTO

       COUNTY SHERIFF'S DEPARTMENT

10     AND ITS CORRECTIONAL HEALTH

       SERVICES DIVISION; AND DOES

11     1 THROUGH 20,

12                    Defendant(s).

       _____/

13

14                  VIDEOTAPED DEPOSITION OF

15                    ALEXSEY PREDYBAYLO

16

                    FRIDAY, JULY 9, 2021

17

18

19

20     Reported by:

       KAREN A. URBANO, CSR License No. 6698

21     Registered Professional Reporter

       Job No:  4664016

22

23

24

25

                                              Page 1

1    wearing glasses that day?

2    A.      No.

3    Q.      Do you have any hearing-aids?

4    A.      No.

5    Q.      Did you have hearing-aids back in July 2017?   10:23

6    A.      No.

7    Q.      Do you recall you or your attorney filing a

8    complaint against Sacramento County and some

9    individual deputies in this case?

10   A.      Yeah.                                          10:24

11   Q.      And what was the date of the incident that

12   you're alleging your injuries or wrong occurred?

13   A.      July 5th.

14   Q.      And what year was that?

15   A.      2017.                                          10:24

16   Q.      And on July 5th, 2017, were you on probation?

17           MR. DWYER:  Objection, relevance, lack of

18   probative value.  Go ahead and answer.

19           THE WITNESS:  Yes.

20   Q.      BY MR. GROSS:  And what were you on probation  10:24

21   for?

22           MR. DWYER:  Objection, relevance, lack of

23   probative value and instruct him not to answer that

24   question.

25   Q.      BY MR. GROSS:  Did your probation have any     10:24

Page 25

1    conditions, such as, you couldn't possess weapons?

2              MR. DWYER:  You can answer that but don't --

3    don't state what the conditions were.

4              THE WITNESS:  Yes.

5    Q.      BY MR. GROSS:  Do you know who owns the          10:24

6    Instagram account at slimey1ZZZ?  I'm going to spell

7    it out S-L-I-M-E-Y-1-Z-Z-Z.

8              MR. DWYER:  Objection, relevance.  Counsel,

9    what does that have to do with anything involving a

10   strip search at the jail?                              10:25

11   Q.      BY MR. GROSS:  We'll get to that.  I've got

12   to build my foundation.  Go ahead.

13   A.      I do or did.

14   Q.      Does anyone else have access to that account,

15   or is that yours that you use?                         10:25

16   A.      No, that was mine.

17   Q.      Do you recall ever posting pictures of

18   yourself holding a firearm on that account in 2017?

19             MR. DWYER:  Objection, relevance, lack of

20   probative value, potentially highly prejudicial.  It   10:25

21   has no relevance to the case.  Instruct you not to

22   answer that question.

23   Q.      BY MR. GROSS:  Do you recall posting a

24   picture of a black handgun and AR pistol sitting on

25   top of a bed on June 26, 2017?                         10:25

Page 26

1              MR. DWYER:  Same objection, lack of

2     relevance, lack of probative value, highly

3     prejudicial, again has no bearing on any issue in the

4     case.  Instruct you not to answer.

5     Q.      BY MR. GROSS:  Were you on parole on          10:29

6     July 5th, 2017, when you posted pictures of you with

7     the AR 15?

8              MR. DWYER:  Objection, assumes facts not in

9     evidence.  Instruct him not to answer any questions

10    about what he posted --

11             THE COURT REPORTER:  I can't hear you.

12             MR. DWYER:  I'm sorry, madam reporter.  And I

13    have instructed him not to answer any questions

14    regarding posting items on Instagram account.  They're

15    not relevant to the case.  They're potential for       10:30

16    prejudice.  They have no probative value.  And on that

17    basis, I instruct him not to answer that.

18             I believe my counsel -- my client has

19    answered it.  But if you need to ask him again, was he

20    on probation at the time of the arrest on July 5th,    10:30

21    that's a legitimate question, and he can answer that

22    question.

23    Q.      BY MR. GROSS:  I think I'll just ask it again

24    to make sure.

25             Were you on probation -- not asking any more  10:30

                                        Page 30

1    specific, just a yes or no, were you on probation on

2    July 5th, 2017?

3    A.       Yes.

4    Q.       At some point, did you see a Sacramento

5    Police Department Officer in the parking lot of the          10:31

6    Carmel Pointe Apartment Complex?

7            MR. DWYER:  Objection, relevance, has no

8    bearing on the issues in the case.  I think he can

9    answer that question, but it's not relevant.

10           THE WITNESS:  Yeah, I seen him.                      10:31

11   Q.       BY MR. GROSS:  And what did you do when you

12   saw him?

13           MR. DWYER:  Objection, relevance, lacks

14   probative value, potentially prejudicial to client,

15   has no bearing on the issues in the case.  Instruct        10:31

16   you not to answer.

17   Q.       BY MR. GROSS:  Do you recall seeing the

18   Sacramento police officer at approximately 3:22 in the

19   afternoon on July 5th, 2017?

20           MR. DWYER:  Objection, relevance, but you can      10:31

21   answer that.

22           THE WITNESS:  Yes.

23   Q.       BY MR. GROSS:  Were you in a gray Honda Pilot

24   at the apartment complex, Carmel Pointe Apartment

25   Complex, on July 5th, 2017, in the afternoon?              10:32

Page 31

1          MR. DWYER:  Objection, relevance.  You can go

2     ahead and answer.

3          THE WITNESS:  Yes.

4     Q.     BY MR. GROSS:  Did Sacramento PD officer

5     Sergeant Hall say anything to you in the parking lot     10:32

6     on July 5th, 2017?

7          MR. DWYER:  Objection, relevance, lack of

8     probative value.  I don't see it as being highly

9     prejudicial but -- you can answer that.

10          THE WITNESS:  Can you repeat the question?     10:32

11     Q.     BY MR. GROSS:  Did Sergeant Hall say anything

12     to you while you were in the parking lot of the

13     apartment complex?

14          MR. DWYER:  He just wants to know if Sergeant

15     Hall spoke to you.                                     10:33

16          THE WITNESS:  No.

17     Q.     BY MR. GROSS:  Did you have a backpack in

18     your possession while you were in the parking lot of

19     the apartment complex?

20          MR. DWYER:  Objection, relevance.  You can     10:33

21     answer that.

22          THE WITNESS:  Yes.

23     Q.     BY MR. GROSS:  And what was in the backpack?

24          MR. DWYER:  Objection, relevance and instruct

25     you not to answer.  It has no bearing on the case.     10:33

                                        Page 32

1      There's nothing involved here in the case.  This is a

2      way to try to get around prior instructions to not

3      discuss the nature of the charges.

4              Client has stipulated he was charged with

5      felonies on that July 5th, the nature of which are not      10:33

6      pertinent to this case.  Instruct you not to answer

7      about the contents in the bag.

8      Q.      BY MR. GROSS:  Were you eventually arrested

9      by Sacramento PD Sergeant Hall?

10             MR. DWYER:  No objection.  Go ahead.              10:33

11             THE WITNESS:  Yes.

12     Q.      BY MR. GROSS:  I'm going to ask it anyway for

13     the record.

14             Did Sergeant Hall confiscate anything from

15     you when he arrested you?                                  10:34

16             MR. DWYER:  Objection, lack of probative

17     value.  There is no relevance to the case, issues that

18     we're trying and instruct you not to answer.

19             MR. GROSS:  I'm going to introduce Exhibit A

20     as my first exhibit.                                       10:34

21                 (Exhibit A was marked.)

22     Q.      BY MR. GROSS:  You should have a copy in

23     front of you there.  If you want, we can put it up on

24     the screen as well, but maybe we don't need it right

25     now.                                                       10:34

                                                      Page 33

1   Q.       BY MR. GROSS:  And how were you not

2   cooperative?

3            MR. DWYER:  Same objection, relevance.  Go

4   ahead and answer.

5            THE WITNESS:  I ran.                        10:39

6   Q.       BY MR. GROSS:  Other than running, was there

7   any other uncooperativeness, or was that sort of the

8   only thing?

9            MR. DWYER:  Objection, relevance.  Go ahead

10  and answer.                                          10:39

11           THE WITNESS:  No, that was the only thing.

12  Q.       BY MR. GROSS:  While you were being -- so

13  after that, where did you go next?

14  A.       To the jail.

15  Q.       And who transported you to the jail?        10:39

16  A.       Sergeant Hall.

17  Q.       Were you cooperative with him during the

18  transportation in the patrol car?

19  A.       Yes.

20  Q.       And you went to the Main Jail, which is the  10:39

21  one downtown?

22  A.       Yes.

23  Q.       Not RCCC out in the country?

24  A.       No.

25  Q.       Do you recall what time you were brought into 10:40

                                                    Page 37

1    the Main Jail?

2    A.       No, I don't recall.

3    Q.       I have some video later to sort of go over

4    time but just if you remembered off of your memory.

5    So once being brought into the Main Jail, what happens   10:40

6    next?

7    A.       In general --

8             MR. DWYER:  Objection, you're asking him to

9    describe a large general question.  Do you want to ask

10   him what his booking process was, what his memory of   10:40

11   that is.  I have no objection to that.

12   Q.       BY MR. GROSS:  What -- what was the first

13   step of the booking process after you're let out of

14   the patrol car at the Main Jail, what happens next?

15   A.       I believe they take your shoelaces, your belt   10:40

16   and you wait to go to medical.

17   Q.       And did you go through a medical screening

18   process?

19   A.       Yes.

20   Q.       And that was after the initial taking your   10:41

21   shoelaces and belt?

22   A.       Yes.

23   Q.       Were you cooperative during the medical

24   screening process?

25   A.       Yeah, I recall I believe I was cooperative.   10:41

                                              Page 38

1      A.        Well, they just ask you if you have any pain,

2      or you're injured.  And they ask you questions about

3      your health, and yeah.

4      Q.        And then they document it in this, looks

5      like, six-page --                                    10:45

6      A.        Yeah.

7      Q.        -- document.  And if you look at the top

8      right, there's a screen date and time that says

9      July 5th, 2017/1712 hours.  Does this look to be about

10     the time that you were going through the medical     10:45

11     intake?

12     A.        I don't -- I don't recall.  I mean if that's

13     what it says, yeah.  I lose track of time.  I lost,

14     you know --

15     Q.        No reason to believe that it's inaccurate   10:45

16     that you were in the jail in the morning, and this is

17     at 5:12 p.m.?

18     A.        Oh, yeah, not -- no reason to believe that.

19               MR. DWYER:  Mr. Gross, may I just ask my

20     client a question to help us in the future questions.  10:46

21     Do you know how to read 24-hour time like 1712 as

22     being 5:12?

23               THE WITNESS:  Yeah.

24               MR. DWYER:  Okay.  All right.  I just want to

25     make sure you understand that.                       10:46

                                                    Page 41

1    Jail in the medical intake, were you experiencing

2    withdrawal from Xanax?

3    A.      No, I don't recall.  I can't recall.

4    Q.      Did you -- on July 5th, 2017, did you take

5    any opiates?                                      10:48

6    A.      No.  Sorry.

7            MR. DWYER:  He's already answered.  You said

8    no, right.

9    Q.      BY MR. GROSS:  Were you experiencing

10   withdrawal symptoms on July 5th, 2017, while you were   10:48

11   at the Main Jail?

12           MR. DWYER:  Objection, relevance, has no

13   probative value, potentially prejudicial to my client,

14   but go ahead and answer.

15           THE WITNESS:  I can't recall.            10:48

16   Q.      BY MR. GROSS:  Is there any reason to believe

17   that the information in this medical intake screening

18   is inaccurate?

19           MR. DWYER:  Well, counsel, you're asking him

20   about the whole document, six or seven pages.  You     10:48

21   want him to stop and read all that, or you want him to

22   take it page by page?  We can stop for five minutes,

23   and he can read through and answer that question.

24   Q.      BY MR. GROSS:  Looking at specifically number

25   seven and number eight, is there anything on those --   10:48

Page 43

1      on those numbers that is -- that you believe to be

2      inaccurate?

3              MR. DWYER:   Look at that and look at that.

4      You can break it up into two answers.

5              THE WITNESS:   Well, I don't know about the --   10:49

6      I wouldn't -- yeah, I mean I don't understand how this

7      will be like a withdrawal evaluation thing, like, as

8      far as, they didn't necessarily ask me, are you

9      withdrawing.

10             They just -- they ask you, have you done        10:49

11     opiates or Xanax in the last five or, you know,

12     certain amount of time.   But they necessarily don't

13     ask you are you withdrawing.   It's just -- it's just a

14     withdraw column, you know what I mean, but there's no

15     other way -- you know, when they ask you, have you     10:50

16     been taking Norco in the last two weeks, they put it

17     down right here.

18             But they didn't necessarily ask me, are you

19     withdrawing.   They just -- you know, they just said,

20     have you taken Norco, and then, yes.   But it          10:50

21     doesn't -- it doesn't ask me nowhere, nor do I

22     remember them asking, are you withdrawing.

23     Q.      BY MR. GROSS:   So they just asked you -- the

24     medical intake person, whoever that was, just asked

25     you the question as it's identified under number seven  10:50

Page 44

1    and number eight?

2    A.        Yeah, I believe so.   If I recall, they just

3    asked me, have you taken Norco or Xanax in the last

4    two weeks.   They didn't ask me, are you withdrawing.

5    Q.        Do you recall if you felt like you were          10:50

6    withdrawing from Xanax or Norco on July 5th?

7    A.        I can't recall.

8    Q.        I want to take you to the next page number 13

9    under comments.

10             MR. DWYER:  Counsel, I'm a little confused.     10:51

11   Where are we at now?  On the same document?

12             MR. GROSS:  Yeah.

13             MR. DWYER:  And what page now?

14             MR. GROSS:  The next page.

15             MR. DWYER:  Is there a number on the bottom?   10:51

16             MR. GROSS:  Yeah, number 13.

17             MR. DWYER:  130.

18             MR. GROSS:  13, it says, comments.

19             MR. DWYER:  Oh, okay.  You're looking at the

20   form.  I was looking at the Bates number.  All right.   10:51

21   Thank you.  Yeah.  Go ahead.

22             THE WITNESS:  What was the question again?

23   Q.        BY MR. GROSS:  So I just want to give you a

24   moment to read number 13 to the best of your ability.

25   A.        Okay.  Okay.                                    10:52

Page 45

1    Q.        It looks like to me, and correct me if I'm

2    wrong, it says -- I can't read that first part --

3    "states he scraped his knee right while running from

4    the police, superficial" -- unintelligible word --

5    "noted without D/C."                                      10:52

6              MR. DWYER:  Counsel, just to help, I believe

7    that unintelligible word is "abrasion."

8    Q.        BY MR. GROSS:  Thank you.

9              And then it looks like on the next line

10   there's something about benzo and opiate detox and       10:52

11   right knee.  Do you see that?

12   A.        Um-hmm.

13   Q.        Is this information that you communicated to

14   the medical intake screening person?

15   A.        I didn't necessarily say that, but they -- I    10:53

16   believe that if you've been -- if you fall into these

17   questions, either yes or no, if you been taking the

18   last two weeks, I believe they mark down as detox

19   because you've been -- you've been, you know, doing it

20   the last in some time the last two weeks.                 10:53

21   Q.        How did the screening person learn of the

22   injuries to your right knee?

23   A.        Because when I first came in, I was limping;

24   and then I told her right away that I was limping

25   because I didn't want any misunderstandings.              10:53

Page 46

1   Q.      And what did you tell her specifically?

2   A.      That when I -- when I ran, I fell; and I hit

3   my knee.

4   Q.      And it's when you ran from --

5   A.      Sergeant Hall.                              10:54

6   Q.      I'm going to take you two pages now.  It's

7   labeled at the bottom DEF 132.  It looks like this?

8   A.      Okay.

9   Q.      And under the disposition, there's a checked

10  box on, "priority flex nurse appointment referral    10:54

11  made."  Do you see that?

12  A.      Um-hmm.

13  Q.      Do you know what that means?

14  A.      No, I don't know what it means.

15  Q.      Next to that it says, "benzo/opiate detox."   10:54

16  Do you see that?

17  A.      Yeah.

18  Q.      Was a priority flex nurse appointment made

19  based on the benzo/opioid detox?

20          MR. DWYER:  Objection, calls for -- question   10:55

21  calls for him to speculate.  There's been no --

22  nothing to establish that he had -- he needed a detox

23  or was currently then under the influence.

24          So if you want to ask him whether he recalls

25  he was under the influence at that time or had asked   10:55

1           THE WITNESS:  No, I don't know the answer.

2    Q.      BY MR. GROSS:  Is there any estimate you can

3    give for why you think a priority flex nurse

4    appointment referral was made?

5    A.      I mean because it says in the last two weeks    10:57

6    if you've done anything and obviously -- obviously,

7    I've said, yeah.  So I think that's probably why.  I

8    believe there's a window period of two weeks.  And

9    then if you have, then they put you on flex -- I don't

10   know.  I'm not too familiar with all that stuff.           10:57

11   Q.      And then I want to take you to the last page

12   of Exhibit B down at the bottom.  Do you see a portion

13   where it says, "medical screening completed?"

14   A.      Yes.

15           MR. DWYER:  Hold on a second.  Oh, I see it.    10:57

16   Thank you, counsel.

17   Q.      BY MR. GROSS:  And what check box there is

18   filled?

19   A.      Below it?

20   Q.      Yes.                                                10:58

21   A.      Says, "cleared, no wristband."

22   Q.      And what is your understanding of being --

23   during the medical health screening being cleared?

24   What does that mean?

25   A.      I guess I have no serious injuries when I       10:58

1    came in to Sacramento County Jail at that moment.

2    Q.      And on the bottom right, there's a time and

3    date.  Do you believe that to be correct for when you

4    were done with the medical health screening?

5    A.      Yeah.                                          10:58

6    Q.      Okay.  How long do you recall the medical

7    health screening process lasting?

8    A.      It's hard to say.  I don't recall how long it

9    took.

10   Q.      Five minutes, an hour?                         10:58

11   A.      I mean in there five minutes feels like an

12   hour sometimes.  I don't know.  It's hard to say.  You

13   lose track of time quickly.

14   Q.      What's the next step of the booking process

15   after going through the medical screening?            10:59

16   A.      I believe it's to the photo, get a photo.

17   Just every now and then, they do it differently.  So I

18   don't -- I don't necessarily know.

19   Q.      And do you recall during the medical

20   screening process, how many Sacramento County         10:59

21   Sheriff's Deputies were interacting with you?

22   A.      During -- during the medical screening, you

23   said?

24   Q.      Yeah.

25   A.      I can't recall.                                10:59

Page 50

1      Q.      One, more than one?

2      A.      I don't know.  I can't recall.

3      Q.      All right.  So how many deputies escorted you

4      to have your photo taken?

5      A.      I can't recall.  I haven't seen that video in      11:00

6      a while.

7      Q.      Okay.  And we'll -- we'll get to that.  I'm

8      not trying to trick you in any way.

9              Do you recall being handcuffed while you were

10     walking to the photo area?                               11:00

11     A.      Yeah, I believe so, yeah.

12     Q.      And then what does the photo area involve

13     during the booking process?

14     A.      Fingerprint and photo -- getting your photo

15     took.                                                    11:00

16     Q.      And how long does that process usually take?

17     A.      I don't know, maybe couple minutes, five

18     minutes.  I don't know.

19     Q.      Were you cooperative while you were having

20     your photo taken?                                        11:01

21     A.      Yes, sir.

22     Q.      Did you ever flinch while deputies were

23     holding you during the photo session?

24     A.      I don't recall flinching.  My leg was

25     injured.  So I might have shifted my body weight, or     11:01

Page 51

1    my pants were falling down.   But I don't recall

2    flinching.

3    Q.        Do you recall -- did any Sacramento County

4    Deputy say anything to you while the photo -- while

5    the photo process was happening?                        11:01

6    A.        I don't remember him saying anything to me,

7    but I do recall him maybe reaffirming his grip on my

8    arm or something.   But, as far as saying anything to

9    me, I don't recall.

10   Q.        And was -- was this deputy reaffirming his    11:01

11   grip because of this leg shift?

12   A.        Yeah, I believe so.

13   Q.        But nothing was said?

14   A.        I can't -- I can't -- I can't recall if

15   anything was said.                                      11:02

16   Q.        Did you say anything to any deputies

17   during -- during the photo process?

18   A.        I can't recall.

19   Q.        After the photo -- after you get your photo

20   taken, you get the fingerprints done.   What's the next  11:02

21   step of the booking process?

22   A.        Go back in the holding cell and then -- and

23   you wait and gather up more people, and they take you

24   and strip search you.

25   Q.        And have you ever been strip searched at the  11:03

                                                    Page 52

1     the other cell and wait for them to shoot you

2     upstairs.

3              MR. GROSS:  This looks like a good spot.  I'm

4     going to take a break.  Let's go off the record.

5              THE VIDEOGRAPHER:  The time is 11:08 a.m.  We   11:08

6     are off the record.

7              (Whereupon a recess was taken.)

8              THE VIDEOGRAPHER:  The time is 11:16 a.m.  We

9     are on the record.

10    Q.       BY MR. GROSS:  Mr. Predybaylo, I want to talk   11:16

11    about now specifically the July 5th, 2017, incident,

12    not the sort of your prior experience, so now what

13    happened in this incident.

14              So you testified previously about the intake

15    booking process, going through the medical screening,   11:16

16    the photo area.  At some point were you taken to a

17    safety cell to be strip searched?

18    A.       Yes.

19    Q.       How did you become aware that you were going

20    to become strip searched?                               11:16

21    A.       I think Sergeant Hall mentioned something

22    about taking my clothes for evidence.  So -- well, no,

23    I guess I didn't know I was going to be strip searched

24    at that moment.  It was just supposed to be taking my

25    clothes for evidence.  I don't -- I don't know.  Yeah,  11:17

                                                Page 56

1       Q.      Was it in the safety cell?

2       A.      Yeah.

3       Q.      So once you were in the safety cell, you

4       realized, I'm going to be strip searched?

5       A.      Yeah.                                           11:23

6       Q.      And so you weren't aware while your

7       photographs and fingerprints were being taken that you

8       needed to be strip searched?

9       A.      It's been a long time.  I can't recall.

10      Yeah, I don't know.  I can't recall.                    11:23

11      Q.      Did you say anything to any deputies as they

12      were escorting you from the photograph and fingerprint

13      area to the safety cell to be strip searched?

14      A.      I can't recall.

15      Q.      Did they say anything to you?                   11:23

16      A.      I can't recall.

17      Q.      Do you recall being cooperative as they were

18      escorting you to the safety cell?

19      A.      Yeah.

20      Q.      How many -- how many deputies were in the      11:24

21      safety cell to assist in the strip search?

22      A.      Four, as I recall correctly, four.  My best

23      recollection, four.

24      Q.      In your prior strip searches at the Main Jail

25      that we talked about before, how many deputies would   11:24

Veritext Legal Solutions
866 299-5127

1    routinely be involved in a strip search?

2    A.      One.

3    Q.      Do you know why four deputies needed to be

4    involved in this strip search?

5    A.      Hmm-um, I don't know.                    11:24

6    Q.      So you have no understanding as to why there

7    needed to be four in that safety cell?

8    A.      No, I can't recall.

9    Q.      Can you -- have you ever been to the safety

10   cell where you were strip searched on July 5th, 2017,   11:25

11   previously?

12   A.      No, I can't recall that.  I don't think so.

13   Q.      To the best of your knowledge, that was the

14   first time you had been in that specific area of the

15   jail?                                            11:25

16   A.      Yes.

17   Q.      And so what -- can you describe to me what --

18   what that cell looks like?

19   A.      I know it had a drain in the middle of it.

20   That's about all I can really remember.          11:25

21   Q.      Do you know how long and wide the cell is?

22   A.      It's not -- I mean it's not that big,

23   generally a little smaller than the regular cell

24   upstairs.

25   Q.      And do you know what the walls are made of?   11:25

                                        Page 62

```
1    A.       No, I don't know.

2    Q.       Do you know what the floor is made out of?

3    A.       No, I don't know.

4    Q.       Okay.  While you were being escorted to the

5    safety cell, were you still in handcuffs?              11:26

6    A.       Yeah, to the best of my recollection, yeah, I

7    believe I was in handcuffs.

8    Q.       At what point do you recall the handcuffs

9    were taken off?

10   A.       Prior to them -- prior to them taking my      11:26

11   clothes.

12   Q.       So while you were in the safety cell, at some

13   point the handcuffs were removed?

14   A.       Yeah.

15   Q.       Do you recall speaking with any of the        11:26

16   deputies as you were walking into the safety cell?

17   A.       No, I don't recall.

18   Q.       Do you recall anything as they're escorting

19   you into the safety cell, did they say anything to

20   you?                                                   11:26

21   A.       No, I don't recall.

22   Q.       Once you got into the safety cell, what

23   happened?

24   A.       Once I got in the safety cell, to my best --

25   to the best of my recollection, I got in the safety    11:27
```

Page 63

1    cell.  They uncuffed me.  They told me to take one

2    clothes off at a time.  I believe, the best of my

3    recollection, I took my shirt and socks and shoes off

4    first.

5          And that's when Deputy Hopeck told me to put   11:27

6    my hands behind my back, and I was confused about it.

7    And then he told me -- and then he -- he wrapped his

8    hands around my thumbs -- wrapped his hand -- I had my

9    hands behind my back, and he told me to relax your

10    thumbs.   11:27

11          And then once I told him, "my thumbs are

12    relaxed," and then he yelled, "I said, relax your

13    f'ing thumbs."  And then that's when the other two

14    officers -- I believe it was Ranum and Gonzales --

15    they pulled my pant legs out from under me.   11:28

16          And I went head first, and I hit my head on

17    the ground.  And then Hopeck dropped his knee --

18    dropped his knee on my temple and then had me pinned

19    down to the ground.  And you want me to get into

20    the -- everything or --   11:28

21    Q.     You've given me a lot to digest and break

22    down from there.

23          MR. DWYER:  So you want him to stop for now?

24    Q.     BY MR. GROSS:  Yes, yes, that would be good.

25          Did any of the deputies order you to face the   11:28

Page 64

1    wall once you got into the safety cell?

2    A.       I don't recall them -- see that video that

3    you're talking about, I haven't seen it.  My attorney

4    notified me about it.  I haven't seen it.  I

5    haven't -- like I haven't seen it in a while.  I seen      11:28

6    it years ago when it first -- when I first -- when

7    this case first started.

8            I believe they might have told me to face the

9    wall.  I don't remember.  But I mean I wasn't -- I

10   just looked like this.  Like, I don't remember          11:29

11   looking.  I just went over my shoulder like this.

12           I wasn't like -- I wasn't doing anything out

13   of the ordinary, as far as, in a threatening manner

14   that would warrant this type of -- this type of --

15   this type of assault.                                    11:29

16   Q.       And we'll get to the video in a little bit.

17   Do you recall saying anything when you were turning

18   your -- turning your head to look back at them?

19   A.       I don't recall saying anything.

20   Q.       So after you took off your shirt, socks and     11:29

21   shoes, what was the next article of clothing that

22   needed to be removed?

23   A.       The underwear and pants.

24   Q.       Presumably the pants needed to be removed

25   first?                                                   11:30

                                                    Page 65

```
 1    A.       Well, yeah, yeah, yeah, yeah.

 2    Q.       I know it's a dumb question.  I just got to

 3    get it for the record.

 4    A.       Obviously, yeah.

 5    Q.       And so did you begin to attempt to remove     11:30

 6    your pants, and then deputy -- and then Deputy Hopeck

 7    ordered you to put your hands behind your back?

 8    A.       No, he -- he didn't even ask for my pants.

 9    That was the weird part was.  As soon as I took my

10    shirt -- I mean as soon as I took my shirt, socks and   11:30

11    shoes off, he told me to put my hands behind my back.

12    Q.       And did you put your hands behind your back?

13    A.       Yep.

14    Q.       And describe to me in words, so that the

15    court reporter can get them, how you put your hands     11:30

16    behind your back?

17    A.       As if I'm going back in restraints.

18    Q.       Did you put your -- put your hands together?

19    Did you interlock them?  How --

20    A.       I can't recall exactly how I put my hands      11:31

21    together, but I know the way I put my hands together

22    he wrapped his hand -- he's a fairly large dude, and

23    he wrapped his hands -- he wrapped his hands around

24    both of my arms.  I have fairly small hands.  And he

25    wrapped his hands around my thumbs and told me to       11:31
```

Page 66

1    relax my thumbs.

