UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXSEY PREDYBAYLO, an individual,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SACRAMENTO COUNTY, CALIFORNIA, a county government and the operator of the Sacramento County Sheriff's Department and its Correctional Health Services Division; DEPUTY JARROD HOPECK; DEPUTY BENJAMIN GONZALES; DEPUTY ROBERT RANUM; DEPUTY JEFFREY WILSON; and Does 1 through 20,<br><br>　　　　　Defendants. | No.  2:19-cv-01243-MCE-CKD<br><br>**MEMORANDUM AND ORDER** |

Through this action, Plaintiff Alexsey Predybaylo ("Plaintiff") seeks redress from Defendants Sacramento County (the "County") and Deputies Jarrod Hopeck ("Hopeck"), Benjamin Gonzales ("Gonzales"), Robert Ranum ("Ranum"), and Jeffrey Wilson ("Wilson") (collectively with the County, "Defendants").  Plaintiff's Second Amended Complaint ("SAC"), filed November 14, 2020, alleges two causes of action:  (1) Individual Liability for Violation of Plaintiff's Constitutional Rights under 42 U.S.C. § 1983 (Unlawful Use of Force) against Hopeck, Gonzales, Ranum, and Wilson; and (2) Municipal Liability

for Violation of Plaintiff's Constitutional Rights (Deliberate and Callous Disregard for Repeated Acts of Excessive Force) against the County.  Presently before the Court are the parties' cross-Motions for Summary Judgment, both of which have been fully briefed. ECF Nos. 53 ("Defs.' Mot."), 55, 57 ("Pl.'s Opp'n"), 58 ("Defs.' Reply"), 59, 60.  For the reasons set forth below, Defendants' Motion is GRANTED, and Plaintiff's Motion is DENIED as moot.[1]

## BACKGROUND[2]

### A. Plaintiff's Arrest and Booking at the Sacramento County Main Jail

On July 5, 2017, Plaintiff was arrested by Sacramento Police Sergeant Andy Hall ("Hall") for possession of firearms and controlled substances as well as resisting arrest and was taken to the Sacramento County Main Jail ("Main Jail").[3]  The booking process began with a cursory pat down and Plaintiff removing his shoelaces and belt.  During this time, Hall informed Plaintiff that he needed to confiscate Plaintiff's clothes for evidence. While Hall completed the arresting paperwork, Plaintiff was examined by medical personnel.  Plaintiff was taken to the medical intake screening, where he reported to have taken Xanax and Norco and that he had scrapes along his knee from running away from Hall.  See Ex. P, ECF No. 53-5, at 176–81 (medical intake form dated July 5, 2017). The medical intake form indicated that Plaintiff was detoxing from Xanax and Norco and that medical personnel should follow-up with Plaintiff once he was booked

///

---

[1] Because oral argument would not have been of material assistance, the Court ordered these matters submitted on the briefs.  E.D. Local Rule 230(g).

[2] Unless otherwise indicated, the following facts are taken from Defendants' Statement of Undisputed Facts and Plaintiff's Response thereto.  ECF Nos. 53-2, 57-1.  Furthermore, all page citations are to the CM/ECF assigned page numbers.

[3] Plaintiff contends that Defendants' inclusion of facts surrounding his arrest are irrelevant and prejudicial in violation of the Federal Rules of Evidence.  See Pl.'s Response Defs.' Statement of Undisputed Facts, ECF No. 57-1 ¶¶ 1–7.  The Court only recounts what is necessary for context.

into a housing unit.  Id.  Plaintiff was medically cleared and was transferred into the County's custody.[4]