2    Q.       And do you recall how many times he told you

3    to relax your thumbs?

4    A.       He told me to relax my thumbs the first time,

5    and then the second time he yelled, "relax your          11:31

6    thumbs."  And that's when -- that's when everything --

7    everything happened to me.

8    Q.       Did you -- I think you had testified that you

9    told him, "I am relaxing my thumbs"?

10   A.       Yeah, yeah, yeah, I might have mentioned       11:31

11   that.  I mentioned that, yeah.

12   Q.       Did you turn around to tell him that you were

13   relaxing your thumbs?

14   A.       I can't recall if I turned around and told

15   him, or I just told him by itself.  I can't recall.     11:32

16   Q.       Do you recall you have were facing the wall

17   when you told him "I am relaxing my thumbs"?

18   A.       No, I don't think we were by the wall at that

19   point.  I don't remember a wall being that close to

20   me.                                                     11:32

21   Q.       Where were you in relationship to the room?

22   A.       I don't remember exactly where, but I know I

23   wasn't like up next to a wall.  Like, I was probably,

24   like, a good foot away from the wall.  I wasn't that

25   close to a wall.                                        11:32

Page 67

1    Q.       And at this point, you were out of handcuffs?

2    A.       Yeah.

3    Q.       Do you recall any other verbal commands that

4    were given to you during the strip search process?

5    A.       No, I might have said -- I mean he might have    11:33

6    told me to remove my -- my pants -- I mean remove my

7    shirt and my socks and shoes.  And then I think that's

8    the last command that he gave me besides relax your

9    thumbs.

10   Q.       And so the deputies ordered you one by one,     11:33

11   remove your shirt, remove your socks, remove your

12   shoes?

13   A.       I don't know if it was one by one, or they

14   just -- they just told me everything together just

15   remove them.  I don't know.  I don't know exactly.      11:33

16   Q.       Do you know why Deputy Hopeck came and told

17   you to -- came and grabbed your thumbs?

18   A.       I don't.

19   Q.       At any point, did he grab your wrist?

20   A.       I can't -- I don't recall him grabbing my       11:34

21   wrist.

22   Q.       And how did the other two deputies, I think

23   you said Ranum and Gonzalez, how -- how did they grab

24   your legs?

25   A.       They grabbed my pant legs, and then they        11:34

Page 68

1   pulled it out from under me.  And then I went flying

2   down head -- you know, basically head first.  And then

3   I hit my head on the ground.  But they grabbed my pant

4   legs as if two guys are standing behind you, and they

5   pull your pant legs from under you, you know, you're        11:34

6   going to fall.

7   Q.      Did they just grab the clothing, or did they

8   also -- were they also able to grab your --

9   A.      Leg?

10   Q.      -- ankle or leg?                                    11:35

11   A.      I believe it was just the clothing.  I'm

12   pretty sure it was just the clothing.

13   Q.      And what did Deputy Hopeck do while they're

14   grabbing your legs, what's he doing?

15   A.      He had -- I remember he had a grip on my           11:35

16   thumbs.  But then, obviously, once I got -- once I

17   was -- once I was in the air and I was coming down,

18   you know, he -- I don't think -- if I recall

19   correctly, this to my best recollection, I believe

20   that he couldn't -- he couldn't handle me falling that    11:35

21   fast, and then he let go.  And I hit my head on the

22   ground, and then he jumped on me and did all that

23   stuff.

24   Q.      So, as you were going to the ground, he

25   wasn't touching you as Deputy Ranum and Gonzales are      11:35

Page 69

1    grabbing your pant legs?

2    A.       Well, I don't remember if he was still

3    touching me or not -- no, I don't think he was

4    touching me.  I think he -- he had my -- my thumbs or

5    he had -- he was holding my thumbs.  And then once the    11:36

6    body weight became too much to hold on to my thumbs

7    with, he let go, and then I fell.

8    Q.       And then what -- what did Deputy Hopeck do

9    once you hit the ground?

10   A.       He dropped his knee into my temple, and then    11:36

11   he kind of had me pinned to the ground.  And then

12   that's as far as what he did.  He had me pinned to the

13   ground.  And then later on -- see, I can't really

14   remember.

15        I believe I blacked out for a little bit           11:36

16   because I can't remember him shifting -- shifting his

17   knee from my temple to my back.  Like I remember

18   him -- I remember him dropping his knee into my temple

19   and then -- and then I believe something happened to

20   the back of my ear as well.                              11:37

21        It's been such a long time, I can't -- you

22   know, it's hard to remember, but there's medical

23   records.

24   Q.       How do you know that you blacked out?

25   A.       I mean I can't remember how he shifted his       11:37

                                              Page 70

1    knee.  I don't remember when he shifted his knee from

2    my temple to the back.  It's just -- I just -- some

3    parts I just can't remember.

4    Q.      And so because there's a missing gap between

5    when he was holding you at your temple to moving to        11:37

6    another part, that's why you believe that you blacked

7    out?

8    A.      Yeah, there's missing events.

9    Q.      Okay.  And how long do you think this missing

10   event lasted for?                                          11:37

11   A.      I mean it's hard to say.  Could have been

12   five.  Could have been 15 seconds.  I mean the fact of

13   the matter is I blacked out.  I didn't have a set time

14   or when, you know.

15   Q.      And what were the -- what did the deputy --       11:38

16   what did the deputies do who pulled out your pant

17   legs?  What did they do once you were on the ground?

18   A.      I can't remember if it was them or not, but I

19   was forcefully strip searched.  I mean not

20   forcefully -- yeah, I was forcefully -- I wasn't even     11:38

21   searched.  I was forcefully stripped of my clothes.

22   They didn't search me, anything.  They didn't even

23   complete their strip search.

24   Q.      And so did -- did they remove your pants from

25   you?                                                       11:38

Page 71

1    A.      Yeah.

2    Q.      And did they remove your underwear from you?

3    A.      Yeah.

4    Q.      And you were conscious and aware of that

5    while they were taking off your pants and underwear,      11:39

6    correct?

7    A.      Yeah, I believe so.  I know I blacked out for

8    a little while.  But when I regained consciousness, I

9    remember that, them stripping me because it didn't

10   happen right away.  It was -- it was -- you know, it      11:39

11   didn't happen like right after they dropped me to the

12   ground, they just started taking my clothes off me.

13   It might have happened like a couple -- it was like a

14   little -- little missing events, and then it happened

15   a little later afterwards.                                11:39

16   Q.      Did they give you any orders once you were on

17   the ground to remove your clothes --

18   A.      No.

19   Q.      -- the remaining of your clothes?

20   A.      No.                                               11:39

21   Q.      After taking your clothes, was there any more

22   of a strip search process that the deputies needed to

23   do?

24   A.      Needed to do, yeah.

25   Q.      What happened after your pants and your          11:39

```
1      fold your feet how they usually fold, and then they

2      cross them.  They try to cross them at least, and they

3      pin them down.

4      Q.      And were one or two deputies doing this

5      hogtie?                                              11:47

6      A.       I can't recall.

7      Q.       Do you recall ever being punched during the

8      strip search process?

9      A.       No, I don't recall being punched.

10     Q.       Do you recall ever being kicked during the    11:47

11     strip search process?

12     A.       No, I don't recall being kicked.

13     Q.      How did -- how did the deputy that had your

14     upper body with your arms, once you were on the

15     ground, how did he control your -- scratch that        11:48

16     question.  Let's go through.

17              So you previously testified Deputy Hopeck had

18     a knee on you, correct?

19     A.       Um-hmm.

20     Q.      And at some point, he transitioned to a        11:48

21     different part of your body?

22     A.       (Nods head.)

23     Q.      How was he controlling you when he moved from

24     your head to that other region?

25     A.       Controlling me as far as my arms or just --    11:48
```

Page 78

```
 1      became verbally abusive as booking deputies stood by

 2      during the intake exam," end quote.

 3              Did you become verbally abusive during the

 4      booking process?

 5      A.      No, not -- not that I can recall.  I wasn't      12:55

 6      being verbally abusive.

 7              (Reporter clarification.)

 8      Q.      BY MR. GROSS:  Was there any abuse that you

 9      might have given that you could see why this was

10      written in the report, anything that you recall?      12:55

11      A.      I can't -- it's been so long, I can't recall.

12      Q.      And then the last sentence before a dashed

13      line says, quote, "Predybaylo stated he was going to

14      call Internal Affairs if we strip searched him and

15      took his clothing," end quote.                         12:56

16              Did you tell any Sacramento County Deputy

17      that you would call Internal Affairs if you were strip

18      searched?

19      A.      No, I don't recall me telling him that.

20      Q.      Did you ever make any statement during the      12:56

21      booking process on July 5th, 2017, that you would

22      contact Internal Affairs?

23      A.      No.

24      Q.      Going down to sort of the second paragraph

25      underneath the dashed line, it says, quote,             12:56
```

Page 93

1        but go ahead.

2                THE WITNESS:  I mean I -- I don't remember.

3        I wasn't right next to the wall.  I mean I had some

4        space between the wall in front of me.

5        Q.      BY MR. GROSS:  How much space do you estimate   01:06

6        there was between you and the wall?

7        A.      I mean a foot maybe.  I don't know.  I mean I

8        can't really give you an estimate.  I don't remember,

9        but it was enough space to where I wouldn't hit my

10       face on the wall you could say.                         01:07

11       Q.      What was the first body part that hit the

12       ground?

13       A.      My head.

14       Q.      So it wasn't your knees that hit first?

15       A.      No, I don't recall my knees hitting first.      01:07

16       Q.      And it wasn't your abdomen or chest that hit

17       first, or do you not recall?

18       A.      No, I don't -- I recall -- I don't know.  I

19       don't know what -- I don't recall exactly what hit

20       first, but I know I hit my head when I went down.       01:07

21       Q.      I want to take you to page nine starting at

22       lines -- at your answer at line 383 through 386.

23       A.      Okay.

24       Q.      And you gave this testimony, if you look at

25       the -- apologize -- going back to the first page, you   01:08

                                                        Page 99

```
 1              (Playing video.)

 2    Q.      BY MR. GROSS:  Can you pause?

 3            Mr. Predybaylo, do you see yourself in this

 4    video?

 5    A.      Yeah.                                    01:24

 6    Q.      And who is the person, when you're looking at

 7    the video, to your right?  He's wearing a vest that

 8    says "police"?

 9    A.      It's Sergeant Hall.

10    Q.      And where is this video being captured from   01:24

11    inside of the Main Jail?

12    A.      It's at the first step of the booking process

13    you could say.

14              (Reporter clarification.)

15    Q.      BY MR. GROSS:  And would it be correct to say   01:24

16    that at some time around approximately 4:39 on

17    July 5th, 2017, you're now inside and beginning the

18    booking process at the Sacramento County Main Jail?

19            MR. DWYER:  Objection, there's been no

20    authentication of the video and the timestamping of   01:24

21    the video.  And I have frequently run into --

22    frequently run into a problem of the dates and

23    timestamps on police videos being incorrect.

24            So absent an authentication of what's called

25    metafile data, that would be associated with the   01:25
```

Page 108

1    video, we cannot stipulate to the time.

2         But, Mr. Predybaylo, if you have an

3    independent recollection about the time, please go

4    ahead and state that.

5         THE WITNESS:  No, I don't have no          01:25

6    recollection.

7    Q.      BY MR. GROSS:  Would it be incorrect to say

8    that sometime before 5:00 p.m. on July 5th, 2020, you

9    were inside the Sacramento County Main Jail?

10   A.      Before 5:00 p.m., would it be incorrect you   01:25

11   say?

12   Q.      Is there any belief that you have that you

13   weren't inside the Sacramento County Main Jail on

14   July 5th, 2017, around 4:00 p.m.?

15   A.      I said I think it's pretty accurate that I    01:25

16   was in jail on July 5th.

17   Q.      And can you identify what you were wearing in

18   this video?

19   A.      Black-and-white shirt and I believe those

20   were white pants and bluish gray boxers.            01:26

21            (Reporter clarification.)

22   Q.   BY MR. GROSS:  And are you handcuffed in this

23   video?

24   A.      Yeah.

25   Q.      My next exhibit I'm going to introduce is    01:26

                                        Page 109

```
 1      Exhibit F marked DEF 371.

 2                    (Exhibit F was marked and

 3                    retained by counsel.)

 4      Q.       BY MR. GROSS:  And I'm playing the video

 5      right now.  It's a rather long video, and it's          01:27

 6      starting at the top left at approximately 5:00 p.m. is

 7      the timestamp in the video.

 8               Do you see yourself, Mr. Predybaylo, in this

 9      video?

10      A.       Yes.                                            01:27

11      Q.       And what stage of the booking process is

12      this?

13      A.       The first one.

14      Q.       And what is the first part of the booking

15      process?                                                01:27

16      A.       I don't know.  I believe take your shoelaces,

17      and he's booking me in initially.  I don't know how --

18      I don't know how to really describe it except that.

19      Q.       And so is that Sergeant Hall wearing the

20      police vest with -- that's operating the computer?      01:27

21      A.       Yeah.

22      Q.       And this is the first step of the booking

23      process.  He's completing some paperwork,

24      administrative work, while you're sitting there?

25      A.       Yeah.                                           01:28
```

Page 110

1    Q.      Correct.  Then after this step is where you

2    were then transported to the medical intake screening

3    process, correct?

4    A.      Yes.

5    Q.      I want to introduce the next exhibit that we      01:28

6    have, Exhibit G.  This is marked DEF 372, and it's at

7    seven minutes and 41 seconds in the video.  The top

8    left corner has a timestamp of  5:07:48 seconds p.m.

9              (Exhibit G was marked and

10             retained by counsel.)

11   Q.      BY MR. GROSS:  Do you see yourself in this

12   video, Mr. Predybaylo?

13   A.      Yeah.

14   Q.      And what area of the booking process is this?

15   A.      The medical.                                      01:29

16   Q.      Go ahead and play the video until 810.

17             (Playing video.)

18   Q.      BY MR. GROSS:  Are you able to identify any

19   of the law enforcement officers in that video that we

20   have paused at 811?                                       01:30

21            MR. DWYER:  If you need to stand up and go

22   look at it, it's fine, but careful of your microphone.

23            THE WITNESS:  I'm by Sergeant Hall.  I

24   believe that's Deputy Hopeck by the door.  And then I

25   can't -- I can't -- I don't know the other two.  I       01:30

                                              Page 111

```
 1                    (Playing video.)

 2     Q.         BY MR. GROSS:  And so while we're watching

 3     the video, do you see the nurse writing stuff?

 4     A.         Um-hmm, yes, sir.

 5     Q.         And is she writing stuff down based on        01:34

 6     questions she's asking you?

 7     A.         Yeah.

 8     Q.         And do you recall what questions she was

 9     generally asking you?

10               MR. DWYER:  Well, objection we've already      01:35

11     been over the medical intake form that I would presume

12     that's what she's filling out there.  So I'm not quite

13     sure what the point of the question is.  Are you

14     asking him if he remembers the questions on the form?

15     Q.         BY MR. GROSS:  Does he -- does Mr. Predybaylo 01:35

16     remember the nurse going through these questions with

17     him?

18               MR. DWYER:  Go ahead.

19               THE WITNESS:  I mean specifically I don't

20     remember, but it seems to me that these questions down  01:35

21     here, that's what she did.  That was her job.

22               MR. GROSS:  Can you skip ahead to like 1145?

23                    (Playing video.)

24               MR. GROSS:  So we're pausing the video at

25     1144.  That's timestamped in the video.  It's 5:11:51   01:36
```

```
 1      at the top left.  We'll play the video for two or

 2      three seconds.

 3                  (Playing video.)

 4      Q.      BY MR. GROSS:  And what's happening in this

 5      portion of the video?                              01:36

 6      A.      I'm limping.

 7      Q.      Have you completed the medical screening

 8      portion at this point?

 9      A.      Yeah, I think so.  Yeah, I don't know.  I

10      don't recall.  I believe so.  I don't recall if I was  01:36

11      done or I don't --

12      Q.      All right.  I'm going to introduce the next

13      exhibit, Exhibit H, which is marked in our defendant's

14      production DEF 373.  And we have the video right now

15      at 2335 or at the top left 5:23:39 p.m.            01:38

16                  (Exhibit H was marked.)

17      Q.      BY MR. GROSS:  Mr. Predybaylo, can you tell

18      me where this video is captured at the Main Jail?

19      A.      At the photo -- photo screen or photo

20      machine.                                           01:38

21      Q.      And can you tell -- we'll begin to play the

22      video, so maybe just keep my question in mind.  The

23      two deputies that are escorting you, are you able to

24      identify them right now?

25      A.      No, not right now.  Assumption but not --   01:38
```

Page 115

1    Q.      What are the -- are you still handcuffed at

2    this point?

3    A.      Yeah.

4    Q.      And what are the two deputies doing right now

5    in this still image?                                    01:39

6    A.      Like they're escorting me to the photo booth

7    or photo.

8    Q.      I'm going to play the video until 23 minutes

9    and 41 seconds, and I want you to focus on your body

10   in the video.                                           01:39

11          (Playing video.)

12   Q.      BY MR. GROSS:  Did you see in your video your

13   right elbow move upwards?

14   A.      No, the light was kind of in the way.  Can

15   you rewind it?                                          01:39

16          MR. DWYER:  The light -- I think this light

17   fixture above the conference room table was kind of

18   blocking the view.  Maybe we could sort of move to one

19   side or the other, so you could see that part of the

20   video.                                                  01:40

21          MS. TORRES:  I can turn off the light.

22          MR. DWYER:  The light fixture itself is right

23   in our line of view.  Maybe if you switch places with

24   me.

25          THE VIDEOGRAPHER:  The time is 1:40 p.m.  We    01:40

Page 116

```
1    are off the record.

2                 (Discussion off the record.)

3              THE VIDEOGRAPHER:  The time is 1:44 p.m.  We

4    are on the record.

5    Q.         BY MR. GROSS:  I'm going to play Exhibit G,     01:44

6    DEF 373, from 2330 in the video until 2341 and then

7    ask you a couple questions.

8                 (Playing video.)

9    Q.         BY MR. GROSS:  Mr. Predybaylo, did you see in

10   the video your right elbow rise up?                        01:45

11   A.         I couldn't even notice my right elbow.

12   Q.         I'll play the video again.  I'll back it up

13   five or six seconds.  Have you watch for your right

14   elbow.

15   A.         Okay.                                           01:45

16   Q.         And then I'll let you answer.

17                 (Playing video.)

18   Q.         BY MR. GROSS:  Did you see your right elbow

19   move in that video that we played again?

20   A.         I mean I seen it -- I kind of seen it.  I       01:45

21   don't -- it wasn't really much to see, but I, you

22   know, seen it rise slightly.

23   Q.         All right.  I'm going to play the video again

24   starting at 2400 until 2410, and I want you to look at

25   your right elbow in the video.                             01:46
```

Page 117

```
 1                    (Playing video.)
 2     Q.       BY MR. GROSS:  Did you see your right elbow
 3     move again after watching this next clip?
 4     A.        I didn't see my right elbow move.  It seemed
 5     like I seen the -- is there an officer on the other      01:46
 6     side.  Yeah, it seemed like the officer might have
 7     been moving around, moving my elbow around to like
 8     maybe I was -- maybe I was shifting, or I don't know.
 9             I couldn't even tell that my elbow moved.  I
10     can see the officer moving, but I can't -- I can't see   01:47
11     my elbow moving.  And if it was, I mean it might have
12     been slightly.  But I can't -- I can't tell that even
13     the elbow was moving.
14     Q.     I'm going to play the next clip 2440 until
15     2445.                                                    01:47
16                    (Playing video.)
17     Q.     BY MR. GROSS:  Did you see your weight shift
18     forward in that video?
19     A.        I mean, yeah, I seen my body -- yeah, I seen
20     my body -- my upper body shift a little bit, my leg.     01:48
21     I might have been moving my leg.  I mean, you know,
22     putting weight on my other side of my leg.  I mean I
23     couldn't really tell.  These are slight movements.  I
24     mean I don't -- I don't see anything passive
25     aggressive about it.  I don't -- I don't see anything.   01:48
```

Page 118

1    Q.       I'm going to play the next clip about 2458

2    until 2506.

3              (Playing video.)

4    Q.        BY MR. GROSS:  What did you see occur in that

5    portion of the video?                                01:49

6    A.        I seen -- I seen my body move, but it was

7    because of my leg was injured.  And then I see one cop

8    grabbing me one way and the other cop grabbing me

9    another way.  So then it looks like I'm going like

10   this.  But he's grabbing me this way, and he's trying  01:49

11   to control me here.  And they're both having a tug of

12   war with me.  But I'm not moving.  I was just shifting

13   my leg because this one I can actually see myself

14   moving.  The other two I couldn't see myself moving.

15   Q.        Did you -- I'll play the video again for you.  01:49

16   But my question will be before you play the video, did

17   you dip your right shoulder down during this moment in

18   the video.

19              (Playing video.)

20              THE WITNESS:  Yeah, it seemed like my body   01:50

21   kind of jerked downwards.

22   Q.       BY MR. GROSS:  Is there any point in watching

23   that video where you see the deputies do something

24   that causes you to move?  I can play the video again.

25   A.       Yeah, play it again.                          01:50

                                              Page 119

```
 1      Q.       I'm going to play the video.  Just finish it
 2   out until 2511.
 3               (Playing video.)
 4      Q.       BY MR. GROSS:  And what happened -- what
 5   happens at the end of this video?                    01:52
 6               MR. DWYER:  Objection, I don't understand the
 7   question, counsel.
 8      Q.       BY MR. GROSS:  Where are you being led to
 9   next in this video?
10      A.       Excuse me.  I believe to the -- to the -- to  01:52
11   the room -- to the little room.
12      Q.       And the little room you're referencing is to
13   the safety cell --
14      A.       The safety cell.
15      Q.       -- to be strip searched, correct?           01:52
16      A.       Yes.
17               MR. DWYER:  This is 375 or 376.
18               MR. GROSS:  It's going to be 375.  And I'm
19   going to introduce the next exhibit, Exhibit I, which
20   is DEF 375.  And I'm going to play it for about        01:53
21   15 seconds starting at, what, 22 minutes and
22   46 seconds.
23               (Exhibit I was marked and
24                retained by counsel.)
25               (Playing video.)                            01:54
```

Page 121

1    Q.      BY MR. GROSS:  Can you tell me, to the best

2    of your recollection, where this video is captured in

3    the Main Jail?

4    A.      I'm not too sure.  I only -- I only been in

5    that room one time and then I mean -- I don't know.  I   01:54

6    don't know.  I have problems telling Patrick initially

7    where I was at.

8    Q.      Would it be fair to say that's a hallway or a

9    side area outside of the safety cell?

10   A.      Yeah.                                             01:54

11   Q.      And let's back it up to the 2246 again.

12   Let's pause it.

13               (Playing video.)

14   Q.      BY MR. GROSS:  Do you know who that first

15   deputy is who's about to walk into the -- walk into      01:55

16   that doorway of the safety cell?

17   A.      Deputy Ranum maybe.  I'm not -- I'm not sure.

18   Q.      Play it again and I sort of want you to sort

19   of describe what you're visually seeing for the next

20   like five to ten seconds.                                01:55

21               (Playing video.)

22   Q.      BY MR. GROSS:  There, pause it.  What's

23   happening in this portion of the video?

24   A.      They're taking me into the safety cell.

25   Q.      And how many deputies are holding you?          01:56

                                                    Page 122

1    A.      Two.

2    Q.      And are you still in handcuffs at this point?

3    A.      Yeah.

4    Q.      Are you able to identify from the back of

5    these heads which deputies they are -- these are?        01:56

6    A.      To the right, that's Hopeck; and to the left,

7    it might be either Gonzales or might be Wilson.

8    Q.      Hopeck makes it easy with the bald head.

9    A.      Yeah.

10           MR. DWYER:  I would just like to note for the   01:57

11   record that these videos are quite grainy.  So it's

12   hard to recognize people's faces accurately here, but

13   go ahead.

14           MR. GROSS:  Play the next couple seconds.

15           (Playing video.)                                 01:57

16   Q.      BY MR. GROSS:  And who is that last person

17   that's walking into frame?

18   A.      Sergeant Hall.

19   Q.      And he's presumably there to collect the

20   evidence of the clothing, correct?                        01:57

21   A.      Yeah.

22   Q.      I'm going to introduce the next exhibit,

23   Exhibit J, which is marked DEF 376.

24           (Exhibit J was marked and

25           retained by counsel.)

                                            Page 123

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I certify that the foregoing proceedings in

 4     the within-entitled cause were reported at the time

 5     and place therein named; that said proceedings were

 6     reported by me, a duly Certified Shorthand Reporter

 7     of the State of California, and were thereafter

 8     transcribed into typewriting;

 9            That before completion of the deposition,

10     review of the transcript { }was, {X}was not

11     requested.  If requested, any changes made by the

12     deponent (and provided to the reporter) during the

13     period allowed are appended hereto.

14            I further certify that I am not of counsel

15     or attorney for either or any of the parties to said

16     cause of action, nor in any way interested in the

17     outcome of the cause named in said cause of action.

18            IN WITNESS WHEREOF, I have hereunto set my

19     hand this 23rd day of July, 2021.