The parties dispute whether Plaintiff was cooperative during this time and rely on a surveillance video in the booking photo area.  See Ex. M, ECF No. 53-5 ("Booking Photo Video") (no audio).  In the beginning of said video, Plaintiff is handcuffed and escorted by Hopeck and Ranum for his booking photo while Gonzales and Wilson operated the fingerprint machine and camera.[5]  Id. at 0:01–0:10.  Hopeck and Ranum remain on each side of Plaintiff as photographs were taken of Plaintiff's front and side profiles.  See id. at 0:10–1:27.  At one point, when Plaintiff, Hopeck and Ranum's backs are facing the surveillance camera, the Booking Photo Video shows Plaintiff moving his right arm.  Id. at 1:28–1:36.  According to Defendants, Plaintiff attempted multiple times to move his right arm and pull away from Hopeck at his side, and that Ranum grabbed Plaintiff's left elbow because Plaintiff was continuing to move around during the photo including jerking his body and shoulder downwards.[6]  See Ex. C, Ranum Dep., ECF No. 53-5, at 100–01; Ex. D, Gonzales Dep., ECF No. 53-5, at 126.  On the other hand, Plaintiff counters that he did not move his elbow or shift his weight in any manner that was uncooperative or assaultive, only that he shifted his weight for a moment because his leg hurt.  See Ex. A, Predybaylo Dep., ECF No. 53-5, at 21–22, 47–48.  The

---

[4] Hopeck testified at his deposition that, during this same timeframe, he remembered hearing noises and yelling at the nurse's station, but he could not recall any specific threats or what was said.  See Ex. B, Hopeck Dep., ECF No. 53-5, at 57.  Plaintiff, however, testified that he did not remember being verbally abusive.  Ex. A, Predybaylo Dep., ECF No. 53-5, at 37.

[5] According to Defendants, "[a]nytime an arrestee is handcuffed and escorted by two or more deputies for their booking photo, it indicates that the arrestee has been uncooperative."  Defs.' Statement of Undisputed Facts, ECF No. 53-2 ¶ 18 (citing Ex. C, Ranum Dep., ECF No. 53-5, at 99–100; Ex. D, Gonzales Dep., ECF No. 53-5, at 124–25).  In response, Plaintiff cites Hall's deposition testimony in which he testified that he did not recall Plaintiff being uncooperative; however, Hall does not appear in the Booking Photo Video.  See Ex. 6, Hall Dep., ECF No. 55-4, at 344 (stating he did not see Plaintiff being uncooperative during the booking process); see generally Booking Photo Video.

[6] When Plaintiff attempted to move his right arm and pull away from Hopeck, Defendants claim that "Gonzales, Ranum, and Hopeck were aware and believed that Plaintiff was passively resisting, while in handcuffs, throughout the booking process, and these are early indicators for deputies that an arrestee can become violent."  Defs.' Statement of Undisputed Facts, ECF No. 53-2 ¶ 23 (citing Ex. B, Hopeck Dep., ECF No. 53-5, at 71–72, 76; Ex. C, Ranum Dep., ECF No. 53-5, at 104; Ex. D, Gonzales Dep., ECF No. 53-5, at 129, 130).

1  surveillance video ends with Hopeck and Ranum escorting Plaintiff out of the booking
2  photo area.  Booking Photo Video at 1:37–1:41.

### B. Plaintiff's Strip Search Inside the Main Jail Safety Cell

Main Jail policy requires deputies to strip search arrestees when they are brought in for drug possession, gun charges, or violence charges.[7]  After taking his booking photos, Plaintiff, who remained in handcuffs, was taken to Safety Cell #2 for a strip search by Hopeck, Ranum, Gonzales, and Wilson.[8]  See Ex. F, Hall Dep., ECF No. 53-5, at 151 (stating Hall was also present during the strip search).  There is a surveillance video from inside Safety Cell #2.  Ex. O, ECF No. 53-5 ("Safety Cell Video") (no audio).  According to Defendants, the cameras inside the safety cells are covered with post-it notes because the video is shared with non-law enforcement County employees.  Deputies remove the post-it note to ask the arrestee if they have drugs or weapons and afterwards, the post-it note is placed back on the camera for privacy during the strip search.  With that said, the Safety Cell Video begins with Gonzales removing the post-it note from the camera.  Id. at 0:00–0:01.  Plaintiff then enters Safety Cell #2 with Ranum holding his left arm and Hopeck holding his right arm.  Id. at 0:01–0:05.  Gonzales pointed to the camera and asked Plaintiff if he had any additional drugs hidden on his body.  Id. at 0:05–0:08 (no audio); see Ex. D, Gonzales Dep., ECF No. 53-5, at 121–22.  Plaintiff apparently did not answer Gonzales' question but the Safety Cell Video shows Plaintiff talking and turning around to face the deputies.  Safety Cell Video at 0:05–0:09; see also Ex. B, Hopeck Dep., ECF No. 53-5, at 81 ("Well, he's – he's talking and he's turning to the left as he's like attempting to turn around towards Deputy Ranum."); Ex. C, Ranum Dep., ECF No. 53-5, at 97–98.  Gonzales then replaced the post-it note over the camera.  Safety Cell Video at 0:09–0:11.