20

21

22          KAREN A. URBANO

            California CSR No. 6698

23

24

25

                                          Page 137
```

# EXHIBIT B

{02518243.DOCX}

# In the Matter Of:

## PREDYBAYLO V. SACRAMENTO COUNTY

2:19-CV-01243-MCE-CKD

---

## JARROD HOPECK

*October 21, 2020*

---



800.211.DEPO (3376)
EsquireSolutions.com

1   me now is I'd like to ask you right now in this moment,

2   do you have any specific recollection of the strip

3   search on my client on July 5th, 2017?

4       A.   Very, very small details.

5       Q.   Okay.  Would you go ahead and tell me what --

6   whatever little details, what is it you remember right

7   now about that event?

8       A.   The actual strip search itself or the whole

9   event leading up to it or --

10      Q.   The strip search.

11      A.   I just remember that during the process going

12  into the segregation cell -- is it Predybaylo?  I'm

13  sorry.

14           MR. GROSS:  Mr. Predybaylo, yeah.

15           THE WITNESS:  -- Mr. Predybaylo was -- he was

16  verbally just aggressive.  We had to ask him to stay

17  facing the wall.  And I remember he, you know, didn't

18  want to follow those directives on how to do it safely.

19           I do remember at some point we had placed him

20  on the ground to finish the strip search safely.  And I

21  remember that there was -- there's a sergeant outside --

22  I think it was SPD -- that needed the clothing for

23  evidence.

24           But a lot of the little details and stuff, you

25  know, I got from referring -- from my report, so --



 1   BY MR. DWYER:

 2      Q.   Do you have any specific memory of

 3   Mr. Predybaylo being violent?

 4      A.   Violent?  No.

 5      Q.   Did he try to --

 6          Do you have any memory of him trying to strike

 7   anyone?

 8      A.   No.  I don't have a memory of that at all.

 9      Q.   Okay.  You do have a memory that he was

10   verbally negative, maybe swearing or saying some things

11   that were not nice?

12      A.   Yeah, and just being -- he was actively

13   resisting by, you know, pulling his body, you know, not

14   following directions, moving around, pulling away from

15   our grasp, stuff like that, but not violent.

16      Q.   Okay.  Could you turn to page -- I believe

17   it's the third page of Exhibit 14.  It's marked in the

18   lower right-hand corner defendant's document 636.  And

19   I'm looking at the question and answer beginning on

20   line 125 and going through line 135.  Would you take a

21   minute to read that?

22      A.   From 125 to where?  To 135?

23      Q.   135.

24      A.   Correct.  Sergeant Culp speaking, "And can you

25   explain the normal process of the strip search from



1    Q.   Okay.  And going down to line 175 to 177,

2    Sergeant Culp gave you an example or asked you what

3    would be out of the ordinary that might make you

4    remember something, and you answered there on line 177,

5    "Yelling, screaming, yelling threats."  You see that?

6    A.   I do, yeah.

7    Q.   Was that -- is that answer still correct, in

8    your mind?

9    A.   Yes.

10   Q.   Okay.  So do you have any memory of my client

11   yelling, screaming, or yelling threats?

12   A.   I don't remember specific threats.  I just

13   remember that there was enough noise and yelling in

14   there that I believe we got the attention that we had to

15   go into the nurse's station.  I don't remember what he

16   was saying.  I mean, after reviewing the report and

17   stuff, you know, I'm going off of a lot of that.  But

18   from my actual memory, I don't remember that much to it.

19   Q.   Okay.  So what I'm trying to get at here is it

20   appears to me that -- and you seem very typical of

21   humans.  Unless something kind of emotional or elevated

22   happens, we don't really remember it, the brain gets rid

23   of it, it's unnecessary.  And so this indicates to me

24   that nothing really significant or strident or unusual

25   occurred in that -- in that cell.  Is that correct?



1       A.   Well, things unusual compared to what a normal

2   strip search was on a normal person who is being

3   compliant, that was not the case.  So there was more

4   than just a compliant arrestee.

5       Q.   Okay.  What I'm trying to find out is, do you

6   have any specific memory of what was different or

7   unusual on the part of my client?

8       A.   I remember him not following our directives on

9   how to perform the strip search.

10      Q.   Do you have an example?  Like did you tell him

11  to "Take off your shirt" and he didn't do that or do you

12  have any memory of something like that?

13      A.   At one point I do remember -- and, you know,

14  I'm trying not -- I know what happened if I go off my

15  report, but are you asking me just off just my memory?

16      Q.   Just from your memory.

17      A.   I just remember him not -- not facing the

18  wall.  But as to a lot of the details, you know, I don't

19  remember.

20      Q.   Okay.  And do you recall what you did when

21  he -- when he didn't face the wall right away?

22      A.   Well, I remember my report.

23      Q.   Well, I'm just -- right now what do you

24  remember?

25      A.   That basically he wasn't facing the wall, so I



1   think I grabbed his arm, put him in a control hold, and

2   explained to him he needed to follow the directions,

3   stay facing the wall, for our safety, their safety.  You

4   know, and these are words -- these are not exact words.

5   I just know that this is a pretty standard procedure on

6   what we do, but I don't recall exactly what was said,

7   but that's -- you know, I do remember that happening to

8   an extent.

9        Q.   Right.  And when you put him in a control

10  hold, did he then face the wall?

11       A.   I believe so, yeah, because I think we gave

12  him another chance, you know, to go ahead and perform

13  the actual removal of his clothings and stuff like that.

14       Q.   And your memory is that he did then turn and

15  face the wall?

16       A.   He did.  And then he turned back around again.

17       Q.   Do you recall whether he was asking a question

18  or didn't understand?

19       A.   I don't -- I don't remember.

20       Q.   Okay.

21       A.   He wasn't asking very many questions.  He was

22  basically yelling and -- you know, "I don't have to do

23  this," and "You're going to go to IA," just basically

24  making threats.  There was not many questions that I

25  recall.



1  asking them to face the wall and applying a control

2  hold?

3      A.    That varies with every single arrestee,

4  depending on how -- how much -- their previous display

5  on how violent they were, if they have -- you know, type

6  of history, if we feel like this guy is legitimately

7  dangerous or if he's just -- and there's different

8  levels of -- it's how we feel at the time.  If he's

9  going to be a legitimate danger, it could be very, very

10  quickly.  You know, if he's just somebody who doesn't

11  want to follow directions or it's more of a behavioral

12  thing, you know, we'll try and usually give them a

13  little bit more time.  Some people are just not

14  understanding.  Some people haven't gone through the

15  process.  But some -- some arrestees are legitimately

16  very dangerous, so we give them less time.

17      Q.    Okay.  Do you have any memory about

18  Mr. Predybaylo?  Did you consider him dangerous?

19      A.    I don't know if he was dangerous, but he could

20  possibly, you know, pose a threat because he kept

21  turning around.  But he wasn't saying "I'm going to

22  punch you," anything like that.  He just didn't want to

23  follow directions for our safety.  And you know, that

24  changes on -- that can change on a dime, very quickly.

25      Q.    No, I understand.  I'm just trying to find out



```
 1   because that's what I'm trying to get to.
 2          So in your training, if they turn away from
 3   the wall, are you trained to then apply a control hold?
 4      A.   Usually we were trained to intercede some sort
 5   of way.  It's not a black and white "You will go use a
 6   control hold."  You know, it's our discretion, like, is
 7   this something that I can verbally, say, place my hand
 8   on his back, you know, "Hey, stop.  You need to do
 9   that," or is this somebody who, you know, I can just
10   verbally do it?  Every person, you know, we read
11   differently.  They're -- it's not a black and white
12   thing.
13          But, yes, in training, if they refuse to stay
14   facing the wall, we are trained to react in some sort of
15   way.  A lot of the way that we react is our discretion
16   based off of how the arrestee is at that time.
17      Q.   Do you recall whether or not you put a hand on
18   Mr. Predybaylo's shoulder or whether you used a control
19   hold right away?
20      A.   I don't recall.  I do know that I used a
21   control hold, but I don't remember if there was any use
22   of force or touching him other than -- yeah, I -- I
23   don't -- I don't recall.
24      Q.   Okay.  And by "control hold," was that like an
25   arm lock where you pull the arm up in the back and you
```



JARROD HOPECK                                    October 21, 2020
PREDYBAYLO V. SACRAMENTO COUNTY                            22

1    kind of lift the arm up to --

2        A.    Yeah.   It's just basically bringing his arm

3    around behind him so you have control so he can't spin

4    around on you, because then we have to get close, try

5    and explain to him, "Hey, you need to stay facing the

6    wall for your safety, for my safety."

7        Q.    Now, in this incident you filed what's called

8    a PF10 and which we have marked as Exhibit 13.

9        A.    Correct.

10       Q.    Would you look at the second page.

11             Now, my first question to you is, why did you

12   file the PF10?

13       A.    It was a force PF10, so probably because I had

14   used a control hold on him.   That's usually -- if we use

15   a control hold on somebody or place them in a -- PF10s

16   are a very wide thing.   We use them for a lot.   We use

17   for anybody we place in a safe seg cell.

18             This is a force one.   And more than likely

19   it's because I put him in a -- I think -- yeah, in an

20   armbar on the ground and the rear control hold, so --

21       Q.    Okay.   What is the purpose or why does the

22   Sheriff's Department have you file a PF10?

23       A.    Well, I can speculate on that.   You'd have to

24   ask them why they did that.   But realistically it's, you

25   know, if we put a control hold on somebody so there's



1   and leaving somebody in there before having them

2   complete the strip search.  Usually once we engage, we

3   just -- we have to finish it.  It can lead to a whole

4   lot of other problems.

5        Q.   Have you ever had an experience of an arrestee

6   saying "I'm just not going to cooperate.  I'm not going

7   to do a strip search" and you said "Okay.  We're going

8   to lock you, you know, in this cell until you agree"?

9   Has that ever happened?

10       A.   Well, part of that I've had.  I've had many

11  arrestees say "I'm going to refuse" or not do it.  But

12  we don't just leave them in the cell.  I might have, but

13  I don't recall ever saying that or actually just leaving

14  them in there, because then we have to go reengage them

15  again.  It can cause a lot more issues.

16       Q.   Okay.  When you -- when an arrestee has said

17  that, says "I'm not going to do a strip search.  No

18  way," what do you do?

19       A.   It depends on the situation.  Is he -- you

20  know, if he's proned out and he says he's not going to

21  spread -- because they spread their butt cheeks, you

22  know, on their own.  We don't force any of that.  If he

23  says he's not going to do it, we'll usually call a

24  sergeant and we'll try and talk to him, talk to him.  If

25  he doesn't do it, a lot of times they'll send them out



JARROD HOPECK                                      October 21, 2020
PREDYBAYLO V. SACRAMENTO COUNTY                              45

```
 1   on a med run.
 2       Q.   What was the last thing you said?  They
 3   will --
 4       A.   If they refuse to do it completely, then
 5   they -- a lot of times they'll get sent out on a med run
 6   to make sure that they don't have any drugs in their --
 7   in their anal cavity.  That's if they completely refuse,
 8   yeah.
 9       Q.   So if they completely refuse, do you go ahead
10   and use a control hold and put them on the ground?
11       A.   Well, at what point would they refuse?  That's
12   what I'm saying.  I don't -- are you talking about on
13   the ground right now?
14       Q.   No.  Let's say you take someone to the safety
15   cell and you ask them to stand and face the wall.
16       A.   Okay.
17       Q.   Okay?  And they say "I'm not going to
18   cooperate and I'm not going to do the strip search."
19   What do you do?
20       A.   If they say right then and there they're not
21   going to do the strip search, we usually try and tell
22   them, "Hey, you need to do this," we'll give them the
23   options, "If you don't, we have to -- you have to
24   probably go to the hospital because we don't know if you
25   have drugs inserted in your anus."
```



 1          A lot of times I'll give them stories, "I've
 2   seen multiple guys OD, you know, die because they don't
 3   want to give up drugs, got to go to the hospital."  You
 4   know, there's so many factors that we -- we try and tell
 5   them.
 6      Q.   And have you ever had an instance where they
 7   still continue to refuse?
 8      A.   Oh, yes.
 9      Q.   And what do you do then?
10      A.   Usually we'll call a sergeant and the sergeant
11   will say the same thing, "Hey, if you completely refuse
12   to" -- and depends at what point they're refusing.  Are
13   they refusing to lift up their genitalia, are they
14   refusing to spread their buttocks, are they refusing --
15   you know, depending on what point.
16          But to complete the strip search, you know,
17   the last part's usually spreading their buttocks with
18   their hands.  If they reuse that, then usually the
19   sergeant tells them, "Well, you're going to have to go
20   to the hospital."
21      Q.   Okay.  My hypothetical was prior to that.
22   You've brought them into the cell, they're facing the
23   wall, and they say "I'm not going to take off my
24   clothes.  I'm not going to do a strip search."  What
25   happens?



1   but the actual strip search of, you know, looking --
2   spreading their buttocks, genitalia.
3        Q.   Okay.  So it's my understanding then that
4   you're testifying that it's your understanding that
5   subsection k.(1) through (4) only refers to the actual
6   inspection of the genital area; is that correct?
7        A.   And buttocks and mouth, you know, other areas,
8   because we remove people's clothing all the time but
9   don't perform a strip search.
10       Q.   So your understanding is removing clothing is
11  not really a strip search.
12       A.   Not the complete -- nope.  We -- actually in
13  property for misdemeanors we remove people's clothing,
14  completely naked all the time, but we don't perform a
15  strip search on them.
16       Q.   And when people remove clothing, are they
17  visible to other people?  Are there other people
18  standing there?
19       A.   Which time?  In property or in the -- what are
20  we talking about?
21       Q.   At any time other than a strip search, if
22  people are taking off their clothing.
23       A.   In property they are.  There's about five guys
24  in there.  But they have like kind of these little
25  dividers, I guess, you know, that give them a little bit



1  and pull their cheeks apart at that time?

2      A.   If there -- there's a criteria which we do if

3  they're arrested on a felony, if they're, you know,

4  there for a parole violation.  You know, there's a list

5  of qualifications that -- whether they'd actually get

6  stripped.

7         But like misdemeanors -- and it's all changed

8  now because of COVID, because a lot of misdemeanors

9  aren't coming in.  But before that, misdemeanors would

10  just -- they would remove all their clothing, be naked,

11  make sure didn't have a visual -- any visual contraband

12  on them, and then we would give the misdemeanors their

13  roll, they would get dressed, where the other -- the

14  other arrestees who were there for felonies and part of

15  that long list, they would then perform the strip search

16  of opening their mouth, lifting up their genitalia,

17  bending over, and, you know, spreading their buttocks.

18      Q.   And is that strip search -- that's kind of

19  like the normal strip search of everyone who has a

20  felony arrest gets when they get their -- and they get

21  the strip search just as they get their prison garb,

22  their jail garb?

23      A.   Yes, sir.  Yes.

24      Q.   So my question to you is, why did

25  Mr. Predybaylo have a separate strip search apart from



1    that?

2        A.    I believe he was arrested on drugs.  He had

3    drug possession, had felony drug possession.

4        Q.    And so when there's a drug possession, you

5    give them a special type of strip search.

6        A.    Well, it's a -- it's a strip search.

7        Q.    Why don't you just have them do the strip

8    search like everyone else who's on a felony charge?

9        A.    Back in property -- well, because there's a

10   long time frame from when they come in to when they

11   actually get to the property process.  And, you know,

12   it's our policy that if they've been there for, you

13   know, felony drugs or even misdemeanor drugs that they

14   get searched to make sure they cannot bring it into the

15   facility.  Or a lot of times if arrestees have drugs,

16   you know, up into their buttocks, they've broken before,

17   they've OD'd.  So a lot of it's the safety of them and

18   also not bringing in the contraband into the jail.

19       Q.    Now, going back to the situation with my

20   client, if he refused to cooperate and didn't want to

21   take his clothes off, would the policy on page 5 and 6

22   of this document we've marked as Exhibit 8 -- would that

23   apply?

24       A.    The policy -- I'm sorry.  Say again.  The

25   policy where?



1        A.    Yes.

2        Q.    And then there's a dotted line that seems to

3   divide like a top paragraph and bottom paragraph?

4        A.    Yes.

5        Q.    Is that all one paragraph or is that two

6   separate things?  It's like the top part justification

7   or explanation and the bottom part some more facts or is

8   that all considered the justification?

9        A.    No.  The justification is -- this was an old

10  template that we used.  "Justification" is kind of like

11  a synopsis on a report, you know, and then a quick, you

12  know, part of it, and then there's a narrative body,

13  from what I believe -- yeah, a narrative body from under

14  the dotted line kind of where you could be a little bit

15  more detailed.

16       Q.    Now, looking at the last sentence in your --

17  under the "Justification" section, it says, "Predybaylo

18  stated that he was going to call Internal Affairs if we

19  stripped serched him and took his clothing."  Do you see

20  that?

21       A.    Yes.

22       Q.    Okay.  Do you specifically recollect that he

23  said that and you heard that?

24       A.    I didn't specifically remember it.  After

25  reading my report, that's, you know --



1    Q.   But the fact that --

2    A.   -- going off of my report.

3    Q.   But the fact that you wrote it here would

4    indicate that that's what you heard him say.

5    A.   Absolutely, yes.

6    Q.   And you personally would have heard him say

7    that.

8    A.   Yes.  Well, actually, I will -- I will take

9    that back.  I don't know if I did personally hear that

10   or my -- he said it to one of my -- my colleagues and

11   they relayed it to me.  I don't remember.  I don't

12   remember if it was directly to me.  I do remember going

13   into the nursing station, but I don't remember if he

14   directly said it to me or he said it to one of my

15   colleagues.

16   Q.   What did you do when you heard him say that?

17   Did you speak to him or --

18   A.   I don't -- I don't remember that.

19   Q.   Do you have any recollection of whether you

20   told him that if he didn't agree to the strip search

21   that you would have to -- you could use force on him?

22   A.   I don't remember -- recall saying any of that.

23   It's very limited on what I recall.

24   Q.   Looking at the next section below the dotted

25   line, it describes taking Mr. Predybaylo handcuffed down



1   the booking hallway to the photo machine, and it

2   describes Mr. Predybaylo complaining about deputies

3   touching him.  What do you recall about that?

4       A.   Well, after reviewing the video, you know,

5   seeing it, I just -- like I said, you know, what's

6   actually recalling or reviewing the video, I just

7   remember him being -- you know, kind of turning around,

8   not wanting us to touch him, just being very verbal.  I

9   think on the video at one point too he kind of pulls

10  away from our escort.

11      Q.   Well, what I'm trying to get at here, Officer,

12  is you wrote this -- these statements into the PF10

13  likely within the hour after the strip search was

14  conducted.  So this would have been fresh, correct?

15      A.   I would think so, yes, because of --

16      Q.   Okay.  Looking at this PF10, does that refresh

17  your recollection at all about Mr. Predybaylo

18  complaining about deputies touching him?

19      A.   Some.  It's very, very limited, though.

20      Q.   Okay.  So nothing's coming back to you.

21      A.   Well, it's very limited.

22      Q.   Okay.  What -- what's coming back to you about

23  that?

24      A.   I just remember him being -- like you said, he

25  was verbally -- verbally abusive and walking down the



1  hallway, he didn't -- didn't want us touching him, and

2  he would, you know, move his body back and forth -- you

3  know, when you escort somebody, you're usually just

4  lightly holding their arm -- kind of pulling away.  I do

5  remember at one point, I think in the -- the -- where we

6  take the photos, you know, he kind of pulled away.  It

7  wasn't like combative but, you know, actively just kind

8  of pulling away a little bit.

9       Q.   Are there -- is there audio recording on any

10  of those cameras or are they all just video?

11       A.   The entire booking loop and everything is just

12  video.

13       Q.   What about the hallway to the safety cells?

14       A.   As far as I know, it's all just video.  We

15  don't have audio cameras in -- like I don't think on

16  hardly any of the cameras in the jail.

17       Q.   Okay.  Now, it says here that "During the

18  strip search in safety 2 Predybaylo turned around

19  towards deputies after being told multiple times to face

20  the wall."

21       A.   Uh-huh.

22       Q.   Then it says, "Predybaylo was placed into a

23  rear wrist lock and told he needed to follow directions

24  for" -- do you see that.

25       A.   "...follow directions," "rear wrist lock,"



1  "needed to follow directions for deputies safety."  Yes.

2      Q.   Now -- and then it continues and says,

3  "Predybaylo refused to follow directives" and then you

4  put him on his belly.  It says actually you attempted to

5  put him on his belly.

6      A.   Yes.

7      Q.   Was there a problem with putting him on his

8  belly?  He -- you couldn't get --

9      A.   It said he refused to lay on his belly.

10     Q.   So you asked him to lay on his belly and he

11  refused?

12     A.   Apparently, yeah.  "Deputies attempted to

13  place him on his belly for strip search."  That's

14  generally what we do is like we tell them get on their

15  knees and then get on their belly and we support their

16  upper torso as we lay them on their belly.  Apparently

17  here he refused to do that.

18     Q.   Do you have any memory about how you got him

19  onto the ground?

20     A.   I don't have any memory, but I know how we do

21  it.

22     Q.   Can you describe for us how you do it.

23     A.   If somebody refuses to get on the ground,

24  usually we'll have a deputy -- we'll have one deputy on

25  the right, one deputy on the left of his arms supporting



1  him, and a lot of times we'll just have a deputy come

2  up, grab his feet, lift up, and we lay him down on his

3  belly.

4      Q.   Do you have any recollection as to whether or

5  not that was the same process used with Mr. Predybaylo?

6      A.   I don't remember exactly, but I'm pretty sure

7  that's what we did.  That's what we always do.

8      Q.   Do you recall any other holds or force that

9  you may have used on him?

10     A.   After we placed him on -- on his belly?

11     Q.   At any time.

12     A.   At any time, I think I put him in an armbar

13 while you're removing his shirt to keep him from rolling

14 over.

15     Q.   And did Mr. Predybaylo take off any articles

16 of his clothing when he was asked to?  For example, when

17 he was asked to take off his shirt, do you remember him

18 taking off his shirt but then he stopped and said "No.

19 I'm not taking off my pants"?

20     A.   I don't remember.  I don't remember.  At that

21 point, probably we did it for him.  I don't remember,

22 though.  If we had to put him in an armbar, we probably

23 just went ahead and took off his shirt and stuff off for

24 him.

25     Q.   Looking at this description, it doesn't



1   describe him giving you any active resistance other than

2   having -- being told to face against the wall.  Do you

3   see anything in here about him giving any active

4   resistance or refusing any other directives?

5       A.   Well, he refused to lay on his belly.  So once

6   we placed him on his belly, then, yeah, he was in a

7   control hold.  So, you know, at that point I think we

8   were probably in control and just did it for him.  But

9   there's nothing that says, you know, he was pulling away

10  from us at that point.  I don't -- to keep him from

11  rolling over towards deputies, you're --

12      Q.   Okay.  And just so I make sure I understand --

13  you've already testified about this, but make sure I

14  have it correct in my head.  At the point in time where,

15  you know, he refused to follow directions about keeping

16  his head against the wall and then again at the point

17  where he purportedly refused to lay on his belly, at

18  either one of those two opportunities you did not say

19  "Look, you either cooperate here and we're going to" --

20  you know, "or else we're going to lock you in this cell

21  until you do cooperate."  In other words, did you use

22  any nonforce means to attempt to get him to cooperate?

23      A.   I'm sure we did.  That's why I put him into a

24  control hold and explained it to him and gave him

25  another opportunity.  We usually do.  That's just pretty



1   standard procedure is that we try and talk to them and

2   tell them, you know.  But, you know, I don't --

3       Q.   Well, did you tell him that --

4       A.   I don't recall everything, but I also know

5   that him coming down the hallway and everything there

6   was already a preexisting attitude that he had and

7   showing, you know, resistance, so it might have been

8   less than just somebody walking in there on their own

9   accord.

10      Q.   Did you give any thought to him just being

11  locked up in the cell until he said "I'm going to

12  cooperate"?

13      A.   To exit the cell and leave him in there?

14      Q.   Yeah.  Until he agreed to cooperate.

15      A.   No.  No.

16      Q.   And --

17      A.   I mean, he cooperated in terms of strip

18  search.  He just did not want to do it the way that

19  we -- you know, to be -- to safely complete removal of

20  the clothing and all that.  There's different levels of

21  cooperation, you know.

22      Q.   Can you explain that last statement for me?

23  You said he --

24      A.   Yes, he cooperated in terms of he completed

25  the strip search, you know.  But he didn't want to



1  cooperate in the terms of, you know, stay facing the

2  wall, you know, things like that.  There's different

3  levels of cooperation.  So he did perform the strip

4  search, we were able to complete that, as it says in my

5  report, but he did not want to do it in a safe manner.

6      Q.   Now, when you said he cooperated with doing

7  the strip search itself, you mean that he voluntarily

8  spread his own cheeks for you.

9      A.   Yes, sir.  Because if he hadn't, we would --

10 it would have been -- you know, it would have been a

11 whole different situation.

12     Q.   Okay.  Are you able -- or is it authorized for

13 you to like just spread his legs and spread his cheeks

14 yourselves?

15     A.   No.  We -- we don't touch any part of their

16 buttocks or genitalia or anything like that.  The legs,

17 you know, like if you're down on legs, you can use their

18 feet and spread their feet a little bit, but we don't

19 touch or would we ever touch any part of their -- you

20 know, their genitalia, buttocks area, or even their

21 mouth.  We don't -- we don't do that either.

22     Q.   Now, you've reviewed the video in this case,

23 correct?

24     A.   Yes.

25     Q.   And do you recall the portion of video where



 1   the question.

 2   BY MR. DWYER:

 3       Q.   Yeah.  Do you remember the position you were

 4   in?

 5       A.   I do remember I had my leg across his back or

 6   head or like pinning him to the ground, yeah.

 7       Q.   Can you tell us why?

 8       A.   Well, apparently it's -- he was, you know --

 9   to hold him so he could complete the removal of his

10   clothing, so he wouldn't roll over on us.

11       Q.   Can you tell us, do you remember, have any

12   recollection about where you were at the beginning of

13   the process when you first brought him into the cell?

14       A.   I believe -- trying to remember the video.  I

15   believe I was on the left -- I was either on the left or

16   the right-hand side.  I don't remember.  But I was

17   escorting him and I had a partner over there, so --

18       Q.   And after he was facing the wall, at some

19   point did you go around to his -- to his back side and

20   the center of his back and hold his cuffs or hands?

21       A.   At some point I probably did, yeah, because I

22   was probably going to remove the cuffs or -- I don't

23   remember.  Have to see the video again.

24            MR. GROSS:  That's okay.

25            THE WITNESS:  But, yeah, I don't remember.



```
 1                    EXAMINATION

 2   BY MR. GROSS:

 3        Q.   Deputy Hopeck, I have what we're going to mark

 4   as Exhibit 15 to this deposition.  It's been previously

 5   marked DEF 376.  And it's a video that appears to be

 6   inside safety cell number 2 marked at the top of the

 7   video "Wednesday, July 5th, 2017, at 5:30:52 p.m.," and

 8   it's right at about 30 minutes and 43 seconds in the

 9   actual video file.  And so you're having a chance to

10   look at the video right now.  It's paused at 30 seconds

11   and 43 seconds.  And can you describe to me your

12   position in this video.

13        A.   I'm on Mr. Predybaylo's right side.  I have my

14   right leg on his upper back, shoulders, and my right

15   hand is holding his left arm.

16        Q.   And how would you describe your body weight on

17   Mr. Predybaylo?

18        A.   Well, my body weight is on my left leg and I'm

19   just holding him there so he can't roll over.

20        Q.   And why is your weight on the left side of

21   your body?  What's the purpose of that?

22        A.   To not put my weight on him.

23        Q.   And is there any sort of specific technique or

24   purpose towards taking the weight off him and having

25   your knee just run across the upper portion of his body
```



1   along the shoulder?

2       A.   It's just a preventative measure so he doesn't

3   roll over.

4       Q.   And so if he were to roll over, what would be

5   the first body part he would hit?

6       A.   Be my -- my right leg that was across his

7   upper back or shoulder.

8       Q.   And then would it be safe to assume you would

9   then use more force or a different technique to control

10  him once he hit your right knee?

11      A.   Yes.

12      Q.   And can you describe to me in this video --

13          Do you recognize the other two deputies in

14  this safety cell video?

15      A.   Yes.

16      Q.   And who -- there is a second deputy that

17  appears to be also touching Mr. Predybaylo.  Do you know

18  who that is?

19      A.   I believe that's Deputy Gonzales.

20      Q.   And do you know what -- what control hold he's

21  using in that video?

22      A.   Yes.  It's a figure-four leg control hold.

23      Q.   And what's the purpose of the figure-four leg

24  control hold?

25      A.   Well, he would be -- when we exit the cell, he



1  26 minutes and 1 second, and this is a brief 11-second

2  clip of -- inside safety cell number 2.  And can you

3  tell me who is removing the Post-it note from the

4  camera?

5       A.   Deputy Gonzales.

6       Q.   I'm going to play the video now.

7            Can you describe from watching that -- I just

8  stopped it at 26 minutes and 10 seconds.  Where are you

9  positioned in the video?

10      A.   I'm on the right side of Mr. Predybaylo.

11      Q.   And who's holding the other half of

12 Mr. Predybaylo?

13      A.   Deputy Ranum.

14      Q.   And can you describe Mr. Predybaylo's behavior

15 in this 10-second clip as you're entering safety cell

16 number 2.

17      A.   Well, he's -- he's talking and he's turning to

18 the left as he's like attempting to turn around towards

19 Deputy Ranum.

20      Q.   And is he following your directives while

21 entering safety cell number 2?

22      A.   Well, we had told him multiple times just to

23 walk in and, you know, stop turning around, just walk

24 forward, and it appears there in the video that he's

25 continuously turning to the left turning around towards



1   at that point.

2       Q.   So based upon the video you just saw, you

3   think that you removed his shirt, his pants, and his

4   boxers?

5       A.   Well, I wouldn't have removed.  It would

6   probably be -- Deputy Wilson was on the legs.  He

7   probably would have removed his pants and boxers.  I

8   would have assisted Deputy Gonzales in removing his

9   shirt.

10      Q.   And do you have any memory of that?

11      A.   No, I don't.

12      Q.   Okay.  And do you recall whether he struggled

13  or fought you over that?

14      A.   I don't recall, but I don't remember he -- I

15  don't remember any point in time he fought us, no.

16      Q.   So you have no recollection of him ever

17  fighting you, striking you --

18      A.   No.  No, he did not.

19      Q.   -- wrestling with you?

20      A.   I know he did not fight us.  I would have

21  remembered that.

22      Q.   He just simply refused to take his clothes

23  off.

24      A.   I assume in the beginning part.  I don't

25  remember if he said "I'm not going to take them off."



1  Deputy Ranum.  So no.

2          MR. GROSS:  Thank you, Deputy Hopeck.  I have

3  no further questions.

4          MR. DWYER:  Thank you, Matt.  You actually

5  answered -- took some of the questions I was going to

6  do, so let me just go over my list, but I think we're

7  done here.

8          I do have a couple questions for you,

9  Officer Hopeck.

10                  FURTHER EXAMINATION

11  BY MR. DWYER:

12     Q.   Can you tell me whether or not my client

13  refused to take off his clothes or -- and/or refused to

14  do the actual showing you his genitalia?

15     A.   Well, he showed us his genitalia and did

16  the -- and spread his buttocks.  I don't remember if he

17  said "I refuse to take off the clothes" or he just

18  wasn't doing it in a safe manner.  I don't remember him

19  saying "I'm not going to take off my clothes."

20     Q.   Do you recall whether or not you had to take

21  his clothes off or whether he removed them?

22     A.   I don't recall.  But looking at the video and

23  knowing how our procedures are, I'm sure that we would

24  have done it at that point, because usually once they're

25  placed on their belly, we just end up doing it for them



JARROD HOPECK                                    October 21, 2020
PREDYBAYLO V. SACRAMENTO COUNTY                              86

1   But I think it was more of the procedure, like not

2   facing the wall.  Those are the issues that he didn't

3   want to cooperate in.  So at that point we just put

4   him -- laid him on his belly and removed them for him.

5        Q.   Okay.  So my understanding of your last answer

6   is that the problem was he was not keeping his head

7   against the wall and -- when he first was brought in,

8   and consequently you --

9        A.   He wasn't facing the wall.

10       Q.   Wasn't facing --

11       A.   Not his head against the wall.

12       Q.   Wouldn't stay facing the wall.

13       A.   Yeah.

14       Q.   So based upon that, you put him in a control

15   hold and then you put him to the ground and took off his

16   clothes.

17       A.   Yes.

18       Q.   But after you had his clothes off, he agreed

19   and he went back with his own hands and separated --

20   pulled his cheeks apart for you.

21       A.   Apparently did, yeah.  Because we would have

22   gone down a whole different path if he had refused that.

23            MR. DWYER:  I have no further questions, Matt.

24            MR. GROSS:  No further questions.

25            We can go off the record.