---

[7] Plaintiff does not dispute the reason for the strip search or challenge the need for the strip search.  See Pl.'s Opp'n at 16.

[8] Once again, Defendants assert that "[s]trip searches that involve more than two deputies usually indicate the arrestee is not cooperative."  Defs.' Statement of Undisputed Facts, ECF No. 53-2 ¶ 29 (citing Ex. E, Wilson Dep., ECF No. 53-5, at 143; Ex. F, Hall Dep., ECF No. 53-5, at 152–53).

As to what transpired after the camera was covered, Defendants refer to Plaintiff's deposition testimony. It is undisputed that the deputies removed Plaintiff's handcuffs, and Plaintiff then took off his shirt, socks, and shoes without incident. See Ex. A, Predybaylo Dep., ECF No. 53-5, at 26–27.

Plaintiff next needed to remove his pants and underwear and at this time, he was approximately one foot away from the wall. Id. at 30. Hopeck testified that he first used verbal commands to get Plaintiff to comply with the strip search, face the wall, and remove his pants. See Ex. B, Hopeck Dep., ECF No. 53-5, at 81 ("Well, we had told him multiple times just to walk in and, you know, stop turning around, just walk forward, and it appears there in the [Safety Cell Video] that he's continuously turning to the left . . ."). Plaintiff provides the following account as to what happened next:

> And that's when Deputy Hopeck told me to put my hands behind my back, and I was confused about it. And then he told me – and then he – he wrapped his hands around my thumbs – wrapped his hand – I had my hands behind my back, and he told me to relax your thumbs.[9]
>
> And then once I told him, "my thumbs are relaxed," and then he yelled, "I said, relax your f'ing [sic] thumbs." And then that's when the other two officers – I believe it was Ranum and Gonzales – they pulled my pant legs out from under me.
>
> And I went head first, and I hit my head on the ground. And then Hopeck dropped his knee – dropped his knee on my temple and then had me pinned down to the ground.[10]

Ex. A, Predybaylo Dep., ECF No. 53-5, at 26–27; but see Ex. B, Hopeck Dep., ECF No. 53-5, at 56 ("[H]e was actively resisting by, you know, pulling his body, you know, not following directions, moving around, pulling away from our grasp, stuff like that, but not violent."); Ex. C, Ranum Dep., ECF No. 53-5, at 93 ("There wasn't any violent encounter with him. It was just him being verbally uncooperative at the beginning. . . .

---

[9] Hopeck explained that a "control hold" such as the one described by Plaintiff is used to prevent an arrestee from spinning around if the arrestee does not comply. See Ex. B, Hopeck Dep., ECF No. 53-5, at 62.

[10] According to Defendants, Safety Cell #2 has a padded floor. Pl.'s Response Defs.' Statement of Undisputed Facts, ECF No. 57-1 ¶ 26. However, Plaintiff asserts that "the floor has nominal padding that does not prevent him from receiving a concussion and other injuries." Id.