```
 1                    REPORTER'S CERTIFICATE

 2                         --oOo--

 3           I, the undersigned, a Certified Shorthand

 4    Reporter in the State of California, do hereby certify:

 5           That the foregoing proceedings were taken by me

 6    at the time and place herein set forth; that any

 7    witnesses in the foregoing proceedings, prior to

 8    testifying, were placed under oath; that the testimony

 9    and proceedings were reported stenographically by me and

10    thereafter transcribed under my direction; further, that

11    the foregoing is a true record of the proceedings taken

12    at that time.

13

14           IN WITNESS THEREOF, I have this date subscribed

15    my name.

16

17    Dated:   November 6, 2020

18

19

20    _____
      Sharon C. Holloway, RPR
21    Certified Shorthand Reporter
      State of California
22    Certificate No. 12227

23

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

# EXHIBIT C

{02518243.DOCX}

1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        --oOo--

4   Alexsey Predybaylo, an
    individual,
5
                    Plaintiff,
6
                vs.                    Case No.:
7                                      2:19-CV-01243-MCE-CKD
    Sacramento County, California,
8   a county government and the
    operator of the Sacramento
9   County Sheriff's Department
    and its Correctional Health
10  Services Division; and Does
    1-20,
11
                    Defendants.
12  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

13

14

15                  DEPOSITION OF

16                  ROBERT RANUM

17                October 21, 2020

18                   1:24 p.m.

19

20              Sacramento, California

21

22

23

24

25      Reported by Sharon C. Holloway, CSR No. 12227



ROBERT RANUM                                      October 21, 2020
PREDYBAYLO V. SACRAMENTO COUNTY                              14

1  force?

2      A.   Yes.  I -- we would -- we would take the

3  clothing from them.

4      Q.   And you would, what, put them in a control

5  hold and then remove clothing?

6      A.   If we do need to have a control hold, but if

7  we're -- we do maintain control of them for safety.

8  We're taught, you know, if you can touch them, you

9  can -- you have about half-second reaction time to

10  understand when they're going to do -- make a furtive

11  movement.

12      Q.   If you have to take the clothing from them, do

13  you do that when they're standing up or do you put them

14  on the ground?

15      A.   We put them on the ground.

16      Q.   And you put them -- do you put them facedown?

17      A.   Yes.  I've done it from people standing up,

18  and that's when there's an obvious medical issue.  Some

19  of the older males -- because I only deal with males --

20  they just aren't able to bend their knees.  But we try

21  to accommodate it the best way we can.  But it's

22  generally safer on the ground.  The cell is padded.  And

23  so that's why we do that -- do it that way.

24      Q.   Do you ever use a technique of -- without any

25  force where you simply -- if they keep refusing, you



1         And I don't remember my conversation with him,
2    but I'm inferring that at some point he was just like,
3    "Okay.  This is serious.  I need to listen to these
4    guys," and then that's why the rest of the search was --
5    he was cooperative during that time.
6         Q.   Well, according to the records, you were in
7    the cell, the safety cell, during the strip search
8    process.  You have no recollection of some event or
9    something he did or said that led to the almost
10   immediate use of force?
11        A.   I don't remember the incident.  It was -- I
12   mean, I guess it was unmemorable.  I'm just going off
13   the video that I saw.  It was a few years ago.
14        Q.   Well, if my client had been, you know, violent
15   or started to take a swing at somebody or wrestle, I
16   mean, that would be something you'd remember, right?
17        A.   Yes.
18        Q.   So he didn't do anything like that.
19        A.   No.
20        Q.   Might he have had kind of an attitude about
21   him?
22        A.   Yes, maybe.
23        Q.   And -- but don't a lot of people getting
24   arrested kind of have an attitude because, well, who
25   likes to be arrested and --



ROBERT RANUM                                    October 21, 2020
PREDYBAYLO V. SACRAMENTO COUNTY                              20

```
 1        A.   Exactly.  And so --

 2        Q.   And --

 3        A.   -- that's why we try -- sorry.

 4        Q.   And so what I'm trying to understand here is

 5   why they didn't just -- if he had an attitude problem or

 6   wasn't going to be, you know, snappy cooperative, you

 7   know, give him a verbal judo lay of the -- you know, lay

 8   down the law and come back in 10 minutes; maybe he's got

 9   a different approach, it will get done in one minute,

10   real simple?  I'm trying to understand what happened in

11   there.

12        A.   Yeah.  We -- well, we talk about that verbal

13   judo.  That's something that we would much rather use.

14   And a lot of the times I think we are effective.  Some

15   people are more effective than other people.  But at

16   that time when he was turning around, from the video, we

17   were already inside of the cell.  Would have been more

18   dangerous for us to just kind of leave the cell.

19        Q.   So are you trying to say that once you're in

20   the cell, once you have the person in the cell, it

21   really is -- you've kind of like crossed the threshold

22   that if they don't cooperate you're going to use control

23   holds and use force?

24        MR. GROSS:  Objection.  Misstates the prior

25   testimony.
```



1          But I can let you explain.  Go ahead.

2          THE WITNESS:  So once we go in there and we're

3    past this threshold, it's -- you don't want to just let

4    the person go.  I mean, if -- just -- it's dangerous.

5    You don't want to -- we have the situation under

6    control, and so we want to continue to what we're doing

7    in the way that we learned, which is placing them on the

8    ground and -- safely and then backing out at that point,

9    which we did.

10   BY MR. DWYER:

11       Q.   Okay.  I understand your answer with respect

12   to someone who's showed some tendency towards violence,

13   you know, taking a swing or want to wrestle or, you

14   know, being physical in some sense, because clearly you

15   don't want to lose control there, so that makes sense.

16   But everyone's testimony so far and the PF10 indicate

17   that nothing like that happened.

18       A.   Yes.  I agree.

19       Q.   So if that's the case, nothing like that

20   happened, then what was the problem with just leaving

21   the cell and saying "Look, you know, Predybaylo, you got

22   a problem here, an attitude problem.  This is not

23   working for us.  Get it together.  We're coming back in

24   10 minutes, we're going to do the strip search"?

25       A.   Yes.  I think part of that was we had to



1   retrieve the evidence for the arresting officer.  They

2   don't stick around.  They needed items of clothing for

3   their case.  And also we want to move these people along

4   with the process.  So at some point during us undressing

5   him, he became cooperative is what I'm assuming because

6   I let him out of the cell right afterwards.

7       Q.  Well, so let me go back to this issue of the

8   officer waiting for the clothing.

9       A.  Yes.

10       Q.  I mean, you know, can't you just put the

11   clothing in a bag?  You have an evidence bag, right, and

12   you mark "Predybaylo" on it and the date and time and

13   "Clothing" and, you know, "Sacramento PD" and

14   Officer Hall can come and get it whenever, right?

15       A.  There's evidence issues.  I mean, we're very

16   careful with our evidence and who touches it and it's

17   documented, and so --

18       Q.  Yeah.  But I understand evidence.  I mean, I

19   deal with evidence in police cases all the time, and you

20   put it in an evidence bag and you mark it and hold it

21   for them.  And if they want to come get it, they come

22   and get it.  I don't understand why -- why would you

23   need to use force -- why would the -- Sergeant Hall's

24   desire to get the clothing get out of there be more

25   important than my client's right to personal safety?



1        A.   Well, I --

2             MR. GROSS:   I'm going to object as

3    argumentative.

4             But you can answer.

5             THE WITNESS:   I mean, we didn't have to fight

6    him like, you know, you were saying.   There wasn't any

7    violent encounter with him.   It was just him being

8    verbally uncooperative at the beginning.   You know,

9    again, from the video -- I wish I remembered what he

10   said and how this whole thing transpired.   I don't.   But

11   from the video, he -- he was making some -- we have

12   people face the wall right away.   He kept turning around

13   on us.   So we grabbed ahold of him and assisted him to

14   the ground and grabbed the evidence.

15   BY MR. DWYER:

16        Q.   Did you take him to the ground as soon as he

17   tried to turn away from the wall?

18        A.   I don't remember.

19        Q.   Okay.   That's what I thought I just heard you

20   say.

21        A.   Yeah, if I did, I apologize.   Yeah, I don't

22   remember how long it took for us to -- usually when we

23   grab them we are -- we give them another chance.   We'll

24   back up, "Hey, are you going to go with the program?"

25   We use that verbal judo.   And if, you know -- if he



ROBERT RANUM                                      October 21, 2020
PREDYBAYLO V. SACRAMENTO COUNTY                                 24

1    becomes argumentative and -- and, you know, we're

2    already in there, we have to lay him down.  And then

3    we'll even talk to him again on the ground.

4         Q.   Yeah.  I hear what you're saying.  I

5    appreciate what you're saying.  But the problem is

6    there's this gap, and none of the officers have been

7    able to answer the simple gap question, which is, what

8    did he do that was so urgent or significant that you

9    needed to put him onto the ground?  You said that he was

10   cooperative enough that you let him out within two

11   minutes.  So the other --

12        A.   That was once --

13        Q.   -- officers testified he, you know, cooperated

14   with the strip search and by peeling his cheeks back.

15   And I'm at a loss to understand what happened in that

16   safety cell that my client ended up, as shown in that

17   video, pressed to the floor of the cell naked?

18        A.   We don't place people on the ground that are

19   cooperative.  We don't.  There's no reason to.  And so

20   he was uncooperative up to that point.  I don't

21   remember -- I mean, you see the video.  He turns around

22   on us multiple times, and that is in direct -- directly

23   against what we tell him to do for our safety and his

24   safety.

25        Q.   Well, I do know why -- my client has told me



1    Q.   There's something missing here.  Something's
2    not jibing.  Do you understand my --
3    A.   Yeah.  I don't remember this incident.
4    Q.   Do you see where I'm coming from?
5    A.   Yeah, I do.  And I just don't remember this
6    incident in particular.  I'm trying to go off of -- I've
7    done hundreds of these strip searches.  I worked down
8    there for over a year and a half.  I'm trying to go off
9    of all that and what I saw in the video.
10        I don't remember what happened the middle, but
11   if he was uncooperative, I would not have let him out of
12   that cell within a couple of minutes afterwards.  It
13   just -- he at some point -- I'm assuming from the video
14   that he became cooperative and said "Okay.  I'm going to
15   do what you guys asked" and there was no need for us to
16   force any strip search.
17   Q.   Okay.  Well -- but at some point he was
18   uncooperative, apparently.  Is that your view?
19   A.   Yeah.  I think it wasn't following directions.
20   Yes.
21   Q.   Well, at some point wasn't following
22   directions to do the strip search.  And my question is,
23   what's wrong with just backing out of the cell and
24   saying "Look, you're not cooperating, Predybaylo.  We
25   got to get this done.  We don't have time to waste.



1    We're leaving.  We're coming back in 15 minutes.  We

2    expect you to have a different attitude and to cooperate

3    with us," leave the cell, you close the door, come back

4    and knock in 15, you know, you call through the door and

5    say "Hey, Predybaylo.  You ready for a strip search, yes

6    or no?"

7         A.   We were already in the cell and holding on to

8    him.  That would have been unsafe for us to do that,

9    especially if they're not listening to us.  We have to

10   safely exit the cell.

11        Q.   If he wasn't being violent or being forceful

12   or wasn't doing anything, then why would you have him in

13   a control hold, number one.  Number two, why didn't you

14   let go of him and just leave?  You said he's not being

15   violent.

16        A.   Yeah.

17             MR. GROSS:  Objection to the form of the

18   question, also vague and argumentative as to "not doing

19   anything."  I mean, Deputy Ranum has already testified

20   to that.

21             But go ahead and answer.

22             THE WITNESS:  What's the question?

23             MR. DWYER:  Madam Reporter, can you read back

24   the question for us.

25             (Record read.)



ROBERT RANUM                                     October 21, 2020
PREDYBAYLO V. SACRAMENTO COUNTY                              37

 1   into that.

 2          What I'm trying to get at is I'm trying to

 3   understand -- and this is such an important question.

 4   Goes right to the heart of the case -- why was it

 5   necessary to use force?  And by "use force," I mean pick

 6   him up and put him on the ground.  Why didn't you

 7   just --

 8      A.   For his --

 9      Q.   Why didn't you just tell him "Look, you've got

10   an attitude problem.  We need to get this done.  We

11   don't want to use any force on you.  We're coming back

12   in 10 minutes.  Fair warning"?  Why couldn't you do

13   that?

14      A.   We were in the cell, all the way in the cell,

15   we were up against him, and he -- well, I don't remember

16   what he said, and so this whole attitude problem, if

17   that's what he said, then he had an attitude, but I see

18   him turning around on us.

19          Now, you don't turn around to face somebody in

20   that situation unless -- you're probably looking for a

21   place to punch somebody.  So that -- we -- there's no

22   reason for him to look unless he's looking for a place

23   to land a punch.  And that's that kind of spidery sense,

24   spidey sense you feel after working down there for so

25   long, and that's what made us nervous.  I mean, and



1   that's what I'm seeing on the video.

2        Q.   Okay.  When I saw the video, in the brief

3   moment when they take off the Post-it pad and put it

4   back on, showing him against the wall, he was

5   handcuffed.

6        A.   Yeah.  You can't take off his shirts without

7   his handcuffs being off.

8        Q.   Okay.  So, you know, I don't understand why

9   the policy as stated in Exhibit 8 is not actually --

10  does not appear to be put into practice.  And it appears

11  to be -- you basically have offered two reasons for me.

12  And let me reiterate them to you, and please correct me.

13       A.   Yes.

14       Q.   What happened here was Sergeant Hall was in a

15  hurry to get the clothing because he wanted to get on to

16  his -- the rest of his shift at the Sacramento PD, and,

17  you know, it's inconvenient.  Once you've got him in the

18  cell and you've got him in a controlled space, it's kind

19  of inconvenient to have to stop and, you know, go

20  through the process of leaving him in a cell and coming

21  back later on.

22            And so I've heard two reasons why the use of

23  force was immediate.  And that was Sergeant Hall wanted

24  his clothes right then and there, and it's inconvenient

25  to leave him in the cell alone to change his attitude.



```
 1                      EXAMINATION
 2   BY MR. GROSS:
 3        Q.   All right.  Deputy --
 4        A.   Ranum.
 5        Q.   Yes, Ranum.  Okay.  I'm going to show you what
 6   has been previously marked as Exhibit 16, which is a
 7   video of the male ID station where they take the photo
 8   of the fresh arrestee, and I've got it Wednesday,
 9   July 5th, 2017, at 5:23 and 35 seconds p.m., or about
10   23 minutes and 30 seconds into the video.  And so I'm
11   going to play a couple portions of the video for you and
12   ask you some questions.
13             And I've paused the video at 23 minutes and
14   36 seconds.  Can you tell me how many deputies are
15   holding Mr. Predybaylo?
16        A.   Two deputies.
17        Q.   And is that ordinary, for two deputies to be
18   holding an arrestee when they're about to get their
19   photo taken?
20        A.   No.
21        Q.   And what is not ordinary about that?
22        A.   We would probably only have one just because
23   he's handcuffed and you want to make sure that it's for
24   his safety, because if he falls, he can't use his arms.
25   But you wouldn't have two.  Two is -- indicates to me
```



1  that he's been uncooperative throughout this process.

2      Q.   And are all arrestees in handcuffs when they

3  have their photograph taken at this point in the booking

4  process?

5      A.   No.

6      Q.   Okay.  And can you tell from the video if

7  Mr. Predybaylo has his hands handcuffed?

8      A.   Yes, his hands are handcuffed.

9      Q.   And so would that be another indicator that at

10  some point during the booking process up to just before

11  this photograph session that he has been uncooperative

12  in some way?

13     A.   Yeah.  We would leave somebody that's

14  uncooperative in handcuffs.

15     Q.   I'm going to continue to play the video from

16  23 minutes and 36 seconds.

17          And so I'm pausing the video again at

18  23 minutes and 50 seconds.  Was there anything from that

19  15-second clip that you saw of Mr. Predybaylo's behavior

20  that you could describe?

21     A.   It looked like he was moving his right arm

22  around, trying to get it in front of his body or

23  something.  It looks like he's pulling it out.

24     Q.   Could that be interpreted as a form of passive

25  resistance --



```
 1        A.    Yes.

 2        Q.    -- to a deputy?

 3        A.    Yes.

 4        Q.    I'm going to continue to play the video from

 5   23 minutes and 51 seconds.

 6              I'm pausing the video again at 24 minutes and

 7   11 seconds.  Was there anything else from that video

 8   that you noticed of Mr. Predybaylo's behavior?

 9        A.    It looks like he's again doing something with

10   his right arm, pulling it away from Deputy Hopeck.

11        Q.    And I'm going to continue to play the video.

12              I'm pausing the video at 24 minutes and

13   39 seconds.  Can you tell me what Deputy Gonzales is

14   doing at this point?

15        A.    He is -- the deputy is grabbing a thumbprint

16   from the arrestee.

17        Q.    Playing the video again.

18              And I've paused the video again at 25 minutes

19   and 1 second.  Can you tell me what Mr. Predybaylo is

20   doing in this video right now.

21        A.    Looks like he's trying to like wrestle away

22   from us.  At one point I had just one hand grasping the

23   back of his left elbow, but then I had to grab him with

24   both hands and kind of get a wide stance.

25        Q.    And how would you describe this behavior
```



1 during the photograph session of the booking process?

2     A.   He's being uncooperative and -- yeah.  It

3 looks like he's being uncooperative, and physically

4 he's -- looks like he's resisting.  He's in handcuffs,

5 so I don't know why he's resisting, but he's definitely

6 making some movements that are causing us to have to

7 react to those movements.

8     Q.   I'm going to switch now to the next exhibit,

9 what has been previously marked as Exhibit 15.  This one

10 is at 26 minutes and one second into the video, and at

11 the top left it's dated Wednesday, July 5th, 2017, at

12 5:26 and 11 seconds p.m.  And I'm going to play this

13 video for you.

14         And so I paused it right now at 26 minutes and

15 4 seconds.  Can you identify yourself in the video?

16     A.   I'm the officer on the left arm of Predybaylo.

17     Q.   And I've paused the video at 26 minutes and

18 7 seconds.  Can you describe what Mr. Predybaylo is

19 doing now at this portion of the video?

20     A.   He's not following our directions to face the

21 wall.  He looks like he's turning around towards us.

22     Q.   And is only his head turning around to face

23 you guys?

24     A.   No.  His -- everything from his feet, lower

25 body, upper body, his shoulders.



```
 1        Q.   Is this a potential concern for you for
 2   officer safety as you're trying to complete this strip
 3   search?
 4        A.   Yes.  It's -- we want him to face the wall for
 5   his safety and ours.
 6        Q.   So I've paused the video again at 26 minutes
 7   and 11 seconds.  What's happening at this point?
 8        A.   Deputy Gonzales covers up the camera.
 9        Q.   And why does he cover up the camera?
10        A.   For the strip search.  It's for the inmate's
11   privacy, so that we don't video-record him naked,
12   essentially.
13        Q.   And was there a concern that if -- after this
14   video's been covered, you had previously testified that
15   Mr. Predybaylo was turning his portion of the body as
16   he's entering safety cell number 2.  Was there a concern
17   that he might do this again if you released him and
18   tried to exit the safety cell?
19        A.   Yes.  Absolutely.
20        Q.   And why is that a concern?
21        A.   Well, his behavior from the videos that I've
22   seen just show that he's not following our directions,
23   being uncooperative, he's not allowing us to kind of do
24   our job and escort him down.  And so when he -- we put
25   him in there, it looks like he's turning on us.  So
```



1    it's -- it's just kind of a consistent -- you know, he's

2    shown us consistently that he's going to be

3    uncooperative.

4         Q.   Would you characterize his behavior as merely

5    having a bad attitude?

6         A.   No.

7         Q.   How would you describe Mr. Predybaylo's

8    behavior throughout the booking process so far that

9    you've seen in these videos?

10        A.   He's physically being uncooperative and

11   turning around on us.  But I mean, if he's not in

12   handcuffs, he might be trying to fight us.  And so

13   that's kind of something we keep in our mind is that

14   he -- you know, if we were to take off the handcuffs,

15   you know, could this go and him be violent with us.

16        MR. GROSS:  Thank you, Deputy Ranum.  I have

17   no further questions for you.

18                   FURTHER EXAMINATION

19   BY MR. DWYER:

20        Q.   Deputy Ranum, is it -- do you know for certain

21   whether or not my client was being passive resistive or

22   is that just your speculation?

23        A.   I can see it on the video.  I don't remember

24   the incident, but I see him being passively resistant in

25   the video.



```
 1        A.   Yes.  I'm --
 2             MR. DWYER:  Objection.  Calls for speculation.
 3             But go ahead.
 4             THE WITNESS:  I'm a training officer at the
 5   jail, so I train people on indicators to look at when
 6   they're -- when force might be used.  So yes, I think I
 7   am a pretty good judge of when that happens, therefore I
 8   train -- I've trained 23 deputies in booking.
 9   BY MR. GROSS:
10        Q.   And do you -- based on the video that you've
11   reviewed, the PF10 report, and some of your own personal
12   memory regarding this incident, do you think that
13   Mr. Predybaylo was resist -- was passively resisting
14   throughout this process?
15        A.   I do.
16        Q.   And is it correct that you believe based on
17   your experience at the Sacramento County Main Jail that
18   he was not making movements or resisting based on some
19   sort of medical need or an itch or a scratch that he had
20   during this process?
21        A.   Yes.  It's absolutely correct.
22             MR. GROSS:  Thank you, Deputy.  I have no
23   further questions.
24             MR. DWYER:  I have no further questions.
25             (The deposition concluded at 2:46 p.m.)
```



1                    REPORTER'S CERTIFICATE

2                          --oOo--

3           I, the undersigned, a Certified Shorthand

4    Reporter in the State of California, do hereby certify:

5           That the foregoing proceedings were taken by me

6    at the time and place herein set forth; that any

7    witnesses in the foregoing proceedings, prior to

8    testifying, were placed under oath; that the testimony

9    and proceedings were reported stenographically by me and

10   thereafter transcribed under my direction; further, that

11   the foregoing is a true record of the proceedings taken

12   at that time.

13

14           IN WITNESS THEREOF, I have this date subscribed

15   my name.

16

17   Dated:   November 6, 2020

18

19

20   _____
     Sharon C. Holloway, RPR
21   Certified Shorthand Reporter
     State of California
22   Certificate No. 12227

23

24

25



# EXHIBIT D

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                          --oOo--

 4   Alexsey Predybaylo, an
     individual,
 5
                     Plaintiff,
 6
                   vs.                    Case No.:
 7                                        2:19-CV-01243-MCE-CKD
     Sacramento County, California,
 8   a county government and the
     operator of the Sacramento
 9   County Sheriff's Department
     and its Correctional Health
10   Services Division; and Does
     1-20,
11
                     Defendants.
12   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

13

14

15                    DEPOSITION OF

16                  BENJAMIN GONZALES

17                  October 21, 2020

18                     11:42 a.m.