He kept turning around on us.  So we grabbed ahold of him and assisted him to the ground and grabbed the evidence."), 94 ("We don't place people on the ground that are cooperative. . . .  He turns around on us multiple times, and that is . . . directly against what we tell him to do for our safety and his safety."); Ex. D, Gonzales Dep., ECF No. 53-5, at 123–24 ("[Plaintiff's] just basically being passive resistive at that point.  We have them face the wall for everyone's safety. . . .  And then pushing back into us and not facing the wall, not following directions is just – it's a sign of being uncooperative, which it looks like is going on in the [Safety Cell Video].").  Hopeck initially retained control of Plaintiff's thumbs but as Plaintiff fell, Hopeck let go.  Ex. A, Predybaylo Dep., ECF No. 53-5, at 32.  As a result, Plaintiff was unable to put his hands out in front of him to block his fall.  Plaintiff believes he "blacked out for a little bit" because he cannot remember Hopeck shifting his knee from Plaintiff's temple to back.  Id. at 33.

      Hopeck, Ranum, and Gonzales then removed Plaintiff's pants and underwear.  It is undisputed that during this entire process, which lasted approximately four minutes, Plaintiff was not punched or kicked by any of the deputies.  Gonzales eventually removed the post-it note from the surveillance camera, which captured Plaintiff lying naked and face down on the ground with Hopeck holding Plaintiff's arms and placing his right leg on Plaintiff's upper back.  See Safety Cell Video at 4:43–49.  Ranum meanwhile is holding Plaintiff's legs, with Plaintiff's ankles crossed and his lower legs bent towards his head.  Id.  It is undisputed that Wilson never touched or was involved in any control holds on Plaintiff.[11]  After the deputies left Safety Cell #2, Plaintiff put on a paper suit, was placed into a holding cell, and eventually was moved into a housing unit at the Main Jail.

///

///

---

[11] What the parties dispute is whether Wilson only stood in the doorway of Safety Cell #2 or if he entered the room.  See Pl.'s Response Defs.' Statement of Undisputed Facts, ECF No. 57-1 ¶ 64; see also Ex. N, ECF No. 53-5 (surveillance video of hallway outside Safety Cell #2) (only depicting Plaintiff and the deputies entering Safety Cell #2).

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995).  The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

7

not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

///
///
///

**ANALYSIS**

**A.     Defendants' Motion for Summary Judgment**

     **1.     First Cause of Action against Hopeck, Gonzales, Ranum, and Wilson**

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."[12] West v. Atkins, 487 U.S. 42, 48 (1988). "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." Graham v. Connor, 490 U.S. 386, 394 (1989) (citation omitted). "The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Id. (citations omitted). In this case, the parties agree that "the Fourth Amendment sets the applicable constitutional limitations for considering claims of excessive force during pretrial detention." Lolli v. Cnty. of Orange, 351 F.3d 410, 415 (9th Cir. 2003); see also Pierce v. Multnomah Cnty., Or., 76 F.3d 1032, 1043 (9th Cir. 1996) (stating that the Fourth Amendment governs the treatment of an arrestee up until arraignment).

     Excessive force claims under the Fourth Amendment are analyzed under the "objective reasonableness" standard. See Graham, 490 U.S. at 395; Drummond v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003). The crucial inquiry in such cases is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." Graham, 490 U.S. at 397; Blankenhorn v. City of Orange, 485 F.3d 463, 477 (9th Cir. 2007).

---

[12] There is no dispute that Hopeck, Gonzales, Ranum, and Wilson were acting under color of state law.

9

Calculating the reasonableness of the force used "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." Graham, 490 U.S. at 396; Blankenhorn, 485 F.3d at 477.  The court "first assess[es] the quantum of force used," then "measure[s] the governmental interests at stake by evaluating a range of factors." Davis v. City of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007).  These factors include, but are not limited to, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396; see also Young v. Cnty. of L.A., 655 F.3d 1156, 1163 (9th Cir. 2011) (stating that "the most important [factor] is whether the individual posed an immediate threat to officer or public safety.").  "These factors, however, are not exclusive" as the court must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in Graham.'" Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010) (quoting Franklin v. Foxworth, 31 F.3d 873, 876 (9th Cir. 1994)). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom . . . summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) (en banc) (internal quotation marks and citation omitted).  The Court will first address whether Hopeck, Ranum, and Gonzales' use of force was objectively reasonable, then whether Wilson had a duty to intervene.