19

20                Sacramento, California

21

22

23

24

25       Reported by Sharon C. Holloway, CSR No. 12227
```



 1      A.   I see it.

 2      Q.   Okay.  And you answered, "It did not stand

 3  out"?

 4      A.   Correct.

 5      Q.   Okay.  I have the same question.  I just want

 6  to ask you again.  It's my understanding reading your

 7  interview that this particular incident with my client

 8  Mr. Predybaylo didn't strike you as being unusual or

 9  significant.  Is that correct?

10      A.   That is correct.

11      Q.   Was it, would you consider, fairly routine?

12      A.   Routine for an uncooperative arrestee, yes.

13      Q.   Okay.  And when you say "an uncooperative

14  arrestee," do you recall how my client was

15  uncooperative?  And again, I'm looking for your

16  recollection right now.

17      A.   From my recollection -- and it may be, you

18  know, partially, for lack of a better term, skewed

19  because I watched a video -- but at that time I was

20  responsible for taking his photo ID for his wristband,

21  and particularly during that time my partner would say

22  "Hey, there's one coming down for a photo" and I'd say

23  "All right.  Come on down" and I'd direct verbally where

24  to stand and what to do.

25          But in this instance, deputies were escorting



1  him, which isn't common and not normal, so that right

2  off the bat would kind of tell me that he was not being

3  cooperative or not following directions, which required

4  the assistance of other deputies to help him down the

5  hallway so that we -- he didn't -- we didn't lose

6  control of him, basically.

7      Q.   Well, did you observe him being uncooperative?

8  Did you see him try and flee and get away or do you see

9  him try and take a swing or fight or anything like that?

10     A.   No.

11     Q.   Did you observe anything that -- physically

12 that you saw was a sign of significant failure to

13 cooperate?

14     A.   I -- at the time of the pat-down search, I

15 wasn't even paying attention to him.  I was doing other

16 tasks, and I didn't realize he was being escorted until

17 they were coming down the hallway.

18     Q.   Okay.  If someone had been doing something --

19 you know, fighting at the pat-down stand and resisting

20 physically, would you have likely noticed that?

21     A.   If it was a big enough incident, yes.  They --

22 someone would have called for help --

23     Q.   Okay.

24     A.   -- or whatever.

25     Q.   So then to the best of your recollection,



1   perfume in there, whatever -- whatever physical thing --

2   they can play a sound that might bring out your memory.

3   So did watching the video evoke any memory in you or --

4        A.   The only --

5        Q.   Did that refresh your recollection?

6        A.   The only -- the main thing that refreshed my

7   recollection, funny enough, was his booking photo due to

8   his shirt.  He had a very patterned shirt, distinct

9   shirt on, and I remembered that shirt and I remembered

10  the face.  But as far as his demeanor, his behavior, and

11  our actions, I didn't remember much.

12       Q.   I appreciate it.  Sounds like a very honest

13  answer.  I appreciate that.

14            Referring now back to the questions and

15  answers you gave on the page in your interview I just

16  referred you to -- that would be lines 283 down to maybe

17  300 -- just in generally -- I asked myself this

18  question, and I'm going to -- I'm asking you the

19  question -- if nothing significant happened with my

20  client either physically or verbally, how did my client

21  end up stripped naked, in control holds, pressed to the

22  floor of that safety cell?

23       A.   That's a good question.  It's almost -- it

24  goes two ways.  When we say he doesn't stand out, we're

25  referring to, I would say, the average arrestee that



BENJAMIN GONZALES
PREDYBAYLO V. SACRAMENTO COUNTY

October 21, 2020
14

1   comes in throughout a 12-hour shift that we're working.

2   We book in anywhere from 30 on a slow day to up to 70 on

3   a busy day.

4          And I wouldn't -- I don't know how to put a

5   number on it, but a majority of those inmates that are

6   fresh arrests, they're obviously not happy because

7   they've been taken out of the free world and

8   incarcerated, they're in a jail, they don't --

9   they're -- they don't know what's going on.  Sometimes

10   they come in under the influence of alcohol, drugs, or

11   just having the anxiety and stress of being in jail

12   built on top of that combined with someone telling you

13   what to do that you might not particularly want to do,

14   and I could see that putting someone in a -- you know,

15   we call it an uncooperative behavior, where they just

16   don't quite want to follow directions.

17          So when I say he didn't stand out, I mean in

18   that aspect of arrestees coming in on a regular basis

19   that just don't want to cooperate, and we become used to

20   that being our normal of, rather than dealing with

21   someone and ask them to doing something and them doing

22   it, to where we have to tell them two, three, maybe four

23   times before they actually comply, and then sometimes

24   they might not comply at all.

25          So in that sense, I would say your client did



1   not stand out because we've become so accustomed to

2   that.  But in terms of him ending up on a safety cell

3   floor with control holds, that's more dependent -- I

4   mean, even that is -- could be considered routine for an

5   uncooperative arrestee.  But in terms of your client

6   ending up in that position, it's usually dictated by him

7   just continually not following directions.

8       Q.   Do you have any recollection of what

9   directions my client did not follow on that day?

10       A.   Not specifically, no.

11       Q.   Do you recall in the safety cell my client

12   being physically aggressive, trying to strike anyone,

13   trying to wrestle or get away?

14       A.   I do not recall.

15       Q.   Do you recall whether or not my client refused

16   to take off his clothes?

17       A.   I'd say vaguely, yes, I remember.  I remember

18   him not wanting to follow directions.  Specifically to

19   remove his clothing, I don't recall that.

20       Q.   Okay.  Do you recall whether or not my client

21   did remove his clothing or maybe took off his shirt and

22   then stopped?  Do you recall anything like that, like he

23   took off his shirt but said "No more.  Not taking off my

24   pants" or --

25       A.   Not specifically, no.



1  goes through to sub number (4).  Take a minute to review

2  that.

3       A.   Okay.  I've read it.

4       Q.   Have you been able to read that?

5       A.   I read it, yes.

6       Q.   Okay.  Were you trained in this policy when

7  you first took training for booking?

8       A.   I was.

9       Q.   And do you recall specifically being given

10 this document?

11      A.   Yes.

12      Q.   Okay.  Has there been any --

13           To your knowledge, has there been any major

14 change, or even minor changes in that regard, concerning

15 the policy about conducting strip searches?

16      A.   Not that I know of.

17      Q.   So what I'm trying to understand is why

18 control holds -- and my client was apparently forcibly

19 taken to the ground and stripped -- why that occurred

20 before he had been put into a separate safety cell and

21 the -- and said "Look, either you cooperate or you're

22 going to stay in here until you're hungry," you know,

23 "Either cooperate with the strip search or you're not

24 going to have any food and water.  You can stay in here

25 as long as you want, buddy."  Can you tell me why my



1    client wasn't -- you know, a nonforce option like being

2    left alone locked up a cell without food and water

3    wasn't used before he was forcibly put onto the ground?

4        A.    Looking back to the situation, my most

5    plausible answer would be that based on his

6    uncooperativeness, I mean, he could have been going with

7    our directives and then not going with our directives

8    and then -- you know what I'm saying? -- going with the

9    directives, then not going with the directives, so we

10   were able to with the minimum amount of force possible

11   get him into the cell, with sufficient bodies to do it

12   safely, and then he was going with the program and then

13   maybe passively resistive, meaning that he just -- he

14   wasn't actually trying to assault one of us and escape

15   the cell but just wouldn't listen to directions.  Like I

16   said earlier, we had to tell him two, maybe three times

17   to get him to do something.

18           In that instance, I mean, we would -- we would

19   just continue with the process, where we have him in the

20   cell, we're already there ready to go, we have adequate

21   control of him without using -- and we have a reasonable

22   amount of force on him in order to prevent him from

23   turning around towards us and leaving the cell, but it

24   wasn't a clear and cut -- I mean, based off how we -- we

25   handled the situation, it wasn't a clear and cut -- he



1    didn't give me indicators to where we felt he was going

2    to get hyperaggressive to where we needed to back out of

3    there and have additional deputies on scene.

4         It's kind of gray area, if you're looking back

5    at it, to where he wasn't a clear and cut refusal where

6    he said he's not going to comply with our directives.

7    It was more of a passive just-not-going-to-listen-to-us

8    type of thing.

9    Q.   Okay.  Well, what I'm trying to understand is,

10   you know, why my client wasn't given, you know, a few

11   seconds or a minute, maybe five or 10 minutes, to change

12   his tune before force was used.  Do you understand my

13   question?  In other words --

14   A.   Why we didn't --

15   Q.   I know my own physical body and I know I don't

16   want people touching my body, taking my -- and having --

17   forcing me to take my clothes off for them.  I don't

18   like that.  Right?

19   A.   Okay.  I fully understand that.  I'm the same

20   way, and I'm sure a lot of people are the same way.  But

21   we give everyone the same equal opportunity when they

22   come in where we -- we don't like touching people.  I

23   could tell you that as the first thing.  We don't like

24   going hands onto people and so on.  We would -- we would

25   love to give people verbal directives, and that's the



1      A.   Okay.

2      Q.   Do you understand?

3           So it appears to me that the policy is written

4  so that nonforce, the lack of force, is to be used

5  first; what can you do without force so that you don't

6  have to use force?  And do you have an understanding of

7  the question?  So I'm --

8      A.   I see what you're saying.  You're asking me

9  why we didn't leave your client just uncontrolled in the

10  cell by himself and then perhaps come back at a later

11  time.

12      Q.   Yes.

13      A.   Give him a chance to calm down.

14      Q.   Yeah.  Why didn't you just tell my client

15  "Look, you're not cooperating, you're not following

16  directions, you're excited.  We need to get the strip

17  search done.  We can't get it done this way.  So if you

18  don't stop now and cooperate, we're going to leave you

19  in here until you agree to"?

20      A.   Okay.  I understand.

21           I guess first off, what I do recall about the

22  situation is there was a Sacramento Police Department

23  sergeant -- so not Sac Sheriff but a Sacramento Police

24  Department sergeant -- on scene at the time during an

25  arrest requesting that Predybaylo's clothes be seized as



BENJAMIN GONZALES                                    October 21, 2020
PREDYBAYLO V. SACRAMENTO COUNTY                                    28

1   evidence at that time so that he did not have time to

2   deface the clothing or -- you know, there's a little

3   tiny hole in that safety cell that's used for them to

4   defecate and use the restroom in, that he could have

5   shoved it down into that little grate as well, which

6   definitely would have defaced that -- that shirt which

7   was going to be used as evidence.

8           And then secondly, we were already in the

9   cell, like I stated.  And our goal, our primary goal, is

10  to use the least amount of force as possible.  And

11  Predybaylo, if I remember correctly, came in for drug

12  possession or possibly under the influence of a

13  controlled substance.  And it's in my experience from

14  working there that when you have a fresh arrestee that

15  comes in under the influence of a controlled substance,

16  a barbiturate, anything of that sort, they tend to get

17  amped up the longer that they're left alone, especially

18  when they're isolated in a cell.

19          It's been proven that when a -- when a person

20  is placed in a small confined space, their paranoia,

21  their anxiety is heightened.  And with that comes, you

22  know, possible -- possibly us leaving the cell and

23  coming back in with him at that heightened state using a

24  higher force than we had already been using.  Just using

25  control holds and a controlling force to keep him from



1    turning towards us or assuming a combative stance,

2    that's the minimum amount of controlling force we can

3    use on your client.

4         And I think -- I'm guessing based off of the

5    video, our mind-set was, if we can get this done with

6    the least amount of force possible right now, that

7    prevents us coming back in at a later time with him

8    possibly at a heightened, you know, state of just

9    anxiety and not wanting to cooperate even more so to

10   where we have to remake entry or regain control of him

11   which could have had a use of escalated force easily.

12        So our -- well, to answer your question

13   shortly, my mind-set would have been that since we

14   already had him under controlling force and weren't

15   having to, you know, throw anybody around or fight him

16   was the best option at the time.

17        Q.   Okay.  Well, I think I understand your answer,

18   but my question now is, that does not appear to comport

19   with the policy of -- the written policy of the

20   Department, which seems to me to indicate pretty clearly

21   to not use control force -- you know, control holds and

22   control force at all but to use nonforce means first,

23   and before force is used, you need to get permission of

24   a supervisor.

25        A.   But how do we -- how do we stop using



1    Q.   All right.  So he was not actively resisting.

2    A.   In a sense that he wasn't becoming combative,

3    yes.

4    Q.   Okay.  So what's the danger there of saying

5    "Well, look.  Cooperate with us or you're going to sit

6    in here for quite a long time"?

7    A.   And in the same -- in the same --

8    Q.   Just walk out of the cell.  He's not actively

9    resisting.

10    A.   In the same -- I understand where you're

11    coming from.  But working there on a day-to-day -- on a

12    daily basis, what's also to say that he's not resisting,

13    the second we let go of him he starts resisting?  It's

14    very fluid, it's very dynamic, and I wish it was that

15    clear and cut to where we could just simply walk out,

16    but too many times have we lost control of an inmate for

17    a single second and someone either gets punched in the

18    face or gets attacked and then it's an -- it's just --

19    we've lost control of them and now have to regain

20    control of them and now it's an escalated force

21    situation.

22    Q.   Okay.  I appreciate what you're saying and I

23    hear you and I do understand what you're saying and why.

24    There's some pretty tough hombres that come in there and

25    you want safety of your officers and the public that's



1          MR. DWYER:  Your witness, Matt.

2          MR. GROSS:  Thank you.

3                       EXAMINATION

4    BY MR. GROSS:

5       Q.   Deputy Gonzales, I'm going to show you what

6    was previously marked as Exhibit 15.  It's the video

7    inside safety cell number 2 dated Wednesday, July 5th,

8    2017, at 5:26 and 11 seconds p.m., or about 26 minutes

9    and 1 second into the video.  And I paused it here at

10   the 26-minute mark and 1 second.  And can you identify

11   yourself in the video?

12      A.   Yes.

13      Q.   And what does it look like you were doing

14   right here?

15      A.   I am getting ready to cover the camera inside

16   of the safety cell, probably with a Post-it note,

17   possibly with a Post-it note.

18      Q.   And I'm going to play the next 10 seconds of

19   this video and I want you to watch it.

20           And I've paused it as 26 minutes and 8 seconds

21   into the video, and it appears that you pointed up at

22   the camera.  Can you tell me why you pointed up at the

23   camera?

24      A.   Yeah.  So as a courtesy to the arrestees, we

25   try and give them the opportunity to almost 'fess up to



1    bringing contraband in the jail, because once they bring

2    it past -- it's typically -- if they bring it into the

3    jail, it's two additional felonies:  one for possessing

4    contraband within a jail and one for bringing it in.

5            As a courtesy to the arrestee, even though

6    we're well into the jail, into the safety cell, doing

7    the strip search, we give them one more chance to look

8    at the camera and admit that they brought things into

9    the jail and we will not charge them with those charges

10   typically.

11           So I'm pointing at the camera, asking him --

12   or what I typically do is I ask the arrestee, "Do you

13   have any drugs or contraband on you that we're going to

14   find during this search?"  And if they say no, then I

15   ask them, "Okay.  If we find anything, you will be

16   charged with two additional felonies.  Do you

17   understand?"  And then we try and get them to say "Yes,

18   I understand" or "No, I do not understand."  If they say

19   "Yes, I understand," then they -- we continue with the

20   search.

21       Q.   And I'm going to re-back the video up again to

22   the 26 seconds and 1 second mark and play it in full for

23   you.

24           And I've paused the video at 26 minutes at

25   10 seconds.  From watching the video, can you describe



BENJAMIN GONZALES                          October 21, 2020
PREDYBAYLO V. SACRAMENTO COUNTY                          45

1   Mr. Predybaylo's demeanor while entering safety cell
2   number 2?
3       A.   It looked -- his demeanor looked like he was
4   pulling away from the deputies that escorted him in.
5   When I asked him a question, it appeared that he turned
6   his head away from me.
7       Q.   And I'm playing the video again once more.
8   Would you describe his demeanor as cooperative?
9       A.   No.
10      Q.   Is there anything else about -- how would
11  you -- scratch that question.
12           How would you describe his -- it looks like
13  he's turning his body partially away from the wall.  Can
14  you describe to me from your hundreds if not thousands
15  of searches that you've done sort of what that
16  symbolizes or means to you?
17      A.   Yeah.  They're -- he's just basically being
18  passive resistive at that point.  We have them face the
19  wall for everyone's safety.  And we'll ask them
20  questions and they're able to answer those questions.
21  And then pushing back into us and not facing the wall,
22  not following directions is just -- it's a sign of being
23  uncooperative, which it looks like is going on in the
24  video.
25           We also -- I mean, I understand that I'm



 1  asking him a question, so he may turn away from the wall

 2  to answer my question, but we ask them not to turn away

 3  from the wall.

 4          MR. GROSS:  I'm going to pull up the next

 5  exhibit.  Apologies, Patrick.  I can find out off the

 6  record what the exact DEF label is for this, but it's a

 7  video, I can represent -- it's called "Booking 23 Male

 8  ID Station Outside Sobering," and it looks like a video

 9  that's taken as Mr. Predybaylo is getting his photograph

10  taken.

11          MR. DWYER:  Yeah.  I know the video.

12  BY MR. GROSS:

13      Q.   Okay.  And so I'm just finding the exact

14  moment to play it.

15          And so I'm going to start this -- we'll mark

16  this exhibit as 16, the video of the photo ID.  And it's

17  being played Wednesday, July 5th, 2017, at 5:23 and

18  33 seconds p.m., or 23 minutes and 29 seconds into the

19  video.

20          And I've paused the video now at 23 minutes

21  and 36 seconds.  Deputy Gonzales, can you describe to me

22  what you're seeing in this paused video?

23      A.   Yeah.  It looks like the arrestee is being

24  escorted by two deputies, possibly still handcuffed

25  since his hands are behind his back, and he's about to



1   have his photo ID taken.

2       Q.   Is it ordinary for an arrestee to have two

3   deputies holding him each by an arm to take this

4   photograph?

5       A.   Only if they're uncooperative.

6       Q.   And so to you that would symbolize that

7   Mr. Predybaylo at some prior point had been

8   uncooperative.

9       A.   Correct.

10      Q.   And I paused the video now at 23 minutes and

11  41 seconds into the video.  Can you identify yourself in

12  that video?

13      A.   I can.

14      Q.   And to your knowledge, what are you doing at

15  this point in the video?

16      A.   I'm getting ready to take his thumb down.

17  Right now I'm asking him to stare at the camera for his

18  photo.

19      Q.   And so I've paused the video at 23 minutes and

20  46 seconds, and you said that you're -- you've got your

21  arm out like this and you're asking him to -- what was

22  that?

23      A.   There's a camera that -- there where the

24  light -- right below that light there's a camera there

25  that we use to take their mug shot.  And I'm just asking



1  him to square up and face the camera.

2       Q.   I'm going to continue to play the video.

3            I've paused the video at 24 minutes and

4  11 seconds into the video.  Did you -- is there anything

5  you observed about Mr. Predybaylo's behavior in that

6  video?

7       A.   Not yet, no.

8       Q.   I'm going to go back a couple seconds and see.

9  Starting at 24 minutes and 0 seconds, I'm going to play

10 the next 11 seconds.

11           I've paused the video again at 24 minutes and

12 11 seconds.  Did you see anything about Mr. Predybaylo's

13 behavior in that 11 seconds?

14      A.   It looked like on his right arm he's fidgeting

15 or moving it.

16      Q.   And what would fidgeting or moving his arm

17 represent to you?

18      A.   Well, if Hopeck has an indicator hold on him,

19 which isn't really a controlling force, you just have

20 your -- kind of your palm lightly on the inside of his

21 elbow to feel if he's trying to pull away or not -- he

22 could be fidgeting it to get off that indicator hold, to

23 get Hopeck to let go of him.

24      Q.   Would that be a form of passive resistance

25 that you previously described?



1        A.   That would be passive resistive, yes.

2        Q.   I'm going to continue to play the video at

3   24 minutes and 11 seconds.

4             Now, I'm pausing the video at 24 minutes and

5   35 seconds.  It looks like you're taking his

6   fingerprints at this point?

7        A.   Yeah.  Yes.  So he is handcuffed, so we have

8   to turn him to the right to take his side profile.  And

9   then at that time is when we come in behind him and get

10  the thumbprint.

11       Q.   Are all fresh arrestees in handcuffs at this

12  point even if there weren't deputies nearby?

13       A.   Only if they're being strip searched.

14            Another thing too that could have been

15  happening, I don't know for sure, but just speculation,

16  he -- you notice how his head was kind of tilted back

17  and to the left when we're taking his mug shot?  That

18  mug shot is how we identify people, and they need to be

19  squared up with the camera in order to get a good photo.

20  So if his head is kind of at a cocked angle like that,

21  we're not able to get a photograph.

22            So it could have been Hopeck just being like

23  "Hey, come on, man.  Can you please just square up?" you

24  know, and him not doing it and then pulling away, so --

25  a lot of times we'll have to retake that photo sometimes



1    because we can't get a good photo, so --

2        Q.   Would that be another form of passive

3    resistance?

4        A.   Yeah.  Not -- not following directions.

5        Q.   I'm going to continue to play the video now at

6    24 minutes and 36 seconds.

7            Okay.  I've paused the video at 25 minutes and

8    1 second.  From the video, can you describe

9    Mr. Predybaylo's behavior?

10       A.   Yeah.  It looked like he began to -- could be

11   doing one of two things.  He's either --

12           MR. DWYER:  I can't hear you.  I'm sorry.

13           THE WITNESS:  That's my fault.

14           It could be one of two things.  At that time

15   when you're standing behind somebody, do the

16   thumbprints, they'll clench their fists so that you're

17   not able to grab their thumbprint, because I have to

18   take his thumb and push it down on an ink pad and then

19   put in a piece of paper and then put that thumb down on

20   a piece paper.  And if they clinch their hand, you're

21   not able to get their thumb out.  It's pretty hard to

22   do, actually.  So he could have been doing that and just

23   wouldn't relax his thumb so I kind of gave up on it

24   probably and decided to get it later or he could have

25   been grabbing at the officer's hand, Hopeck's hand in



1    this instance, while he had the indicator hold on him

2    and Hopeck had to like kind of reposition himself to

3    either get his hand free or regain control of

4    Predybaylo's arm.

5    BY MR. GROSS:

6         Q.   From your experience, would either one of

7    these actions by Mr. Predybaylo be a form of passive

8    resistance?

9         A.   Yes.

10        Q.   And are all of these actions by Mr. Predybaylo

11   prior to going into the safety cell part of your thought

12   process in how much time you're going to provide of

13   nonforce means using verbal commands before escalating

14   to a control hold or something -- the next step from a

15   control hold?

16        A.   Yeah, of course, because if he's willing to

17   resist while still handcuffed and in control holds,

18   we're just -- we're not able to gauge what he'll do when

19   he's out of handcuffs.  So it does play -- it does play

20   a role into our decision-making, yes.

21             MR. GROSS:  Thank you, Deputy Gonzales.  I

22   have no further questions for you.

23             MR. DWYER:  Just a couple of follow-up on that

24   video there, Deputy Gonzales.

25   ///



```
1                    FURTHER EXAMINATION

2   BY MR. DWYER:

3       Q.   Do you see any moment where Mr. Predybaylo

4   took a swing at any officer?

5       A.   That would be no, I do not.

6       Q.   Okay.  Did you see any other violent motion on

7   his part?

8       A.   Subjectively violent, no.  But --

9       Q.   Okay.  So --

10      A.   -- pulling away from officer --

11      Q.   -- let me -- did you see any --

12           MR. GROSS:  Well, can Deputy Gonzales -- I

13  think he was still answering the question.

14  BY MR. DWYER:

15      Q.   I'm sorry.  Oh, go ahead.

16      A.   Okay.  Yeah.  Just subjectively, violence, I

17  wouldn't -- I wouldn't say he was trying to punch

18  somebody.  I mean, he's still handcuffed there.  There

19  wasn't a ton he can do short of head-butting or

20  shoulder-checking somebody, but the beginning stages and

21  indicators of someone becoming violent usually begins

22  with them, you know, turning back, looking at the

23  officers, figuring out where they're standing, and then

24  pulling away from them.

25           I have been in instances where officers have
```



```
1                    REPORTER'S CERTIFICATE

2                         --oOo--

3            I, the undersigned, a Certified Shorthand

4   Reporter in the State of California, do hereby certify:

5            That the foregoing proceedings were taken by me

6   at the time and place herein set forth; that any

7   witnesses in the foregoing proceedings, prior to

8   testifying, were placed under oath; that the testimony

9   and proceedings were reported stenographically by me and

10  thereafter transcribed under my direction; further, that

11  the foregoing is a true record of the proceedings taken

12  at that time.

13

14           IN WITNESS THEREOF, I have this date subscribed

15  my name.

16

17  Dated:   November 6, 2020

18

19

20  _____
    Sharon C. Holloway, RPR
21  Certified Shorthand Reporter
    State of California
22  Certificate No. 12227