### a. Hopeck, Ranum, and Gonzales[13]

Regarding the type and amount of force inflicted, it is undisputed that Hopeck used a control hold by grabbing Plaintiff's thumbs and Ranum and Gonzales grabbed Plaintiff's pant legs and pulled him to the ground.  See Pl.'s Opp'n at 9; Pl.'s Response

---

[13] As previously stated, Plaintiff does not object to the strip search itself, "only to the violent force used against him" during said search.  See Pl.'s Opp'n at 16.

10

Defs.' Statement of Undisputed Facts, ECF No. 57-1 ¶¶ 41, 46, 53 (undisputed that Defendants did not kick or punch Plaintiff during their encounter).  In the Ninth Circuit, the uses of pepper spray, batons, and police service dogs are regarded as forms of "intermediate force that, while less severe than deadly force, nonetheless present a significant intrusion upon an individual's liberty interests."  Young, 655 F.3d at 1161 (describing pepper spray and baton blows as "forms of force capable of inflicting significant pain and causing serious injury."); see also Smith v. City of Hemet, 394 F.3d 689, 701–02 (9th Cir. 2005) (stating that the police department's use of force policy "classifies the use of both pepper spray and a police service dog as 'intermediate' force.").  Here, the control hold, grabbing Plaintiff's pant legs, and pulling him to the ground are not, on their own, equivalent to the intermediate uses of force described above.  As such, the Court finds that the force used in this case was de minimis.

Next, the Court must examine the governmental interest at stake, including the Graham factors.  In this case, Defendants concede that, throughout their encounter, Plaintiff was never physically violent or combative.  Defs.' Reply at 3.  Instead, Defendants assert that, during the strip search, Plaintiff failed to comply with verbal commands to face the wall and attempted to turn his body away from the wall.  Defs.' Mot. at 17, 19.  Plaintiff disputes that he engaged in any threatening or uncooperative behavior; for example, Plaintiff points out that he removed his shirt, socks, and shoes without incident and that he relaxed his thumbs when ordered to do so by Hopeck.  See Pl.'s Opp'n at 10–13, 15; Ex. A, Predybaylo Dep., ECF No. 53-5, at 26–27.

Viewing the evidence in a light most favorable to Plaintiff, and taking all inferences in his favor, the Court finds that the Graham factors weigh against a finding of excessive force.  Plaintiff does not explicitly dispute Defendants' contentions that Plaintiff, who was out of handcuffs, attempted to turn his body towards the deputies despite their repeated instructions to face the wall.  See Pl.'s Opp'n at 10–12, 15–16.  Aside from stating that he was not uncooperative or belligerent, Plaintiff has not provided any evidence

///

contradicting Defendants' safety concerns.[14]  On the other hand, Hopeck, Ranum, and Gonzales have all testified that Plaintiff's aforementioned actions led them to believe that "Plaintiff posed a potential larger threat if they released their control hold on Plaintiff" and that "Plaintiff may attempt to strike them because Plaintiff continued to turn around after being told to face the wall."  Defs.' Mot. at 17, 19; see Ex. B, Hopeck Dep., ECF No. 53-5, at 60 ("I don't know if he was dangerous, but he could possibly, you know, pose a threat because he kept turning around.  But he wasn't saying 'I'm going to punch you,' anything like that.  He just didn't want to follow directions for our safety."); Ex. C, Ranum Dep., ECF No. 53-5, at 103 ("[W]e want [Plaintiff] to face the wall for his safety and ours."); Ex. D, Gonzales Dep., ECF No. 53-5, at 123–24 ("We have them face the wall for everyone's safety. . . .  And then pushing back into us and not facing the wall, not following directions is . . . a sign of being uncooperative.").