23

24

25
```



# EXHIBIT E

{02518243.DOCX}

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA


ALEXSEY PREDYBAYLO, an
individual,

            Plaintiff,

      vs.                          CASE NO. 2:19-CV-01243-MCE-CKD

SACRAMENTO COUNTY,
CALIFORNIA, a county
government and the operator
of the SACRAMENTO COUNTY
SHERIFF'S DEPARTMENT and its
Correctional Health Services
Division; and Does 1-20,

            Defendants.
_____/




VIDEOCONFERENCE DEPOSITION OF

DEPUTY JEFFREY WILSON



October 20, 2020

9:18 a.m.



350 University Avenue
Suite 200
Sacramento, California



Mandy M. Medina, CSR No. 11649

Reporting remotely via Zoom videoconference



1   A.       No.

2   Q.       Updates or something like that?

3   A.       I don't, sir, no.

4   Q.       I would like to ask you to describe to me

5   when, in booking area, do you do a strip search -- well,

6   I would like to back up a little bit.  Strike that.

7            It's my understanding that as part of the

8   process of when someone who is newly booked gets through

9   the process and gets through medical and is, quote, sent

10  upstairs to be housed, that in between those two steps,

11  there is a final stage where they are actually given

12  their orange jumpsuit and their clothing; is that

13  correct?

14  A.       That is correct, yes.

15  Q.       Is there a term for that stage?

16  A.       A term?  I would just say when the arrestees

17  or the inmates get dressed in.

18  Q.       Yes, dressed in.

19  A.       Yeah, when they're getting dressed in.

20  Q.       Okay.  Now, when they are getting dressed in,

21  is there also a strip search conducted?

22  A.       Yes.  Not on all inmates.  Not all inmates are

23  required to strip search, if it was just a misdemeanor.

24  Typically, somebody that's coming in for a DUI offense

25  that is not a parolee, not on parole, not on probation,



1    it doesn't require a strip search.  So those guys are

2    not strip searched.  They're given their clothes and

3    they're dressed in.

4           The ones that are required to be stripped are

5    the ones that maybe are on probation, or parole, or a

6    felony-level drug offense, or misdemeanor drug offense,

7    that's been signed off by a supervisor for a strip

8    search should be conducted, they will be strip searched

9    again at that point, yes.

10   Q.      Okay.  So it's my understanding that, apart

11   from DUI or other very minor offenses, I'll maybe call

12   infractions almost, there is a strip search process at

13   the time of the, quote, dressing.

14   A.      Yes.

15   Q.      Okay.  Now, apart from the strip search that's

16   conducted at the dressing stage, going back earlier in

17   time in the booking process, are there other occasions

18   where strip searches are conducted?

19   A.      Yes.

20   Q.      Can you tell us what those occasions are?

21   A.      It would be an individual that is a fresh

22   arrest or being brought in on drug charges, or if

23   he's under the suspicion of -- the arresting officer is

24   under the suspicion that he may be hiding drugs.

25          So in something like that, misdemeanor



1  offenses are authorized, if we get supervision -- or

2  signature, blessing off on us to conduct the strip

3  search, we will do that.

4          But if it's a felony-level offense, all felony

5  levels does not require a supervisor's blessing, so we

6  can go ahead and strip search those individuals that are

7  coming in on felony-level drug charges.

8  Q.        Okay.  Now, what is the -- is approval needed

9  to conduct a felony -- a strip search on a felony-level

10 suspect?

11 A.        No, sir.

12 Q.        Okay.  No supervisor needs to be contacted.

13 A.        No, sir.

14 Q.        Okay.  And no forms need to be filled out?

15 A.        No, sir.

16 Q.        Okay.  Where in the jail facility are those

17 strip searches routinely conducted?

18 A.        They're conducted in a safety, in a safety

19 setting, or a safety cell.

20 Q.        Okay.  And would those be referred to as

21 safety cell number 1 or safety cell number 2?

22 A.        That is correct, yes.

23 Q.        How many safety cells are there in the

24 facility?

25 A.        We have got one -- there is two -- I'm sorry.



1   A.        For a strip search?  Wow.

2   Q.        Once a day, once a week, once a month?

3   A.        I would say once a week maybe.  We tend -- we

4   try to keep a safety cell open for the purpose of that

5   arrestee that needs it or for the purpose of our strip

6   searches.

7             So for the most part, we try to keep at least

8   one safety, either safety 1 or safety 2, open and

9   available for the purpose of that one individual that

10  may need it or for the purposes of also for the strip

11  searches.

12  Q.        I would like to go over the process and have

13  you describe the process of how a strip search is

14  normally conducted.

15            And when I'm talking about strip searches, I'm

16  talking here about in the context of a felon or a drug

17  charge that's serious enough to warrant a strip search.

18  So we're not dealing with other things, other types --

19  A.        Right.

20  Q.        -- of charges.

21  A.        Okay.

22  Q.        And I would like to get a description.  For

23  example, if you could tell me, how many officers are

24  involved and what's the methodology?  What's the actual

25  physical process?  And you can just walk us through a



1   typical example.

2   A.         Okay.  So when you get notified of an

3   individual coming in with drug charges, in this case, a

4   felony-level drug charge, knowing he's going to be

5   needing to be strip searched, we will put him in the

6   pat-down box.  At this stage, we are searching for

7   weapons and other contraband as well.  But he will be

8   handcuffed and remain handcuffed in the pat-down box.

9          So if he wasn't coming in on drug charges, at

10  that time, we would take the handcuffs off.  But because

11  he's needing to be strip searched as well, we do a quick

12  pat-down search in the pat-down box, keeping the

13  handcuffs on at that time.

14         Once that pat-down search has been completed,

15  we will escort the arrestee down the hallway to where he

16  will get his picture taken, thumbprint taken, at that

17  time, and then he would be escorted into a safety cell

18  to where the strip search would be conducted.

19         Strip searches are conducted at a minimum of

20  two deputies and --

21  Q.         And let me just briefly stop you there, if I

22  may.

23         You said they are typically conducted by two

24  officers.  Can you give me a percentage of strip

25  searches that are not conducted by two officers?  For



1  example, maybe one out of ten needs three or four, or

2  are 99 out of 100 conducted by two officers?  I'm trying

3  to get an idea.

4  A.        I would say maybe 75 percent of them maybe

5  would be conducted with two officers.

6            Any reason we would need more deputies would

7  be in a case where a guy was being uncooperative.

8  Q.        And when you say "uncooperative," how would

9  you describe that?

10  A.        Just not following directives, I mean,

11  somebody that's pulling away from us as they're being

12  escorted down the hallway and somebody that may be

13  chippy or mouthy, just something that's going to draw

14  our attention to an individual as he's being escorted

15  out.

16  Q.        As I understand, the strip searches, a large

17  percentage of them relate to felony drug arrests,

18  correct?

19  A.        A lot of them do, yes.

20  Q.        Okay.  So my question to you is, is the

21  intoxication or being under the influence of drugs a

22  potential cause for an arrestee to maybe have a little

23  difficulty going through the process from -- you know,

24  through a pat-down area through getting pictures taken?

25  A.        Sure.



1        So let's say you have someone in cuffs.  You

2   have two or more officers escorting them into a safety

3   cell.  Describe the process of taking them into the

4   safety cell.  What do you do?

5   A.        Okay.  Now, it's been a few years since I've

6   done it, but when we escort them in, the first thing we

7   do is we center them on the wall and we have them --

8   because there is no audio in the cell.  There is visual

9   with the camera.  We have them look up at the camera and

10   either have them shake their head yes or no to let the

11   camera know whether they have any drugs on them at that

12   time.

13        And we will ask them, you know, "We're going

14   to ask you if you currently have any drugs on you or in

15   you at this time.  Shake your head either yes or no at

16   the camera so they can see that."

17        So, at that point, when we get the head nod

18   either yes or no, we will cover the camera up with the

19   yellow sticky for the privacy of the arrestee, and then

20   we will conduct another pat search on the individual

21   inside the safety cell for weapons and contraband prior

22   to taking their handcuffs off.

23        So once the pat search has been conducted, we

24   will go ahead and remove the handcuffs, telling them to

25   keep their hands down to their side, and we will be



1   asking them to be removing articles of clothing one at a

2   time and not to drop it on the floor, but to go ahead

3   and remove that piece of article of clothing and to hand

4   it back to us.  If it happens to hit the ground, we are

5   just going to ask that you turn around and pick it up

6   and hand it back to us.

7           We'll start from head to toe, and we will

8   start with if they have got a hat, start with the

9   T-shirt, go down to their pants, their socks, or their

10  shoes or socks, or pants, and then get down to their

11  underwear to where they're fully naked, facing the wall.

12          At this point, you know, we have them do a

13  mouth check.  We'll check their mouth.  We will have

14  them spread their butt cheeks apart and bend over at the

15  waist and go ahead and cough a couple of times to check

16  and make sure they have nothing inserted internally in

17  them.  And then we will ask that they get fully dressed.

18          Once the strip search has been completed -- if

19  they have got long hair, we have them shake out their

20  hair as well, checking behind the ears.

21          But once the strip search has been completed,

22  we will go ahead and have them take the next couple of

23  minutes to go ahead and get fully dressed.  We'll close

24  the door on them, and then come back in and get them.

25  Q.      What is the typical time span, if you can



1   couple of quick questions, but I'll just do it for the

2   record here to make sure you don't have any memory, or

3   if you do have some memory, tell us what you do remember

4   about the events involving my client.

5              Do you have any memory as to what my client

6   was arrested for?

7   A.         Drug charges.

8   Q.         Anything else?

9   A.         That I remember, no.

10  Q.         Okay.  And do you recall walking down the

11  hallway to safety cell 1 with Mr. Predybaylo being

12  escorted into safety cell -- I guess it was number 1 or

13  number 2.  I'm not sure which one it is.

14             Do you have any memory of walking down the

15  hall with Mr. Predybaylo?

16  A.         I mean, watching the video, I mean, that I've

17  seen pertaining to this incident, that's the only memory

18  I have.  Other than that, I don't recall or remember

19  anything.

20  Q.         How long ago did you watch that video?

21  A.         Maybe three, four weeks ago.

22  Q.         Excuse me?

23  A.         Three or four weeks ago maybe.

24  Q.         Okay.  And was that in connection or

25  communication with your counsel?



1    A.        No.

2    Q.        Do you have any independent recollection as to

3    what my client, Mr. Predybaylo, said or what he did that

4    may have caused the use of control holds on that day?

5    A.        No.

6    Q.        Do you have any recollection as to how long it

7    took to gather his clothing and give it to Sergeant Hall

8    who was waiting out in the hallway?

9    A.        No, I do not.

10   Q.        Would you agree that safety cell number 1 and

11   2 are pretty small in size?

12   A.        Yeah.  If I had to reside or live in one of

13   those, it would be pretty small, yes.

14   Q.        And if there was an arrestee plus four

15   officers, it would be a little tight?

16   A.        Yes, it gets pretty cramped in there.

17   Q.        All right.  And so for an arrestee and four

18   officers to be in a safety cell for four minutes, that

19   would be tight quarters?

20   A.        It could be tight quarters, yes.

21   Q.        Okay.  Can you think of any reason why that

22   would occur?

23   A.        Again, other than just possibility of an

24   arrestee being uncooperative during -- you know, prior

25   to, leading up into going into a safety cell.



1    happened.

2           So do you have anything that you could tell me

3    to explain how that happened?

4    A.        I don't.

5    Q.        Okay.

6    A.        I mean, that's something maybe Deputy Hopeck

7    can enlighten you.  But I don't know what he was

8    thinking, what was going in his mind or -- and I don't

9    even recall whether it was him or -- I'm trying to

10   remember even who was in the cell with him.  It might

11   have been Ranum or Gonzales, but -- or who had what, who

12   was in control of what.  I don't remember.

13   Q.        Did you have any recollection of physically

14   touching my client or having been involved in any

15   control holds on Mr. Predybaylo?

16   A.        Me personally?

17   Q.        Yes.

18   A.        No.

19   Q.        Do you have any recollection as to what your

20   involvement was?  In other words, what did you do there

21   at that strip search?

22   A.        I was standing in control of the door, I

23   believe.  I was at the entry point of the -- I don't

24   even think I was in the cell.  I was there at the door,

25   holding the door.



1          My understanding with this, my understanding
2    would be that if somebody starts to become uncooperative
3    on a strip search, you say, Okay, we're backing off,
4    we're leaving and you're in here.  You're locked in here
5    and you're going to stay in here until you get yourself
6    together.  We are either going to do this peaceably or
7    not, or you are going to just stay locked in here until
8    you agree.
9          Is there some reason why you can't, if someone
10   becomes uncooperative, just lock them in the safety cell
11   and come back when they are willing to be cooperative?
12   A.       I think it's to a point where if we have
13   already engaged with somebody and went hands-on, used a
14   little bit of use of force, we are not going to step
15   back and have to reengage later at a certain point.
16          If we can get to the point where we have got
17   control of somebody at that point, let's just go ahead
18   and -- you know, obviously, he got to the point where he
19   was willing to comply with the strip search, because
20   like I said, if the individual is laying on his stomach
21   or on the floor, fully naked, he was willing to comply
22   enough to where he pulled his own butt cheeks apart,
23   because no medical staff was involved to where we had to
24   get medical involved to finish the strip search.  So he
25   was compliant enough to where he went along with the



```
 1                    REPORTER'S CERTIFICATION

 2

 3       I, Mandy M. Medina, Certified Shorthand Reporter,

 4   in and for the State of California, do hereby certify:

 5

 6       That the foregoing witness was by me duly sworn;

 7   that the deposition was then taken before me remotely

 8   at the time and place herein set forth; that the

 9   testimony and proceedings were reported stenographically

10   by me and later transcribed into typewriting under my

11   direction; that the foregoing is a true record of the

12   testimony and proceedings taken at that time.

13

14       IN WITNESS WHEREOF, I have subscribed my name

15    this 30th day of October, 2020.

16

17

18

19

20   _____
             Mandy M. Medina, CSR No. 11649
21

22

23

24

25
```

# EXHIBIT F

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---


| ALEXSEY PREDYBAYLO, | ) | CIVIL ACTION NUMBER |
|---|---|---|
| | ) | 2:19-CV-01243-MCE-CKD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SACRAMENTO COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |


VIDEO CONFERENCE DEPOSITION OF

SERGEANT ANDY HALL

FEBRUARY 25, 2021

---oOo---


Reported by:                              SHANNA GILBERT
                                          CSR No. 12951

SERGEANT ANDY HALL  2-25-21

1      and accurate testimony, for example, you didn't have a good

2      night's sleep or you're exhausted from work or you're taking

3      some medication.  Is there anything that would affect your

4      testimony?

5           A.    No.

6           Q.    Please let me know if you need to take a break at

7      any time.  I do not expect this deposition to go very long,

8      probably 30 or 40 minutes.  But if you do need to take a

9      break or want to talk your attorney, you may do so at any

10     time.  Just state that, and we will take care of it.

11          A.    Okay.

12          Q.    Do you have any questions for me before I begin?

13          A.    No.

14          Q.    Can you just briefly summarize for the record your

15     background as a law enforcement officer?

16          A.    I have been a sworn peace officer with the City of

17     Sacramento Police Department for 13 years, going on 14 years.

18     I'm currently a sergeant assigned to the patrol division, and

19     I work in the North Sacramento area.  And at the time of this

20     incident in 2017, I believe, when this original arrest

21     occurred, I was the supervisor of the South Sacramento Gang

22     Enforcement Team.

23          Q.    Have you worked for any other law enforcement

24     agencies?

25          A.    I was a Deputy District Attorney in Sacramento

6

1     Q.    Now, of the many strip searches that you have been

2  involved in at the main jail, have these all been strip

3  searches to look for drugs?

4     A.    I believe, yes.

5     Q.    Do you recall any instances where you were looking

6  for things other than drugs, such as knives or other types of

7  weapons or paraphernalia?

8     A.    No, I don't recall specifically that.  It's usually

9  just drugs.

10    Q.    Do you have a recollection as to requesting the

11  strip search of my client, Mr. Predybaylo, back in 2017?

12    A.    No.

13    Q.    Do you -- is it your best estimate that it

14  was -- the strip search was the result of a request that

15  you made?  Or do you believe that the strip search was

16  conducted at the behest of the Sacramento County Sheriff's

17  Office?

18    A.    I don't know if I filled the form out that day.  I

19  don't know when that occurred, that transition to the newer

20  policy.  But I believe to my best recollection this

21  particular search was as a result of drugs that were found in

22  his car.

23    Q.    Do you recall whether or not you initiated the

24  strip search?

25    A.    What do you mean?

13

SERGEANT ANDY HALL  3/25/21

```
1         Q.     Well, that you asked for it, or was this a strip

2    search that Sacramento County Sheriff's Office on its own

3    initiated and conducted?

4         A.     That I don't know.  I don't remember.

5         Q.     Do you recall witnessing the strip search?

6         A.     Not independently of those -- reviewing the video.

7         Q.     But reviewing the video, you did see yourself in

8    the strip search?

9         A.     That's what I mean.  After I saw the video, I saw

10   myself there.  But I don't remember really anything about it.

11        Q.     When you watched the video, did you see at the end

12   of the strip search the brown paper bag being handed to you?

13        A.     I did.

14        Q.     What would that indicate to you in terms of whether

15   or not you initiated the strip search of Mr. Predybaylo?

16        A.     Nothing.  I believe those were his clothes that we

17   seized as evidence.

18        Q.     Do you know why the clothes were handed to you?

19        A.     Yeah, I think I asked for them, I'm assuming,

20   because sometimes depending on the crime or whatever there

21   are various reasons we may need to seize the clothing as

22   evidence, so we'll ask for it.  So that's fairly common.

23        Q.     Did you -- do you recall whether or not any drugs

24   were found on Mr. Predybaylo during the strip search?

25        A.     To my best recollection I do not believe there were
```

14

1    it's two deputies in there.  Sometimes it is one deputy,

2    sometimes it is more.  But usually it's two.  And they -- one

3    deputy will be the verbal -- will verbalize the instructions,

4    and they simply tell the person to take this item of clothing

5    off and hand it back.  Usually the person is facing away from

6    them.  It's how I remember them doing it.

7        Q.    And you said that normally you have seen them with

8    one officer, maybe two officers; is that correct?

9        A.    Yeah, I have seen it one deputy, two deputies.  And

10   then I have see three and four.  It just depends on the -- I

11   don't know -- whatever their protocol is.

12       Q.    Do you have any recollection, apart from the strip

13   search of my client, strip searches where more than two

14   officers participated?

15       A.    I have seen that, yes.  I don't have an -- I can't

16   give you a specific, you know, date, time of that.

17       Q.    Do you have a recollection as to why there were

18   more than two officers at those instances?

19       A.    I mean, sometimes there will be more if the person

20   isn't cooperating.  Sometimes there will be two if the person

21   is not cooperative.  And I have seen it where there just --

22   honestly, sometimes I have seen it where if there is nothing

23   else going on, and so they help out.  It streamlines the

24   process.  Like the guy will hand an item of clothing and then

25   that deputy will hand it to another deputy and continue with

                                                                19

1    his instructions while the other person is searching the item

2    of clothing.  So, I mean, it just varies.

3        Q.    Well, previously I you asked you a question about

4    whether or not you had observed anything -- observed my

5    client being uncooperative or arguing or fighting, and you

6    indicated that you had not.

7            So my question to you now is, as of right now, do

8    you recall any reason why there would have been a need for

9    more than one or two officers to conduct the strip search of

10   my client?

11       A.    I don't know.  I don't think so.

12       Q.    So as far as you recall, one or two officers would

13   have been able to conduct the strip search of Mr. Predybaylo

14   without any great difficulty?

15           MS. VELASQUEZ:  I'm going to object that it calls

16   for speculation.

17           You can answer if you know.

18           THE WITNESS:  So you're asking do I know why there

19   was more than two deputies?

20           MR. DWYER:  Madame Reporter, can you read back the

21   question?

22           (The reporter read back.)

23           THE WITNESS:  Yeah, I don't have any recollection

24   of any reason that one couldn't have done it or three

25   couldn't have done it.  I don't really remember.

                                                            20

```
 1    strip search.

 2        Q.    So I just want to confirm then, it's unusual or it

 3    would only have occurred a few times that an inmate has been

 4    held in a control hold or force used?  Is that correct,

 5    typically is no force needed?

 6        A.    Are you asking in my experience?

 7        Q.    Yes.

 8        A.    Yes.  I'll refer back to my previous answer, yes.

 9              MR. DWYER:  Mr. Gross, do you have any questions?

10    Your witness.

11              MR. GROSS:  I have got a couple.  Thank you.

12                    EXAMINATION BY MR. GROSS

13        Q.    Sergeant Hall, my name is Matt Gross, and I

14    represent the Sacramento County Sheriff's Department in this

15    matter.

16              Can you tell me how you initially came into contact

17    with Mr. Predybaylo?

18        A.    Yes.  On the --

19              MR. DWYER:  Objection; irrelevant.

20              Go ahead and answer, sir.

21              THE WITNESS:  So my initial encounter with him was

22    in July of 2017.  I don't remember the specific day.  Prior

23    to contacting him, I had viewed photographs of him from

24    social media, I believe, in possession of an assault rifle,

25    assault weapon.  When I responded to the apartment complex,
```

                                                                36

1    which was the Carmel Pointe Apartment Complex, I saw him

2    getting out of a vehicle, and he had a backpack, and he fled

3    on foot when he saw me.  I chased him.  I was in a full

4    Sacramento Police Department attack vest, with police

5    markings all over it.  And I was in a police vehicle when I

6    saw him.  I chased him.  He basically dumped the same assault

7    rifle that I saw him with in the photos in the bushes.  I

8    arrested him and recovered the gun, which was loaded with

9    30 rounds of 223 ammunition.  I went back and searched the

10   vehicle with the assistance of other officers.  Drugs were

11   found in the vehicle, and he was taken to jail on that

12   date.

13   BY MR. GROSS:

14        Q.    And do you recall what drugs were found in the

15   vehicle?

16        A.    I believe it was methamphetamine.

17             MR. DWYER:  Objection; relevance.  And this

18   question and the prior one, really -- the prejudicial value

19   really outweighs any probative value.

20             Sergeant Hall, go ahead.

21             THE WITNESS:  I believe it was methamphetamine.

22             MS. VELASQUEZ:  Sergeant Hall, can I just remind

23   you to take a minute before you answer Mr. Gross' question to

24   allow Mr. Dwyer to object?

25             THE WITNESS:  Sure.

37

```
 1    State of California   )
                            )           ss.
 2    County of Placer      )

 3

 4         I certify that the witness in the foregoing

 5    deposition,

 6                      SERGEANT ANDY HALL

 7    was by me duly sworn to tell the truth, the whole truth and

 8    nothing but the truth in the within-entitled cause; that

 9    said deposition was taken at the time and place therein

10    named; that the testimony of said witness was reported by

11    me, a duly certified shorthand reporter and a disinterested

12    person, and was thereafter transcribed into typewriting.

13         I further certify that I am not of counsel or

14    attorney for either or any of the parties to said

15    deposition, nor in any way interested in the outcome of the

16    cause named in said caption.

17         IN WITNESS WHEREOF, I have hereunto set my hand

18    this 5th day of March 2021.

19

20                        _____
                          SHANNA GILBERT, CSR No. 12951
21                        Certified Shorthand Reporter
                          State of California
22

23

24

25

                                                              42
```

MARY BARDELLINI & ASSOCIATES  (530) 823-2950

# EXHIBIT G

{02518243.DOCX}

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF CALIFORNIA

 3

 4   ALEXSEY PREDYBAYLO, an individual,

 5           Plaintiff,

 6        vs.                   CASE NO. 2:19-CV-01243-MCE-CKD

 7   SACRAMENTO COUNTY, CALIFORNIA, a
     County government and the operator
 8   of the Sacramento County Sheriff's
     Department and its Correctional
 9   Health Services Division; and DOES
     1-20,
10
             Defendants.
11   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

12

13

14

15

16                      DEPOSITION OF

17                      ORRLANDO MAYES

18

19

20                    March 30, 2020

21                      9:59 a.m.

22

23               350 University Avenue
                      Suite 200
24               Sacramento, California

25          JENNIFER SCHUMACHER, CSR No. 9763
```



ORRLANDO MAYES                                        March 30, 2020
PREDYBAYLO vs SACRAMENTO COUNTY                                    34

1      A.  I think I testified that any time we can use --

2  we can avoid to use force, and then we can use other

3  methods to gain compliance, that that is a better deal

4  for everyone.

5      Q.  Correct.  That's my understanding what you

6  said.  So my follow-up question is, what factors or

7  criteria would indicate to an officer that they should

8  go ahead and use the nonforce alternative first?  What

9  I'm trying to understand is what goes on in the

10  decision-making of the officer, what is the policy of

11  the Department with regard to using force?

12          We appear to be in agreement that use of force

13  can cause injury to everyone, and it's not the preferred

14  approach.  So I'm trying to find out what is the process

15  amongst the officers for determining whether or not to

16  use a nonforce means first.

17      A.  Well, I think when they are trying to gain

18  compliance by using their verbal skills and trying to

19  explain the reasoning for going with the program and

20  going with the process to do the strip search and trying

21  to avoid use of force, that is the objective initially.

22  But the officers, basically if they follow the policy,

23  the policy does state that an inmate cannot refuse a

24  lawful strip search.  And so with that, if force is

25  needed, they can use force if authorized by the



1   supervisor as well.

2          So following the policy and best practice,

3   again, trying to gain compliance with verbal skills and

4   talking someone into compliance and stuff is the goal.

5   And if that doesn't work, then, you know, evaluating and

6   moving from there.

7      Q.  Are you trained to tell the noncompliant inmate

8   that if they don't comply you are going to have to put

9   them into isolation until they do comply?

10     A.  That would be an option that the officers can

11  use.  But as far as phrasing it that way, no, I've never

12  heard it phrased that way.  But that is an option that

13  the officers can obviously use if they need to.  But

14  again, it would be case by case.

15     Q.  Let me explore a little bit more about your

16  specific training on this.  So my understanding of your

17  last answer is that there's no specific training that

18  the officer should say, look, if you don't comply, we're

19  going to put you in isolation.  Is that correct, there's

20  no such training to tell the inmate that?

21     A.  I never heard that.

22     Q.  So if there's no training -- you've never heard

23  it in a training course and you've never heard it

24  actually in use in the jail; is that correct?

25     A.  I just never heard that personally myself.



 1   going to go use the restroom.  I'll be back in three or

 2   four minutes.

 3          (Break.)

 4                    EXAMINATION

 5   BY MR. GROSS:

 6       Q.  Lieutenant Mayes, I want to direct your

 7   attention to what was marked as Exhibit 8, which is the

 8   Sheriff's Department County of Sacramento Operations

 9   Order.

10       A.  Okay.

11       Q.  And I want to talk a bit about section 3, which

12   was labeled Strip Searches, which was previously talked

13   about, subsection (k), which starts with, "Arrestees and

14   inmates do not have the right to refuse lawful strip

15   searches."  Can you provide for me when a strip search

16   is lawful?

17       A.  Sure, a strip search is lawful per our policy

18   when an arrestee is brought in for drug possession, gun

19   charges or violence, those three categories.

20       Q.  And do you have any knowledge about whether the

21   strip search of Alexsey Predybaylo was lawful?

22          MR. DWYER:  Objection.  This is a 30(b)(6)

23   deposition.  We're talking about information about

24   policies of the Department, not specifically about the

25   incident in this case.  So I didn't ask anything about



 1   the incident in this case.  I kept it to the policies

 2   and practices of the Department.

 3          MR. GROSS:  Okay.  Fair enough.  Fair enough.

 4   BY MR. GROSS:

 5      Q.  So you previously established those are the

 6   three times when a strip search may be lawful.

 7      A.  Correct.

 8      Q.  And we had talked about the numbered sections 1

 9   through 4 under subsection (k) about when a forcible

10   strip search can be done.  Can you explain to me the

11   numbering system and what options a deputy conducting a

12   strip search may use?

13      A.  Sure.  So the numbering system is not a

14   progression system where you have to go from 1 and then

15   to 2 and then 3 and then 4.  The number systems allows

16   you -- those are options that an officer has, and the

17   officer can use whatever options that are available and

18   that are reasonable for them to do what they need to do

19   as far as the strip search.  So they can go from --

20   example, from 1, where they get a refusal, try to use

21   verbal and try to deescalate and try to get compliance,

22   and then from there the sergeant authorizes where they

23   can do a forcible search, even though you're bypassing 2

24   and No. 3, it would be reasonable because, again, it is

25   not a progression.  These are just options, and they are



1    just numbered.

2        Q.  And I know you previously testified stating

3    that this is a case-by-case basis.  So there's no

4    formulating approach to if a person comes in with --

5    that fills a certain criteria, we're going to go 1, 2,

6    3, 4, and if he fills another criteria, we're going to

7    go 1, 2 and then 4; it's essentially a case-by-case

8    basis?

9        A.  That's correct.

10       Q.  So there's no one standard approach to a strip

11   search; each strip search is unique on its own?

12       A.  Yes.

13       Q.  Can you explain to me subsection (k) subsection

14   (4) regarding when an inmate continues to refuse and

15   explain this rule?

16       A.  Sure.  If they continue to refuse and the

17   officers try to explain and try to talk him down and

18   were unsuccessful, then with the supervisor's approval

19   they can do a forcible strip search.  And this was in

20   place because this might be deemed necessary, depends on

21   the charges of the arrestee being brought in.  Because

22   if they were brought in, for example, on weapons charges

23   and a gun was supposedly used or whatnot, they could

24   still potentially be armed.  So it's going to be

25   important to make sure that the person is not armed in a



1    correctional environment because officers are not armed

2    in that environment.  So for the safety of the facility,

3    this is important.  That's why you might go from 1 to 4

4    in this case.

5            MR. GROSS:  Thank you.  That is all the

6    questions I have following up with Lieutenant Mayes.  Do

7    you have any more?

8            MR. DWYER:  No, Counsel.  I'm done.  Thank you.

9            MR. GROSS:  All right.  Thank you.  I thought

10   that worked fairly well.  We can go off the record.

11           THE REPORTER:  Do you want a copy of this?

12           MR. DWYER:  I will need a copy.

13           MR. GROSS:  Electronic copy.

14           (The deposition concluded at 11:22 a.m.)

15                        * * *

16

17

18

19

20

21

22

23

24

25



```
 1              REPORTER'S CERTIFICATE

 2          I, JENNIFER SCHUMACHER, a Certified Shorthand

 3   Reporter of the State of California, duly authorized to

 4   administer oaths, do hereby certify:

 5          That the foregoing proceedings were taken

 6   remotely before me at the time and place herein set

 7   forth; that any witnesses in the foregoing proceedings,

 8   prior to testifying, were remotely duly sworn; that a

 9   record of the proceedings was made by me using machine

10   shorthand which was thereafter transcribed under my

11   direction; that the foregoing transcript is a true

12   record of the testimony given.

13          Further, that if the foregoing pertains to the

14   original transcript of a deposition in a Federal Case,

15   before completion of the proceedings, review of the

16   transcript ( ) was ( ) was not requested.

17          I further certify I am neither financially

18   interested in the action nor a relative or employee of

19   any attorney or party to this action.

20          IN WITNESS WHEREOF, I have this date

21   subscribed my name.

22          Dated:  April 7, 2020

23

24          _____
            JENNIFER SCHUMACHER CSR #9763
25
```



# EXHIBIT H

```
※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※
※ REPORT-JIPR3M      SACRAMENTO COUNTY SHERIFF'S DEPARTMENT      PAGE 1   ※
※                                                                         ※
※ DATE- 07/05/2017                                         TIME- 19:21 ※
※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※
```

Case 2:19-cv-01243-MCE-CKD  Document 53-5  Filed 10/19/21  Page 167 of 210

```
NAME- PREDYBAYLO, ALEXESY                      XREF-  4280466
ADDR.-  7826          CENTER PW        110  SACRAMENTO    CA 95823
DOB.- 03/30/1993     POB.- UZBEKISTAN         YY
VEHICLE DISPO.-
```

ARREST INFORMATION:

```
DATE- 07/05/17  TIME- 15:25 AGENCY- CA0340400   SACRAMENTO POLICE DEPARTMENT
LOCATION- 7826 CENTER PKWY, SACRAMENTO,
```

BOOKINGS:
1) REGISTRY NUMBER- 10024696 01
   WARRANT NBR.-          LEA.-
   DATE- 07/05/2017  TIME- 19:09    TYPE- PICKUP (FRESH ARREST)
                                     BAIL AMOUNT- NO BAIL

| CODE | SECTION | DESCRIPTION | SEVERITY | COUNT |
|------|---------|-------------|----------|-------|
| PC | 29800(A)(1 | POSSESSION OF FIREARM BY A FELON | FEL | 01 |
| PC | 30305 | FELON IN POSSESSION OF AMMUNITION | FEL | 01 |
| HS | 11370.1 | POSS. OF CONTROLLED SUSTANCES WHILE ARME | FEL | 01 |
| HS | 11350 | POSSESSION OF-CONTROLLED SUBSTANCES | MIS | 01 |
| PC | 148(A)(1) | RESISTING OR OBSTRUCTING PUBLIC/PEACE OF | MIS | 01 |

CASES:
1) CASE NUMBER- 34100 14F03859
   DATE- 07/10/2014                  BAIL AMOUNT-    $20,000.00

| CODE | SECTION | DESCRIPTION | SEVERITY | CHARGE |
|------|---------|-------------|----------|--------|
| HS | 11378 | POSSESSION FOR SALE-CONTROLLED SUBSTANCE | FEL | C001 |

OUTSTANDING WARRANTS:
  NONE

OUTSTANDING HOLDS:
  NONE

BAIL STATUS:                         BAIL RELEASE NOT ALLOWED

DEF 000002

Main Jail Video – Entrance to Booking Area - DEF 368

# EXHIBIT I

Main Jail Video – Booking Area - DEF 370

# EXHIBIT J

Main Jail Video – Booking Area Paperer Processing - DEF 371

# EXHIBIT K

Main Jail Video – Medical Screening - DEF 372

# EXHIBIT L

Main Jail Video – Booking Photo Area - DEF 373

# EXHIBIT M

Main Jail Video – Hallway Outside Safety Cell #2 - DEF 375

# EXHIBIT N

Main Jail Video – Inside Safety Cell #2 - DEF 376

# EXHIBIT O

# EXHIBIT P

# Sacramento County Sheriff's Department
Correctional Health Services
**Medical Intake**

| Name | PREDYBAYLO, ALEXESY | XRef | 4 2 8 0 4 6 6 |
|---|---|---|---|
| DOB | 3-30-93 | ☒Male ☐ Female | Screen Date & Time 7 5 17 |

## 1) Vitals:

| | | | | |
|---|---|---|---|---|
| (No) | Yes | Temp | 97-3 | Is the arrestee's temperature greater than 100 5? |
| (No) | Yes | SBP | 144 | Is systolic BP (SBP) greater than 230 mm Hg or less than 80 mm Hg? |
| (No) | Yes | DBP | 88 | Is diastolic BP (DBP) greater than 120 mm Hg or less than 50 mm Hg? |
| (No) | Yes | Pulse | 119 | Is pulse greater than 125 or less than 50 beats per minute without explanation? |
| | Stated Height | 5-7 | Stated Weight | 180 |

*Any YES response requires review by RN for medical clearance or ER transfer to be medically cleared for booking*
*If SBP over 230 or DBP over 120 or SBP less than 80 or DBP less than 50 = **Unfit** & requires ER visit for clearance*

## 2) Fever Evaluation

| (No) | Yes | Is the arrestee's temperature greater than 100 5? |
|---|---|---|
| No | Yes | Does the arrestee have flu symptoms and is influenza currently present in the community? |

*If Yes, the arrestee needs **surgical mask** placed and is to be **housed separately** in booking & is a RISO PT*

| No | Yes | Does the arrestee have an altered mental status, stiff neck, productive cough with SOB, abdominal or pelvis pain, back or flank pain, skin infection / abscess, or hot and tender joints? |
|---|---|---|

*Any YES response requires review by RN for medical clearance or ER transfer to be medically cleared for booking*
*If No, the arrestee can follow the **standard booking process** with a **Priority Flex Appointment***

## 3) Chest Pain, SOB, or Dyspnea Evaluation:

| (No) | Yes | Is the arrestee complaining of chest pain, shortness of breath, or trouble breathing? |
|---|---|---|
| No | Yes | Is systolic BP greater than 180 or diastolic BP greater than 115 or Pulse greater than 125 |
| No | Yes | Arrestee is Male 45 years or older / Female 55 years or older? |
| No | Yes | Has previous history of CAD or CHF (MI, stent, angioplasty, DM, HTN, or other significant risk factors)? |
| No | Yes | Arrestee has (N/V, pallor, perspiration, lightheaded, or radiation of pain to neck, face, back, or arms) |
| No | Yes | Resp _____ Is the respiration greater than 24 or less than 8? |
| No | Yes | O2 Sat _____ Is the 02 Sat Less than 91% |
| No | Yes | Arrestee has any of the following (Productive cough with fever, onset of chest pain with vomiting/retching, History of PE or DVT, Unilateral leg pain with swelling/redness, or pneumothorax) |

*Any YES response requires review by RN for medical clearance or ER transfer to be medically cleared for booking*
*If all No, complete the **Asthma Evaluation** to determine if pain is Asthma/COPD related*

## 4) Injury, Trauma, and Life/Limb Medical Issues Evaluation:

| (No) | Yes | Do you currently have any skin infections, abscesses, skin ulcerations, or skin infestation? |
|---|---|---|
| (No) | Yes | Have you had any injuries within the last 3 days such as a head injury, traffic accident or fight? *(without any prior treatment or medical clearance)* |
| No | Yes | Is there a history of LOC for more than 1 minute or an unexplained altered LOC in the last 3 days? |
| No | Yes | Is there a potential for **significant** head, neck, spine, chest, abdominal, pelvic, or extremity injury? |
| No | Yes | Does the arrestee have physical exam findings (tenderness of neck, chest, abdominal, extremity, or pelvis / abrasions or bruising that may represent an internal injury or fracture)? |

*Any YES response requires review by an RN for medical clearance or ER transfer to be medically cleared for booking*

| (No) | Yes | Do you have any medical issues that may become life or limb threatening in the next 12 hours? |
|---|---|---|
| No | Yes | Does the described medical issue require a medical expedite? |

*If Yes, describe the medical issue in the comments section and review for possible **Medical Expedite***

DEF 000128

## 5) Asthma/COPD Evaluation:

(No) Yes  Are you currently taking medication for asthma/COPD?