Plaintiff contends that the deputies "could have accomplished the collection of Plaintiff's clothing by simply placing Plaintiff in the room by himself and asking him to take off his clothes, put them into a bag, and change into the jail uniform[.]"  Pl.'s Opp'n at 14–15.  In response, Defendants explain that "deputies are hesitant to leave arrestees alone in the safety cell if they are arrested for drug possession, have drugs in their anus, and the bag breaks—causing the arrestee to [overdose]."  Defs.' Mot. at 17.  Furthermore, because Hall needed Plaintiff's clothes for evidence, the "deputies were concerned Plaintiff could damage the evidence in the safety cell if he were left alone."  Id.  Even if an arrestee was entitled to dictate the manner in which officers effectuate a jail house search, which he is not, the Court finds Defendants' explanations persuasive.  Finally, it is undisputed that Hopeck, Ranum, and Gonzales attempted other means before deploying the force in question, specifically by first using verbal commands to

---

[14] Plaintiff asserts that Hall testified at his deposition that Plaintiff was cooperative and non-violent. See Pl.'s Opp'n at 11, 15 (citing Ex. 6, Hall Dep., ECF No. 55-4, at 344, 355).  However, Hall stated that he did not remember "very many details from" Plaintiff's strip search, including why more than one officer was required, whether a control hold was used, or even why Plaintiff ended up on the ground.  Ex. 6, Hall Dep., ECF No. 55-4, at 345, 349, 351, 355.  Furthermore, Hall testified that, "if the person is not doing what they're told, that could be a reason to hold somebody and forcibly have to search them," but again he could not recall or remember whether Plaintiff resisted in such a way.  Id. at 352–53, 355.

face the wall, then the control hold, to gain Plaintiff's compliance before Plaintiff was pulled to the ground.  As explained above, Plaintiff has not expressly disputed that he turned away from the wall despite instructions to do so.

In balancing the nature of the force with the governmental interests at stake, the Court concludes that, based on the undisputed evidence and viewing it in a light most favorable to Plaintiff, the force used by Hopeck, Ranum, and Gonzales was objectively reasonable under the circumstances.  As such, summary judgment is GRANTED as to these three Defendants.

### b. Wilson

It is undisputed that Wilson never touched or was involved in any control holds on Plaintiff.  Pl.'s Response Defs.' Statement of Undisputed Facts, ECF No. 57-1 ¶ 64.  As a result, Plaintiff's theory is that Wilson had a duty to intervene to stop the excessive force against Plaintiff since he witnessed the strip search.  Pl.'s Opp'n at 19 (citing Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000)).  However, because there was no predicate constitutional injury, the failure to intervene claim fails.  Accordingly, summary judgment is GRANTED as to Wilson.

### 2. Second Cause of Action against the County

Municipalities cannot be vicariously liable for the conduct of their employees under § 1983, but rather are only "responsible for their own illegal acts."  Connick v. Thompson, 563 U.S. 51, 60 (2011); see Monell v. N.Y. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978) (stating a municipality may only be liable where it individually caused a constitutional violation via "execution of government's policy or custom, whether by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.").  Because there is no underlying constitutional violation, Plaintiff's Monell claim is foreclosed.  Accordingly, Defendants' Motion for Summary Judgment as to this claim is GRANTED.[15]

---

[15] Because the Court finds no constitutional violation, it is also unnecessary to reach the derivative issue of qualified immunity.

### B. Plaintiff's Motion for Summary Judgment

Because the Court finds that Defendants are entitled to summary judgment on both causes of action, Plaintiff's Motion is DENIED as moot.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment, ECF No. 53, is GRANTED whereas Plaintiff's Motion for Summary Judgment, ECF No. 55, is DENIED as moot. The Clerk of Court is directed to enter judgment in favor of Defendants and to close the case.

IT IS SO ORDERED.

Dated: June 16, 2022

_____
MORRISON C. ENGLAND, JR
SENIOR UNITED STATES DISTRICT JUDGE