    No    Yes    Was the medication taken within the last week? If Yes how often    Daily    Weekly    Monthly

    *If YES, schedule an Essential Medications Appointment.*

    No    Yes    Is the arrestee currently short of breath or appear to be having an asthma/COPD attack now?

    *If YES, treat with inhaler  If still in distress, evaluate for Unfit, Medical Expedite, or Priority Flex Appointment*
    *If both are No, the arrestee can follow the standard booking process with an Essential Medications Appointment*

## 6) Diabetes Evaluation

(No) Yes  Do you have diabetes? If Yes, check FSBS _____ If over 350 mg/dl, do a Dip U A for ketones

    *If FSBS greater than 400mg/dl or over 350 mg/dl with Dip U A positive for ketones arrestee is unfit for incarceration*

    No    Yes    Are you a Type I diabetic or have you ever had a DKA emergency?

    No    Yes    Do you use insulin to manage your diabetes?

    No    Yes    Is the FSBS greater than or equal to 200 mg/dl?

    *Any Yes response - the arrestee will need a Medical Expedite with a diabetes evaluation.*
    *If all are No, the arrestee can follow the standard booking process with an Essential Medication appointment*
    *Review the physical appearance of the arrestee's feet  Any wounds on feet require a Priority Flex Appointment*

## 7) Alcohol or Benzodiazepine Withdrawal Evaluation:

(No) Yes  Do you drink alcohol everyday? *(If No, stop here!)* What happens if you stop?
    *(If withdrawal symptoms circle Yes)*

No (Yes)  Have you taken benzodiazepines like Xanax, Valium, Ativan, or Klonopin everyday for the last 2 weeks?

| Perspiration | Normal | | Beads | | Profuse (Wet Clothes) |
|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 |
| Tremor | No Tremor | Constant & Slight | | Constant & Marked | |
| | 0 | 1 | 2 | 3 | |
| Anxiety | No or anxiety | | Mild anxiety | | Constant panic like anxiety |
| | 0 | 1 | 2 | 3 | |
| Agitation | Comfortable at rest | Fidgety | | Constantly restless | |
| | 0 | 1 | 2 | 3 | |
| Hallucinations | No evidence of hallucinations | | | Believes in different place, preoccupied | |
| | 0 | 1 | 2 | 3 | 4 |
| Pulse Rate | Below 90 bpm | 90-109 bpm | 110-129 bpm | 130-149 bpm | |
| | 0 | 1 | 2 | 3 | |
| Orientation | Fully oriented | | Directable | | Not directable |
| | 0 | 1 | 2 | 3 | 4 |

Date & Time of Last Drink or Benzodiazepine _____     Total scale sore _____

*If Yes & Alcohol Benzodiazepine Withdrawal Severity Scale (ABWS) is 15 or more, the arrestee is Unfit for incarceration*
*If Yes and ABWS-scale total 6 to 14 Medical Expedite for Detox Protocol*
*If Yes and ABWS-scale total is 5 or less refer for Priority Flex Appointment*

## 8) Opiate Withdrawal Evaluation

(No) Yes  Have you used any opiates such as heroin, morphine, methadone, or oxycontin in the last week? *(If No, stop here!)* Will you get sick if you stop taking them?

No (Yes)  Do you take Norco, Vicodin, Percocet, or Codeine? *(If No, stop here!)* How many do you take each day? 5-6 *(If more than 12 circle Yes)* Will you get sick if you stop taking them? ~~UD x today~~

*If Yes, type and date/time of last drug use*

*If Yes, schedule a Priority Flex Appointment*

*If arrestee showing signs of acute opiate detox, arrestee requires Medical Expedite.*

**Name** _[handwritten signature]_        XRef _[handwritten]_

## 9) Medical History and Conditions (Circle) List other medical issues in the comments section:

| | | | |
|---|---|---|---|
| (None Stated) | Glaucoma | High Blood Pressure | Stroke (CVA) |
| Dental / Dentures | Hearing Aids | Organ Failure / Transplant | Tuberculosis |
| Dialysis | Heart Disease | Seizures | Thyroid Issues |
| Cancer | Hepatitis | Skeletal Deformities | Recent Pregnancy |
| Glasses / Contacts | HIV-AIDS | STD(s) | Last Tetanus _Unk_ |

## 10) Medical Evaluation.

(No)  Yes   Have you had a cough for 21 days or more **and** weight loss, fatigue, night sweats, or bloody sputum?
      _If **Yes**, the arrestee needs **surgical mask** placed and is to be **housed separately** in booking & is a **RISO PT**_

(No)  Yes   Does the arrestee have a jaw fracture or facial swelling possibly related to dental issues?
      _If **YES** review by RN for **Medical Expedite** then call the on call Dentist if needed_

(No)  Yes   Does the arrestee have physical/developmental disabilities that prevent them from caring for themselves?
      _If **Yes**, arrestee needs **segregation or observation** in booking and **Medical Expedite**_

(No)  Yes   Is the arrestee currently on dialysis? _(Review the current number of dialysis inmates before accepting)_

(No)  Yes   Does the arrestee need an assistive device (cane, walker, wheelchair)?
      _Any **Yes** response requires **Medical Housing**_

(No)  Yes   Does the arrestee have a medical history of seizures?

(No)  Yes   Has the arrestee had an organ transplant or organ failure?

(No)  Yes   Have you had any significant injuries, hospitalizations, or illnesses within the last 3 weeks?
      _For any **Yes** response, document the issues in the comment section, review with RN and schedule an **Essential Medications Appointment**, a **Priority Flex Appointment** or a **Medical Expedite** as deemed necessary_

## 11) Allergies.

_[circled handwritten mark]_

_Medication or Food & Severity_     _Medication or Food & Severity_     _Medication or Food & Severity_

## 12) Essential Medications:

_[circled handwritten mark]_

_Medication, Dose, Frequency, Last Taken_     _Medication, Dose, Frequency, Last Taken_

_Medication, Dose, Frequency, Last Taken_     _Medication, Dose, Frequency, Last Taken_

_Medication, Dose, Frequency, Last Taken_     _Medication, Dose, Frequency, Last Taken_

Source of medication information _(circle one)_        Verbal        Med Bottles        Transfer List

_Name of Pharmacy or Clinic_        _Street Name / Location_        _City_

## 13) Comments

_A+O X3, in NAD, states he scraped his knee (R) while running from the police. Superficial abrasion noted c/o DC. PFN referral to fly benzo & opiate detox and (R) knee._

DEF 000130

Name _____  XRef _____

## 14) JPS Evaluation:

(No) Yes  Are you currently suicidal, or do you feel like hurting yourself or someone else?

(No) Yes  Is the arrestee mentally disabled and/or a danger to self or others?

(No) Yes  *Females Only* Have you given birth within the last year?  (*If No, stop here!*) Are you charged with murder or attempted murder of your child?

*Any Yes response requires emergent JPS referral and booking segregation or an observation cell*

(No) Yes  Within the last 2 weeks have you felt suicidal?

(No) Yes  Have you been hospitalized for mental health treatment within the past 30 days?

(No) Yes  Are you currently taking or been prescribed psychiatric medications within the past 30 days?

(No) Yes  Do you have a history of intellectual disability (*Not learning disability*)? Have you been treated at Alta Regional Center?

(No) Yes  Do you have a conservator? If Yes conservator's name and number

*Any Yes response requires a routine JPS referral*

## 15) Females Only:

(No) Yes  Are you pregnant?  Due Date _____

No  Yes  Are you currently having problems with your pregnancy?  (if the arrestee is complaining of abdominal cramps/pain, in active labor, or showing any signs of a miscarriage, circle **Yes** and review with RN)

No  Yes  Has the arrestee had abdominal trauma within the last 72 hours?

*Any YES, complete pregnancy test, if positive the arrestee is Unfit for Booking – This requires an ER Transfer*
*If both are No, arrestee can follow the standard booking process with a Priority Flex Appointment*
*(If female arrestee is currently on birth control pills, they will need to sign up for Sick Call to continue the birth control)*

**By signing below, I authorize Correctional Health Services to provide necessary and appropriate medical care**
I have also been informed and understand how I can obtain medical, dental, and mental health care while incarcerated

_____  _____  7/7/17
Arrestee Signature  Witness Signature *(if arrestee refuses to sign)*  Date

_____  _____  7/7/17
Nurse's Name Printed  Nurse's Signature and Title  Date

## 16) TB Test:

(No) Yes  5 TU Intradermal  -  Time

Location (circle one)  Left Forearm  Right Forearm  Other

*Schedule a PPD Read Appointment for 3 days from Date and Time Given – Include location in notes*

TB test not given because (circle one)  Refused  Hx Positive  Attached  Other

## 17) Intake Disposition:

☒ **FIT for Incarceration**          ☐ **UNFIT for Incarceration**

Referrals *(Circle All Needed)*:   JPS Referral   Urgent JPS Referral   _____

Dental Referral   Priority Flex Appointment   HIV/AIDS Sick Call   Essential Medications

☐ Medical Expedite (*Circle One*)   2 East   2 Medical   MHU

☐ Medical Housing (*Circle One*)   2 East   2 Medical   MHU   MDorm

☐ Respiratory Isolation Housing (*RISO*) on 2 Medical (If at RCCC, will need transport to Main Jail)



**Sacramento County Sheriff's Department**
Correctional Health Services
**Special Needs**

| | | | |
|---|---|---|---|
| Name | *Predybaylo, Alexesy.* | Date/Time | *7-5-17/1712* |
| X-Ref | *42804606* | DOB | *3-30-93* |

**Allergies:** *NKDA*

## Disposition

☒ (⭕) Fit for Incarceration

☐ **URGENT JPS REFERRAL** *(Green Folder)*

   ☐ Danger to Self *(Includes Suicidal)*

   ☐ Danger to Others *(Includes Homicidal)*

   ☐ Non-Urgent JPS Referral Made

   ☐ Other (Specify)

☐ Seizure Precautions *(Lower Bunk & Lower Tier)*

☐ Pregnant *(Lower Bunk & Lower Tier)*

(⭕) ☒ Priority Flex Nurse Appointment Referral Made

☐ Blood and Body Fluid Precautions *benzo/opiate deeox.*

## Special Medical Needs

☐ **No Known Special Medical Needs**

Arrestee or Detainee has the following special needs

☒ Lower Bunk *X 7 days*    ☒ Lower Tier *X 7 days.*

☐ **MEDICAL EXPEDITE** *(Circle One)*   2 East   2 Medical   MHU

☐ Medical Housing *(Circle One)*   2 East   2 Medical   MHU   MDorm

☐ Respiratory Isolation Housing *(RISO)* on 2 Medical *(If at RCCC, transport to Main Jail)*

☐ Potentially Contagious / Single Cell Isolation – Reason

## Arrestee / Detainee had the following while in Medical Intake

| | | Custody Only | | | Custody Only |
|---|---|---|---|---|---|
| ☐ Glasses / Contacts | | ☐ Sent to Prop | ☐ Mask | | ☐ Sent to Prop |
| ☐ Dentures | | ☐ Sent to Prop | ☐ Prosthetic Eye | | ☐ Sent to Prop |
| ☐ Cane / Crutches | | ☐ Sent to Prop | ☐ Prosthetic Leg | | ☐ Sent to Prop |
| ☐ Walker / Wheelchair | | ☐ Sent to Prop | ☐ Prosthetic Arm | | ☐ Sent to Prop |
| ☐ Other Medical Equipment | | | | | |

Nurse Name (Printed)          Nurse Signature

White  CHS       Pink  Classification       Yellow  Custody       Gold  Pretrial

DEF 000152



# SACRAMENTO COUNTY SHERIFF'S DEPARTMENT

**Arrest Type:**

Intake Screening

Fresh

| Arrestee Name | PREDYBAYLO, ALEXESY, | | | Xref | 4280466 |
|---|---|---|---|---|---|
| DOB | 03/30/1993 | Sex | M | Date | 07/05/2017 |

## Arresting Officer's Observation/Questionnaire:

| # | Yes | No | Question |
|---|---|---|---|
| 1) | | X | Do you have any medical conditions that may become life threatening in the next 24 hours such as diabetes and seizures? Explain |
| 2) | | X | Have you been to an Emergency Room(ER) or been in an auto accident in the last 24 hours? |
| 3) | | X | Are you currently suicidal, or do you feel like hurting yourself or someone else? |
| 4) | | X | Do you have any wounds (for Example, dog bites, abscesses, open sores, bruises to head   )? |
| 5) | | X | Is there a suspicion the arrestee may have ingested or hidden drugs in a body cavity? |
| 6) | | X | Does the arrestee need more than minimal support for walking or standing? |
| 7) | | X | Does the arrestee appear to be under the influence of alcohol or drugs, or have withdrawal type symptoms (for example, tremors, slurred speech, gooseflesh   )? |
| 8) | | X | Are the charges DUI (23152) **ONLY**? |
| 9) | | X | Is the arrestee non-responsive to the above questions? |
| 10) | | X | Has the arrestee been pepper sprayed, tasered, or has any other form of less lethal force been used to subdue the arrestee? |

| Officer's Name | Department | Badge Number |
|---|---|---|
| A  HALL | | 3031 |

## Booking Officers and Medical Use Only

### Vitals

| # | Yes | No | | Question |
|---|---|---|---|---|
| 1) | | | Temp | Is the arrestee's temperature greater than 100 5? |
| 2) | | | SBP | Is systolic BP (SBP) greater than 230 mm Hg or less than 80 mm Hg? |
| 3) | | | DBP | Is diastolic BP (DBP) greater than 120 mm Hg or less than 50 mm Hg? |
| 4) | | | Pulse | Is pulse greater than 125 or less than 50 beats per minute? |

## Disposition

☐ Alcohol Detox Evaluation (Mini Medical) Completed?

☐ Proceed to Booking — if Q to K obtain a full medical intake prior to classification - 12 hours (Green Wristband)

☒ Medical Screening (Full Medical) Completed?

☒ Cleared – (No Wristband)       ☐ Medical Expedite (Yellow Wristband / Red Folder)

☐ Emergent JPS Referral (Green Folder)       ☐ UNFIT

_____       _____       7/5/17 - 1720
RN/LVN Signature       Arrestee or Witness Signature       Date and Time

7400-023 (REV 10/11) Intake Screening

Medical Copy

DEF 000133

# EXHIBIT Q

{02518243.DOCX}

## SHERIFF'S DEPARTMENT · COUNTY OF SACRAMENTO

# OPERATIONS ORDER

## Prisoner Searches

The purpose of this Order is to establish search policy and procedures at the **Main Jail** and the **Rio Cosumnes Correctional Center (RCCC).**

I.    Policy

All prisoners will be searched in a professional and lawful manner in order to maintain the security of the facilities and ensure the safety of the staff and inmates. Prisoners will be searched upon entering either facility and at any other time as determined necessary and lawful by custody staff.

II.   Procedures

    A.    Main Jail

        1.    Intake Pat Searches

            a.    A systematic and thorough pat down search shall be conducted by booking intake staff on all arrestees detained in the building.

            b.    The pat down search shall, whenever possible, be conducted by staff of the same sex as the arrestee.

            c.    Staff shall only search one arrestee at a time.

            d.    The pat down search shall occur in the Intake Sally Port area prior to the arrestee entering further into the facility.

            e.    Intake staff shall use the type of search, level of force and means of restraint necessary to conduct a thorough search of combative, uncooperative or high-risk arrestees.

        2.    Routine Inmate Searches

            a.    Routine inmate searches may be conducted for the following purposes:

        (1)     To prevent the introduction of weapons into the facility or to detect the presence of weapons or contraband in the facility.

        (2)     To gather information necessary for the security of the facility and its' occupants.

        (3)     To preserve evidence

        (4)     To retrieve or prevent the destruction of Department property.

        (5)     To discover evidence of an escape.

        (6)     To detect inmate medical conditions

b.    Inmates shall always be searched:

        (1)     During booking.

        (2)     Prior to housing assignment.

        (3)     Prior to reentry into the secure portion of a facility after leaving.

        (4)     Whenever an inmate worker returns to their housing unit after a job assignment.

        (5)     Whenever staff members have reasonable suspicion to believe that an inmate has weapons or contraband in their possession.

3.    Strip Searches

a.    All strip searches shall be conducted individually and in an area of privacy so that the search can be observed only by officers participating in the search. Only necessary personnel shall be present during the search. At least two sworn personnel shall participate in a search.

b.    Only post-conviction inmates may be strip searched without cause during normal facility operations.

        (1)     CDC inmates and others with a similar status (inmates with search waiver conditions) are post-conviction inmates subject to strip search without cause.

c.    All pre-conviction inmates who will be housed in the general population of the facility, detained on misdemeanor or infraction charges, may be strip searched only under one or more of the following circumstances:

        (1)     Prior to placement in a housing unit and subsequent to a fresh arrest that involved weapons, controlled substances or violence, and supervisor approval is first obtained.

(a) Strip searches based on weapons, controlled substances or violence must occur prior to housing placement. After housing placement, reasonable suspicion will be required.

(b) Determination of whether a fresh arrest falls within the weapons, controlled substance or violence category should be interpreted conservatively i.e. err on the side of not strip searching.

(2) Prior to placement in a housing unit subsequent to a fresh arrest when there exists a reasonable suspicion based on specific and articulable facts that the arrestee may be possessing contraband and supervisor approval is first obtained.

(3) Prior to the return of an inmate from medical appointments, court, intra-facility moves, inter-facility moves, housing area searches or other movement when there exists a reasonable suspicion based on specific and articulable facts that the arrestee may be possessing contraband and supervisor approval is first obtained.

d. Strip searches shall be conducted in an area of privacy so that only those participating can view the search. Persons are considered to be participating when their official duty requires they be present.

(1) Participants in a strip search shall be of the same sex as the inmate unless exigent circumstances exist or the participants are medical staff.

(2) As a practical note- A single staff member can search a group of males who have been partitioned off from onlookers and each other but are still visible to the staff member(s) participating in the search. Females arrestees shall not be strip searched as a group since individualized partitions are not currently available.

e. Staff shall complete the Strip Search Form whenever a pre-conviction inmate detained on misdemeanor or infraction charges is strip searched.  The authorizing supervisor shall sign the Form before the strip search is conducted.  The form shall include the circumstances, location, name of the staff member conducting the search, the justification for the

search, a list of recovered contraband, and name of the authorizing supervisor (absent exigent circumstances).

    f.    All misdemeanor and infraction detainees not arrested on weapons, controlled substance or violence related charges and who do not provide specific and articulable facts supporting reasonable suspicion will be "dressed in" according to Department procedure.

        (1)    Monitoring the dress-in procedure shall occur in the designated locations such that the inmates can be watched for security purposes but the private parts of the inmates cannot be seen.

        (2)    All un-strip searched inmates, upon completion of dressing in, shall be "wanded". They may be pat searched at the staff's discretion.

    g.    There shall be no strip search of misdemeanor and infraction detainees during a housing area search unless reasonable suspicion based on specific and articulable facts exists to believe that the inmate is secreting contraband. If reasonable suspicion exists, the above mentioned procedures will be utilized.

    h.    Post-conviction inmate workers shall be strip searched upon return from a work assignment, but only in a manner that provides individualized privacy. Neither a strip search form nor supervisor approval is required.

        (1)    Non-worker post-conviction inmates may be searched without cause but only in a manner that provides individualized privacy.

        (2)    Court returns of misdemeanor and infraction detainees shall only be strip searched based on reasonable suspicion based on specific and articulable facts. A strip search form and supervisor approval is required. These inmates will also be "wanded" and pat searched prior to returning to their housing unit.

    i.    After briefly explaining the process and reason for a strip search, staff will conduct a strip search using the following instructions:

        (1)    Remove all clothing.

      (2)    Stand and face the staff member (unless physically impossible).

      (3)    Raise, then lower, both hands above the head.

      (4)    Remove all dental work, open the mouth and left the tongue. Sweep the area between the lips and gums with the index finger.

      (5)    Run the fingers of both hands through facial hair (if applicable)

      (6)    Turn 90 degrees to the right; pull the flap of the ear closest to the deputy down with the left hand while pulling the hair away from the ear with the right hand. Repeat for the left side.

      (7)    Bend over at the waist so that the upper body is parallel to the floor and run the fingers of both hands through the hair vigorously moving from the base of the scalp forward then shake the head.

      (8)    Stand up straight and extend both arms directly in front of the body with palms down and fingers spread. Turn both palms up.

      (9)    Lift the rolls of fat, if applicable, in the abdominal area (women should lift their breasts).

      (10)    Spread both feet apart and lift the penis with two fingers only, lift the scrotum and pull back the foreskin of the penis (if applicable).

      (11)    Comb through the public hair with the fingers of both hands.

      (12)    Turn away from the staff member, lift the right foot and wiggle the tows. Repeat for left foot.

      (13)    Lift the rolls of fat, if applicable, on the back and side.

      (14)    Spread both feet apart, bend at the waist, spread the cheeks of the buttocks apart and cough vigorously (inspect vaginal opening also for women).

   j.    When applicable, the arresting or transporting officer shall be responsible for booking, storing, or disposing of evidence or contraband discovered. If the inmate has become the custody of the Department, the staff member conducting the search shall be responsible for the evidence or contraband and all necessary documentation.

   k.    Arrestees and inmates do not have the right to refuse lawful strip searches.

      (1)    A refusal will be deemed additional reasonable suspicion to believe the arrestee is in possession of contraband or weapons. Staff will treat refusals with due caution.

(2)    After a cursory search of a refusing inmate, the inmate shall be placed in an isolation cell with the water turned off and a supervisor will be notified. Such an inmate shall not be housed, allowed access to a phone or released until a strip search is completed.

(3)    The refusing inmate shall remain in isolation until he/she complies or the supervisor authorizes the strip search.

(4)    If the inmate continues to refuse, the supervisor may authorize a forcible strip search. The supervisor, or an alternate supervisor of the same sex as the inmate, shall remain present during the search and force shall cease if the inmate begins to comply.

l.    The Strip Search Form shall be utilized in compliance with this order. The original shall be placed in the inmate's file and a copy will be forwarded to be maintained by the administration.

m.    Any person who knowingly and willfully authorizes or conducts a strip search in violation of California Penal Code section 4030 may be charged with a misdemeanor.

4.    Physical Body Cavity Searches

a.    To conduct any physical body cavity search, the following conditions shall simultaneously exist:

(1)    There shall be reasonable suspicion that an inmate is concealing contraband or weapons and a search will result in the discovery of said items.

(2)    The search shall be conducted under the authority of a valid search warrant issued by a court of competent jurisdiction.

b.    Physical body cavity searches shall only be conducted by licensed medical personnel in a place of privacy and in a medically approved manner.

c.    All physical body cavity searches shall be authorized in advance by the supervisor on duty during the search.

d.    No person arrested on a misdemeanor or infraction offense shall be subjected to a physical body cavity search except under the authority of a search warrant issued by a magistrate specifically authorizing the physical body cavity search.

e.   Physical body cavity searches of the stomach i.e. stomach pumps and induced vomiting shall be conducted at a professional medical facility. Fresh arrestees suspected of ingesting life-threatening quantities of contraband shall not be accepted for incarceration.

f.   Physical body cavity searches conducted on fresh arrestees shall be conducted in the exam room of the sobriety testing area. Physical body cavity searches conducted on housed inmates shall occur in an appropriate medical exam room. The location of all exams will be private and sanitary.

g.   Physical body cavity searches shall be completed by medical staff of either sex and correctional staff of the same sex.

h.   Under no circumstance shall a non-medical staff member attempt to retrieve any item of contraband and/or weapon concealed in the body cavity of an inmate.

i.   A medical referral form shall be completed by custody staff and delivered to medical staff prior to a physical body cavity search. The form shall include which cavity is to be search and what contraband should be searched for.

j.   The staff member initiating the search shall complete a "Physical body Cavity Search" form upon completion of the search. The original will go into the inmate's file and a copy will go to the facility commander.

k.   Arrestees and inmates do not have the right to refuse lawful physical body cavity searches.

(1)   A refusal will be deemed additional reasonable suspicion to believe the arrestee is in possession of contraband or weapons. Staff will treat refusals with due caution.
(2)   After a cursory search of a refusing inmate they shall be placed in an isolation cell with the water turned off and a supervisor will be notified. Such an inmate shall not be houses, allowed access to a phone or released until the search is completed.
(3)   The refusing inmate shall remain in isolation until he/she complies or the supervisor authorizes the search.
(4)   If the inmate continues to refuse, the supervisor may authorize a forcible search. The supervisor, or an

alternate supervisor of the same sex as the inmate, shall remain present during the search and force shall cease if the inmate begins to comply.

    (5)    If the refusing inmate's behavior appears to be influenced by an obvious mental health problem, the staff member shall not allow a physical body cavity search until the inmate is interviewed by Jail Psychiatric Services.

l.    The staff member initiating the physical body cavity search and a sworn supervisor shall be present during the search unless they are not of the same sex as the searched inmate.

m.    The staff member initiating the search will be responsible for the disposition of any contraband and/or weapons and for any additional charges that result from the search.

n.    A fresh arrestee will not be accepted if the arresting officer has reasonable suspicion to believe the arrestee is concealing contraband and/or weapons in a body cavity.

o.    When authorized by a supervisor in accordance with this, the medical staff is responsible for arranging the search to be conducted pursuant to their operating instructions. If no medical personnel are available or willing to complete the search then the Supervising Nurse will arrange for alternate medical personnel to conduct the search.

p.    Any person who knowingly and willfully authorizes or conducts a physical body cavity search in violation of California Penal Code section 4030 may be charged with a misdemeanor.

5.    Facility Searches

a.    Cell searches shall be conducted frequently and a search form shall be completed after any routine search.

    (1)    They may occur during hourly floor and cell checks.
    (2)    They may be conducted anytime and do not require reasonable suspicion or probable cause though searches shall not be conducted for punitive or harassment reasons.

b.    Outdoor and indoor recreation areas shall be searched prior to the beginning of recreation activities and whenever necessary.

DEF 000408

c.   Elevator lobby areas and multipurpose rooms shall be searched as necessary but not less than once a week.

d.   The intake/booking and release areas shall be searched at least once during each shift.

e.   The cleaning crew officer shall conduct a cursory search of garage prior to giving crews access for cleaning purposes.

f.   The laundry officers shall randomly choose a small portion of the laundry area to be thoroughly searched on a daily basis.

g.   The kitchen officers shall randomly choose a small portion of the kitchen area to be thoroughly searched on a daily basis.

h.   The court escort officers shall search the court holding area each morning prior to allowing inmates into the area.

i.   Public counter personnel shall conduct a thorough search of the public and court lobby areas at least once a shift.

j.   A perimeter search of the facility shall be conducted whenever necessary.

k.   All searches shall be conducted in a manner that will ensure maximum surprise and equal coverage.

l.   All contraband and evidence seized shall be disposed of and documented in the proper manner and all violations shall be documented for disciplinary action.

m.   All searches will be logged in the appropriate control logbook.

n.   Search kits including shall be located in each housing control room, the briefing room, and sergeant's offices (except the administrative sergeant).

B.   RCCC

1.   Intake Pat Search- See section A.1.a-e above as the Main Jail procedures for intake pat searches shall also apply to the RCCC.

2.   Routine Inmate Searches- See section A.2.a-b above. Main Jail procedures for routine searches shall also apply to the RCCC.

3. Strip Searches- See section A.3.a-l above. Main Jail procedures for strip searches shall also apply to the RCCC. See below for orders specific to the RCCC.

    a. **Fresh pre-conviction arrestees** booked at the RCCC, who will be housed, shall be transported to the Main Jail as soon as possible. When policy allows, they shall be strip searched at the RCCC prior to transportation pursuant to section A.3.a-l above.

    b. **Convicted, but unsentenced, inmates** at the RCCC are subject to lawful strip search without cause pursuant to their post-conviction status.

    c. **Court returns** shall not be strip searched, absent reasonable suspicion.

    d. **Foreign agency transfers** shall not be strip searched, absent reasonable suspicion.

    e. **Enroutes** are subject to strip searches under the following conditions:

        (1) Warrant-based enroutes shall not be strip searched, absent reasonable suspicion, unless a conviction is confirmed.

        (2) Production-order-based enroutes shall not be strip searched unless their paperwork confirms a conviction related to one or more charges associated with the current custody period.

        (3) US Marshal's-hold-based enroutes shall not be strip searched unless their paperwork confirms a conviction related to one or more charges associated with the current custody period.

    f. A Sacramento County post-conviction inmate who has served his/her sentence and remains in custody on a foreign warrant shall not be strip searched absent reasonable suspicion.

    g. Pre-conviction inmates returning from movements such as the hospital, medical appointments, inter and intra facility moves or other movements shall not be strip searched absent reasonable suspicion.

    h. Post-conviction inmates returning from movements such as the hospital, medical appointments, inter and intra facility

moves, disciplinary moves or other movements may be strip searched subject to this policy.

    i.    In situations where it is impractical to individually strip search groups of post-conviction and post-arraignment inmates, staff members may direct such inmates, as a group, to remove all clothes except their underwear to allow for visual inspection of their bodies. The inmates may also be subject to pat down and metal detector searches.

4.    Physical body cavity searches- See section A.4.a-p above. Main Jail procedures for physical body cavity searches shall also apply to the RCCC.

5.    Facility searches

    a.    Housing area shakedown searches may be conducted at any time with or without reasonable suspicion or probable cause though searches shall not be conducted for punitive or harassment reasons.

    b.    A housing area shakedown shall require prior supervisor approval and will be monitored by a supervisor.

        (1)    Prior to allowing inmates back into the housing area a supervisor will inspect the area to ensure compliance with this order.
        (2)    A shakedown form shall be reviewed by the supervisor and forwarded to the watch commander and division commander.
        (3)    The division commander shall maintain the shakedown form in the Shakedown Log Book.

    c.    Care will be taken to avoid unnecessary destruction or disregard of an inmate's personal property for example:

        (1)    Each inmate's property should be kept separate
        (2)    After an inmate's property has been searched it should be returned to the place it was taken from.
        (3)    Bedding should be placed on an inmate's bunk (though inmates will remake their own beds).

    d.    Personal property not allowed in the housing area may be placed in the inmate's stored property. Staff may complete a Major Incident Report listing the unauthorized property. If written, the form shall be attached to the property receipt form.

e.    If personal property is illegal and claimed by an inmate or proven to be in their possession, it may be booked as evidence and the goldenrod copy will serve as the receipt or a Major Incident Report may be written and the inmate's copy will serve as the receipt.

   (1)    If not claimed by an inmate or provable, the property shall be considered abandoned and may be booked for disposal.

f.    Excess property will be confiscated and returned to its appropriate location with no receipt necessary. A Major Incident report is discretionary.


III.   Definitions

A.   **Body cavity:** The stomach, mouth, nasal passages, ear canals or rectal cavity of a person, and a vagina of a female person.

B.   **Metal Detector Search:**  Any device, when walked through or waived over a person that has the ability to detect metal objects on or within a person.

C.   **Physical Body Cavity Search:** Physical intrusion into a body cavity for the purpose of discovering any object concealed in the body cavity. Body cavities include the stomach, mouth, ears, nostrils, vagina and rectal cavities.

D.   **Pat Search or Clothed Search:**  The inspection by sight and/or touch of the prisoner's hair, mouth, ears, clothed body, and outer clothing (including coats, hats, wigs, pockets, socks, and footwear).

E.   **Pre-conviction prisoners:** Any person entering the facility for the purpose of booking or housing who has not been convicted of any of the charges for which he/she is being held during the current custody period.

F.   **Post-conviction prisoner**: Any person entering the facility for the purpose of booking or housing who is convicted of one or more of the charges for which he/she is being held during the custody period. This category includes, but is not limited to, J&S inmates, sentenced inmates, parole holds and CDC inmates.

G.   **Reasonable suspicion:** Suspicion based on specific and articulable facts to believe that a particular person is concealing a weapon or contraband, and that a strip search will result in the discovery of the weapon or contraband.  Probable cause need not be met.

H.   **Strip search:**  A search which requires a person to remove or arrange some or all of his or her clothing so as to permit a visual inspection of the undergarments, female breasts, buttocks, anus or genitalia of such person.

I.   Undergarments for male prisoners include 'below the waist' underwear such as briefs or boxers. They do not include undershirts, socks or long-john type undergarments unless the long-john is the only garment covering the buttocks or genitalia. Undergarments for female prisoners include underwear (panties) and bras. It does not include socks or items like tights, nylons, slips, undershirts or camisoles unless such a garment is the only garment covering the breasts, buttocks or genitalia.

J.   **Visual Body Cavity Search:** Visual inspection of a body cavity.

**Appendices:**     Strip Search Authorization Form (12-W)
**References:**     Penal Code 4030, Bull vs. County of Sacramento, Way vs. County of Ventura; *Bull v. City & County of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (*en banc*)
**Related Orders:**     Operations Order 4-1-Intake Search and Reception

DEF 000413

# SACRAMENTO COUNTY SHERIFF'S DEPARTMENT
# STRIP SEARCH AUTHORIZATION
☐ **MAIN JAIL**   ☐ **RCCC**

| *INFORMATION* | | |
|---|---|---|
| **REQUESTING AGENCY:** | **DATE & TIME:** | **REPORT/INCIDENT NUMBER:** |
| | | |

| *PRISONER INFORMATION* | | |
|---|---|---|
| **PRISONER NAME:** | **CHARGES:** | **DATE OF BIRTH:** |
| | | |
| **X-REFERENCE:** | **CUSTODY NUMBER:** | **HOUSING UNIT/CELL LOCATION:** |
| | | |

### *REASON FOR SEARCH*

A strip search on this person must be conducted because:  (Check at least one reason.)

| | |
|---|---|
| | Charges involve weapons, controlled substances or violence.(Only used pursuant to intake process) |
| | Individualized Suspicion: There are specific and articulable facts to believe this person is concealing a weapon or contraband, and a strip search will result in the discovery of the weapon or contraband. |
| | An emergency exists which is documented below. |

### *FACTS*

Describe facts which support individualized suspicion or constitute an emergency:

_____
_____
_____
_____
_____
_____
_____

### *REQUESTING OFFICER, AUTHORIZING SUPERVISOR, AND OFFICER CONDUCTING SEARCH*

| | | |
|---|---|---|
| *REQUESTING OFFICER* **Printed Name & Badge Number** | | |
| *REQUESTING OFFICER* **Signature & Badge Number** | | |
| *AUTHORIZING SUPERVISOR* **Printed Name & Badge Number** | | |
| *AUTHORIZING SUPERVISOR* **Signature & Badge Number** | | |
| *OFFICER CONDUCTING SEARCH* **Printed Name & Badge Number** | | **MALE:** |
| | | **FEMALE:** |
| *OFFICER CONDUCING SEARCH* **Signature & Badge Number** | | **LOCATION OF SEARCH:** |

### *DISPOSITION*

List of weapons or contraband discovered and the location found on person:

_____
_____
_____

Distribution Copies:  Copy to Division Commander / Original to Prisoner File

Appendix 12-W          (REV 8/06)

DEF 000414

# EXHIBIT R

```
DATE 08/29/19            SACRAMENTO COUNTY SHERIFF'S DEPARTMENT                    JIPRAC
TIME 15:38:39                   INMATE INCIDENT REPORT                       PAGE 1 OF 2

XREF- 4280466                   Name- PREDYBAYLO, ALEXESY                 DOB- 03/30/1993

HOUSING LOCATION-                                        PROJECTED REL. DATE-
```

**REPORT:**     Number- 1002468701     TYPE- INF   CAT- 1  STATUS- CLEAR   FACILITY- NMJ

DATE- 07/05/2017 1733 hours          OFFICER- 976  HOPECK

REVIEWER-                       DELIVERED-                          WAIVED-

LAST MODIFIED- 04/25/2018 0744 hours       BY- 3706497


**INCIDENT:**   DATE- 07/05/2017 1730 hours       LOCATION- MALE BOOKING SAFE 2


**VIOLATIONS:**  RULE NO.  DESCRIPTION                     CAT     PLEA     DISPO      DATE

FORCE     USE OF PHYSICAL FORCE                 1


**HEARING:**    DATE-                          OFFICER-

RESULT-

ROLLUP-                        GOOD DAYS: AVAIL- _____   LOST-

G/W TIME TAKEN FROM CASE _____ CHG _____


**DISCIPLINE: TYPE**              **FROM DATE**              **TO DATE**


NO HEARING WILL BE HELD SOONER THAN 24 HOURS UNLESS YOU WAIVE THIS TIME AND REQUEST AN
IMMEDIATE HEARING.   WAIVED:    YES _____   NO _____

| INMATE | HEARING OFFICER | FACILITY COMMANDER |
|---|---|---|
|  |  |  |

APPEALS REGARDING THE HEARING OFFICER'S DECISION MUST BE MADE WITHIN FIVE (5) DAYS AND
MUST BE IN WRITTEN FORM TO THE DIVISION COMMANDER, WHO WILL MAKE A FINAL DISPOSITION
WITHIN TWENTY (20) DAYS.

DATE 08/29/19     **SACRAMENTO COUNTY SHERIFF'S DEPARTMENT**                JIPRAC

TIME 15:38:39              INMATE INCIDENT REPORT                    PAGE 2 OF 2

**INCIDENT REPORT NUMBER- 1002468701   NARRATIVE TEXT**


MINOR'S: SEX:      AGE:        HGT:        WT:
IF BOX IS CHECKED, SECTION MUST BE COMPLETED:
--------------------------------------------------------------------------
{X } FORCE USED BY:HOPECK 976       LOC:SAFE 2              TIME:1735
DESCRIPTION OF FORCE:PLACED ON GROUND AND PUT INTO A ARMBAR FOR STRIP SEARCH
AND REMOVAL OF CLOTHING FOR STRIP SEARCH.
JUSTICATION:ARRESTEE PREDYBAYLO,ALEXESY WAS BROUGHT INTO THE MAIN JAIL FOR GUN
AND DRUG CHARGES. PREDYBAYLO STATED TO THE ARRESTING OFFICER THAT HE WOULD NOT
GIVE HIS CLOTHING FOR EVIDENCE. PREDYBAYLO BECAME VERBALLY ABUSIVE AS BOOKING
DEPUTIES STOOD BY DURING THE INTAKE EXAM. PREDYBAYLO STATED THAT HE WAS GOING
TO CALL INTERNAL AFFAIRS IF WE STRIPPED SERCHED HIM AND TOOK HIS CLOTHING.
--------------------------------------------------------------------------
DEPUTIES ESCORTED PREDYBAYLO HANDCUFFED DOWN THE BOOKING HALLWAY TO THE PHOTO
MACHINE. PREDYBAYLO COMPLAINED ABOUT DEPUTIES TOUCHING HIM THE ENTIRE PROCESS.
DURING THE STRIP SEARCH IN SAFETY 2 PREDYBAYLO TURNED AROUND TOWARDS DEPUTIES
AFTER BEING TOLD MULTIPLE TIMES TO FACE THE WALL. PREDYBAYLO WAS PLACED INTO
A REAR WRIST LOCK AND TOLD HE NEEDED TO FOLLOW DIRECTIONS FOR DEPUTIES SAFETY.
PREDYBAYLO REFUSED TO FOLLOW DIRECTIVES AND DEPUTIES ATTEMPTED TO PLACE HIM ON
HIS BELLY FOR THE STRIP SEARCH. PREDYBAYLO REFUSED TO LAY ON HIS BELLY AND
DEPUTIES HAD TO HOLD HIM ON THE GROUND AND PLACE HIM INTO A ARMBAR CONTROL HOLD
TO KEEP HIM FROM ROLLING OVER TOWARDS DEPUTIES. DEPUTIES WERE ABLE TO COMPLETE
THE STRIP SEARCH AND EXITED THE CELL WITHOUT FURTHER INCIDENT. DEPUTIES GAVE
PREDYBAYLO A PAPER SUIT AND TOOK HIS CLOTHING FOR EVIDENCE FOR HIS CHARGES.
PREDYBAYLO WAS DRESSED INTO THE PAPER SUIT AND PLACED INTO HOLDING 1.
DURING THE NURSING INTAKE EXAM PREDYBAYLO WAS COMPLAINING ABOUT LEG PAIN FROM
HIS ARREST. PREDYBAYLO WAS ABLE TO WALK ON HIS OWN ACCORD DURING THE ENTIRE
PROCESS.
REPORT PREPARED BY:                         DATE:        TIME:
                    SUPERVISOR

DEF 000357

# EXHIBIT S

{02518243.DOCX}

# SHERIFF'S DEPARTMENT ✦ COUNTY OF SACRAMENTO

## OPERATIONS ORDER

### Use of Force

The purpose of this Order is to provide policy and procedures for the Use of Force at the **Main Jail** and the **Rio Cosumnes Correctional Center (RCCC).**

I.      Policy

Custody staff shall comply with General Order 2/11 (Use of Force Policy) regarding the use of force. This policy is to be used in conjunction with, but does not supersede, General Order 2/11.

Officers shall use only that force which is reasonable, given the facts and circumstances perceived by the officer at the time of the event, to effectively bring an incident under control.  The reasonableness of the force used must be judged from the perspective of a reasonable officer on the scene at the time of the incident.

The application of force shall cease when control of a prisoner or situation is achieved and shall not be used as a form of punishment.  The objective in applying reasonable force is to control persons and incidents thereby minimizing injury to all persons involved.

II.     Alternative Resolutions in Lieu of Force/De-escalation

A.      Staff should be cognizant of the unique environment in a correctional setting.  Each situation shall be evaluated to determine the urgency of enforcement action.  In situations where an immediate response may escalate or aggravate the situation, officers should consider the containment of the event as a tactic.

B.      Further, staff shall appropriately de-escalate the level of force in response to the suspect's level of compliance.  Possible alternative resolutions in lieu of the application of force include:

1.      Containment of the situation

2.      Shutting off utilities (Water, Electricity)

3.      Negotiation

4.      Waiting situation out until suspect(s) voluntarily comply

DEF 000358

III.   Authorization and Deployment of Tactical Weapons

A.   With the exception of OC spray and Tasers, all tactical weapons (37mm/40mm Launchers, Pepperball, Sting Ball devices, Flashbang devices, or similar combustible-fueled devices) are to be deployed and used only with the prior approval of the shift Watch Commander, or in a bona fide emergency situation such as a riot, attempt escape, hostage taking, or other exigent circumstance in accordance with Operations Order 2-04-Weapons, Tactical Weapons, and Specialized Equipment.

1.   Deployment shall be defined as removal of the weapon and/or device from its place of storage, with the exception of removal for purpose of routine inspection, training, maintenance, or inventory.

2.   Tactical Weapons are defined as weapons, devices, tools, and other instruments used by officers to assist in gaining the compliance of non-compliant, assaultive, or self-injurious individuals in situations where the application of force is deemed necessary to bring a resolution to the incident.

IV.   Recording, Reporting and Documentation

A.   Officers shall make every attempt to video record the suspect's actions prior to a planned application of force.  Officers shall endeavor to record the specific actions, behavior, or threats used to justify the use of force.  Staff shall also endeavor to record any staff member's directions and requests for compliance.  The video recording will be logged and stored in the video library for thirty-six (36) months.

B.   Any use of force which results in an apparent or reported injury shall be documented utilizing the Automated Field Reporting (AFR) system on a crime/arrest report, a casualty report, a 5150 report, or an information report – whichever is applicable.

1.   In no circumstance will a stand-alone supplemental report be sufficient to document a use of force.

C.   Any *Application of Force* or *Use of Deadly Force*, as described in sections II.B and II.C of Appendix A of General Order 2/11, against any person by an employee of this Department (sworn or non-sworn) shall be documented utilizing an AFR incident report which may include, but is not limited to, a crime/arrest report, a casualty report, a 5150 report, or an information report.

1.   Exception- AFR documentation is not required for the use of control/compliance holds, handcuffs, shackles, or other restraint devices when used to restrain persons for security or transportation purposes unless the application resulted in an apparent or reported injury.

2.     In instances where officers used firearms, Electronic Control Devices, and/or 40mm type launchers, a Weapons Discharge Form shall be completed no later than the end of watch.

3.     In no circumstance will a stand-alone supplemental report be sufficient to document a use of force, an Application of Force, or Use of Deadly Force.

D.     The use of control holds on resistive, combative, or noncompliant inmates that does not result in a visible or reported injury, shall be documented using the Jail Inmate Management System (JIMS) Incident Report (PF10). A Custody Log Book entry and a Watch Summary Log are also required.

E.     Medical assistance for any injured persons shall be obtained as soon as possible.  Prisoners exposed to certain tactical weapons may require evaluation by medical personnel in accordance with Operations Order 2-04, Weapons, Tactical Weapons, and Specialized Equipment.

F.     Supervisory notification shall be made to an on-duty supervisor as soon as practical following the application of force; in any instance, no later than the end of watch.

G.     The sergeant supervising the incident shall direct the completion of any required reports.  The required reports minimally include:

1.     A **Housing Unit Log Book** entry referencing the incident.

2.     An **Inmate Incident Report (PF-10)**.  The officer will note in the report if the incident was video recorded and if not, the circumstances preventing the video recording.

3.     An on-line **Watch Summary Log**.

H.     Additional documentation may be necessary and may include:

1.     An **AFR Incident Report**.

2.     A **"Custody Log"** form.

3.     A "**Restraint Extension**" Inter-departmental Correspondence (IDC).

4.     **Weapons Discharge Report** Incident (available on SSDWeb)

I.     The complete use of force report shall include, but is not limited to, the following:

1.     Reason for response or enforcement activity;

2.      Witness/suspect's behavior upon arrival of officers;

3.      Suspect's actions and statements prior to the arrest/use of force;

4.      Differences in physical odds; (i.e., height/weight, alcohol/drug intoxication, demonstrated fighting skill);

5.      Type and amount of resistance offered;

6.      Type and amount of force used to overcome resistance;

7.      Medical treatment requested and by whom provided;

8.      Time of supervisory notification and to whom;

9.      Third party witness statements;

10.     Evidence collected, including description of injuries.

J.      The supervisor of the incident shall ensure the Watch Commander receives a copy of all pertinent reports.  The report package shall include:

1.      The Use of Force Routing Sheet.

2.      The Custody Log Sheet.

3.      The PF-10 Incident Report and any Crime/Casualty/Incident Reports.

4.      The Watch Summary Log.

5.      The Restraint Extension IDC, Weapons Discharge Report if applicable.

K.      The original package shall be placed in the prisoner's custody file.  A copy will be forwarded to the assistant division commander for review and a copy shall be maintained by the division administrative sergeant or designee.

L.      The Watch Commander shall review the use of force, including any available video.

1.      The Watch Commander shall forward all documentation and available video for the use of force to the assistant division commander by the end of watch.

M.      The supervising sergeant shall ensure a Classification Officer is notified of the incident and if a change in housing location for the prisoner is needed.

N.      The supervisor or designee should conduct a debriefing session with involved staff as soon as possible.

**Appendices:**  None

**Related Orders:**  General Orders: 1/34, Reports, 2/11, Use of Force Policy
Operations Orders:  1/15, Reporting of Incidents and Crimes, 2/02,
Use of Restraints, 2/03, Use of the Prostraint Chair; 2/04,
Weapons, Tactical Weapons, and Specialized Equipment; 2/05,
CERT and Cell Extraction Procedures

**References:**  Title 15, Section 1058

# EXHIBIT T

SHERIFF'S DEPARTMENT ✦ COUNTY OF SACRAMENTO

# GENERAL ORDER

**Use of Force Policy**

The purpose of this General Order is to provide officers with guidelines for the reasonable use of force.  This Order recognizes the use of force is a serious responsibility and requires constant evaluation.

I.    General

The Sacramento County Sheriff's Department recognizes and respects the value of all human life.  Officers are involved in numerous encounters daily with a variety of people and may be called upon to use reasonable force in carrying out their duties.  Officers must understand the limitations of their authority with respect to overcoming resistance from those with whom they come in official contact.  Vesting officers with the authority to use reasonable force and protect the public welfare requires a careful balancing of all human interests.

California Penal Code Section 835a:  Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to affect the arrest, to prevent escape, or to overcome resistance.  A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance.

II.    Policy

A.    It is the policy of this Department that officers shall use only that force which is reasonable, given the facts and circumstances perceived by the officer at the time of the event, to effectively bring an incident under control.  The reasonableness of the force used must be judged from the perspective of a reasonable officer on the scene at the time of the incident.

1.    Officers may use force in the performance of their duties when they reasonably believe any of the following conditions exist:

a.    In self-defense;

b.    In defense of another person;

c.    To prevent the commission of a public offense;

d.      To effect a lawful arrest, prevent escape, or overcome resistance;

e.      To protect a person from injuring themselves;

f.      To prevent the destruction of evidence.

2.      Officers may use deadly force in the performance of their duties when the following conditions exist:

a.      In self-defense when the officer has reasonable cause to believe that there is imminent danger of death or great bodily injury;

b.      In defense of another person when the officer has reasonable cause to believe that the other person is in imminent danger of death or great bodily injury (same as GO 2/05);

c.      To effect an arrest, prevent an escape, or recapture an escapee when the officer has probable cause to believe that the suspect has committed or attempted to commit a violent felony involving the threat of death or great bodily injury and when the officer has reasonable cause to believe that the felony suspect to be apprehended may cause death or great bodily injury to an officer or another person should the suspect escape;

d.      In each situation above, where feasible, an officer should issue a verbal warning prior to initiating deadly force.

3.      The objective in applying reasonable force is to control persons and incidents thereby minimizing injury to all persons involved.  Nothing in this policy requires an officer to actually sustain physical injury before applying reasonable force.

III.    <u>Use of Force Options</u>

A.      Examples of force options are provided to officers in Appendix A and do not imply any continuum of force.  These examples are not exhaustive nor are they intended to limit an officer's reasonable response to a perceived threat (see Appendix A).

IV.     <u>Reporting</u>

A.      Any use of force which results in an apparent or reported injury shall be documented utilizing an Automated Field Reporting (AFR) incident report which may include, but is not limited to, a crime / arrest report, a casualty report, a 5150 report, or an information report.

B.    Any *Application of Force* or *Use of Deadly Force*, as described in sections II.B and II.C of Appendix A of this order, against any person by an employee of this Department (sworn or non-sworn) shall be documented utilizing an AFR incident report which may include, but is not limited to, a crime / arrest report, a casualty report, a 5150 report, or an information report.

   1.    Exception- AFR documentation is not required for the use of control / compliance holds, handcuffs, shackles, or other restraint devices when used to restrain persons for security or transportation purposes <u>unless the application resulted in an apparent or reported injury</u>.

   2.    In instances where officers used firearms, Electronic Control Devices, and/or 40mm type launchers, a Weapons Discharge Form shall be completed no later than the end of watch.

   3.    In no circumstance will a standalone supplemental report be sufficient to document a Use of Force, an Application of Force, or Use of Deadly Force.

C.    The complete use of force report, whether an incident, pursuit, casualty, or crime report, should include, but is not limited to, the following:

   1.    Reason for response or enforcement activity;

   2.    Witness / suspect behavior reported prior to and upon arrival of officers;

   3.    Suspect actions and statements prior to arrest / use of force;

   4.    Discrepancies in physical stature; i.e., height / weight, appearance of being under the influence of alcohol or drugs, demonstrated fighting skill;

   5.    Type and amount of resistance offered;

   6.    Type and amount of force used to overcome resistance;

   7.    Medical treatment requested and by whom provided;

   8.    Time of supervisory notification and to whom;

   9.    Third party witness statements;

   10.    Evidence collected, to include description of injuries if applicable.

D.    Supervisory notification shall be made as soon as practical following the application of force which, at the time, appears likely to have caused

physical injury.  Medical assistance for any injured persons shall be obtained as soon as possible.

V.   <u>Debriefing</u>

    A.   Management and / or supervisory personnel shall plan and facilitate debriefings of any use of force incidents which result in serious bodily injury or death to citizens, officers, or suspects.  The debriefing shall include personnel involved in the incident and any other concerned personnel at the discretion of the coordinating manager / supervisor. Debriefings shall occur as soon as possible after the incident, but no later than 30 days afterward.

## ATTACHMENTS:

Attachment A   2-11 (Rev 8-17) Appendix A-Examples